**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

WABTEC CORPORATION,

Plaintiff,

and

STRATO, INC.,

Plaintiff-Intervenor,

v.

UNITED STATES,

Defendant,

and

COALITION OF FREIGHT COUPLER PRODUCERS,

Defendant-Intervenor.

Court No. 23-00161

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Of Counsel:

BENJAMIN JUVELIER
Attorney
Department of Commerce
Office of Chief Counsel for Trade Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

EMMA E. BOND
Trial Attorney | Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-305-2034 | emma.e.bond@usdoj.gov

*Attorneys for Defendant*

April 5, 2024

**TABLE OF CONTENTS**

**PAGE**

RULE 56.2 STATEMENT .......... 2

I. The Administrative Determination Under Review .......... 2

II. Issues Presented For Review .......... 2

STATEMENT OF FACTS .......... 3

I. The Domestic Industry Petitions For Relief From Alleged Unfair Trade Practices From Imports Of Freight Rail Couplers From China And Mexico .......... 3

II. Commerce Initiates An Investigation Of Certain Freight Rail Couplers From China .......... 5

III. After Receiving The International Trade Commission's Preliminary Affirmative Injury Determination, Commerce Issues A Preliminary Affirmative Determination .......... 5

IV. Commerce Issues A Preliminary Scope Determination .......... 6

V. Commerce Issues The Final Scope Determination And Final Affirmative Determination .......... 7

SUMMARY OF ARGUMENT .......... 8

ARGUMENT .......... 10

I. Standard of Review .......... 10

II. Commerce Lawfully Initiated The Investigation And Declined To Terminate It .......... 11

A. Commerce Correctly Initiated The Investigation, Based On Its Findings That The Petition Satisfied Each Of The Statutory Requirements .......... 11

1. Initiation Of An Investigation Is Governed By Statute .......... 11

2. Commerce Reasonably Determined That The Petition Satisfied Each Statutory Element Required For Initiation .......... 12

B. The Statutory Provisions Governing Changed Circumstances Reviews Do Not Apply To The Initiation Of A New Investigation ........................ 13

1. Section 1675(b)(4) Does Not Apply To Petitions To Initiate A New Investigation ........................................................................ 14

2. Wabtec's Interpretation Of Review Is Unpersuasive.................... 17

3. Even Under Wabtec's Proposed Definition Of Review, Commerce's Initiation Of The Investigation Did Not "Review" The Negative Material Injury Determination In *Freight Rail Couplers I*.......................................................................... 20

C. After Initiation, Commerce Correctly Declined To Terminate The Investigation......................................................................................... 22

1. Wabtec's Inherent Authority Argument Is Unpersuasive Because There Was No Need For Commerce To Reconsider The Sufficiency Of The Petition Based On Section 1675(b)(4) ... 23

2. Wabtec Has Waived Reliance On General Principles Of Finality By Failing To Present Any Coherent Argument On This Point ........................................................................... 24

3. Wabtec Has Not Demonstrated That The Legal Principles In *City Of Tacoma* Are Applicable In This Case ............................. 25

III. Commerce's Scope Determination Is Lawful And Supported By Substantial Evidence................................................................................................... 26

A. Commerce Possesses Authority To Define The Scope Of Antidumping And Countervailing Duty Orders ........................................................... 26

B. Commerce Reasonably Exercised Its Discretion By Deferring To The Scope In The Petition ................................................................... 27

C. Commerce Reasonably Explained That Freight Rail Couplers Are Not Substantially Transformed Into A New Article Of Commerce When Attached To Railcars.....................................................................29

D. Wabtec's Arguments Regarding Substantial Transformation Are Unpersuasive ............................................................................ 31

E. Wabtec Is Incorrect In Arguing That Freight Rail Couplers Become A Different "Class Or Kind" Of Merchandise Once Attached To Railcars ............................................................................ 35

F. Wabtec's Arguments Regarding Third-Country Dumping Are Unpersuasive ..... 38

CONCLUSION ..... 40

**TABLE OF AUTHORTIES**

**CASES** **PAGE(S)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
637 F. Supp. 2d 1166 (2009) ... 6, 28, 29

*Adorers of the Blood of Christ United States Province v. Transcon. Gas Pipe Line Co LLC*,
53 F.4th 56 (3d Cir. 2022) ... 25

*Avesta AB v. United States*,
689 F. Supp. 1173 (Ct. Int'l Trade 1988) ... 16

*Bell Supply Co. v. United States*,
888 F.3d 1222 (Fed. Cir. 2018) ... 32, 33

*Bestfoods v. United States*,
165 F.3d 1371 (Fed. Cir. 1999) ... 29, 32, 37

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R*,
331 U.S. 519 (1947)... 19

*Blaw Knox Const. Equip. Co. v. United States*,
596 F. Supp. 476 (1984) ... 23

*Boomerang Tube LLC v. United States*,
856 F.3d 908 (Fed. Cir. 2017) ... 26

*Cabot Corp. v. United States*,
694 F. Supp. 949 (Ct. Int'l Trade 1988) ... 25

*Canadian Solar, Inc. v. United States*,
918 F.3d 909 (Fed. Cir. 2019) ... 22, 37

*Changzhou Trina Solar Energy Co. v. ITC*,
879 F.3d 1377 (Fed. Cir. 2018)... 40

*Chaparral Steel Co. v. United States*,
901 F.2d 1097 (Fed. Cir. 1990)... 21

*Chemours Co. FC LLC v. United States*,
393 F. Supp. 3d 1186 (Ct. Int'l Trade 2019)... 24

*Citrosuco Paulista, S.A. v. United States*,
704 F. Supp. 1075 (1988) ........................................ 21

*City of Tacoma v. Taxpayers of Tacoma*,
357 U.S. 320 (1958) ........................................ 25

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) ........................................ 11

*Comeau Seafoods Ltd. v. United States*,
724 F. Supp. 1407 (Ct. Int'l Trade 1989) ........................................ 14

*Consol. Edison Co. of N.Y. v. NLRB*,
305 U.S. 197 (1938) ........................................ 10, 34

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ........................................ 11

*Dell Prod. LP v. United States*,
642 F.3d 1055 (Fed. Cir. 2011) ........................................ 38

*Dep't of Revenue of Ore. v. ACF Indus., Inc.*,
510 U.S. 332 (1994) ........................................ 16, 18

*Downhole Pipe & Equip. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ........................................ 34

*Duferco Steel, Inc. v. United States*,
296 F.3d 1087 (Fed. Cir. 2002) ........................................ 26, 27, 37

*Elkem Metals Co. v. United States*,
193 F. Supp. 2d 1314 (2002) ........................................ 23

*George v. McDonough*,
596 U.S. 740 (2022) ........................................ 17

*Gilmore Steel Corp. v. United States*,
585 F. Supp. 670 (1984) ........................................ 23, 24

*Government of Argentina v. United States*,
542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ........................................ 15, 18

*Graham Cnty. Soil and Water Conservation Dist. v. United States*,
559 U.S. 280 (2010) ........................................ 16, 18

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995)........................................................................................ 16, 18

*Home Prods. Int'l, Inc. v. United States*,
633 F.3d 1369 (Fed. Cir. 2011)........................................................................................ 23

*Hosiden Corp. v. Advanced Display Mfrs. of Am.*,
85 F.3d 1561 (Fed. Cir. 1996) ........................................................................................ 21

*Inmax Sdn. Bhd. v. United States*,
277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017) .................................................................. 15

*King Supply Co., LLC v. United States*,
674 F.3d 1343 (Fed. Cir. 2012) ........................................................................................ 27

*King v. Burwell*,
576 U.S. 473 (2015)........................................................................................................ 18

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016)........................................................................................................ 13

*Kokusai Elec. Co. v. United States*,
632 F. Supp. 23 (1986) .................................................................................................... 22

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998).......................................................................................................... 13

*MacLean Power, L.L.C. v. United States*,
359 F. Supp. 3d 1367 (Ct. Int'l Trade 2019) ............................................................ 34, 35, 36

*Matra Americas, LLC v. United States*,
-- F. Supp. 3d --, 2024 WL 575265 (Ct. Int'l Trade Feb. 8, 2024)................................... 28, 32

*Merritt v. Shuttle, Inc.*,
245 F.3d 182 (2d Cir. 2001) .............................................................................................. 25

*Minebea Co. v. United States*,
782 F. Supp. 117 (Ct. Int'l Trade 1992) *aff'd*,
984 F.2d 1178 (Fed. Cir. 1993) ................................................................................... 28, 29

*Mitsubishi Elec. Corp. v. United States*,
700 F. Supp. 538 (1988) .................................................................................................... 27

*Mitsubishi Elecs. Am., Inc. v. United States*,
44 F.3d 973 (Fed. Cir. 1994).............................................................................................. 36

*Mitsubishi Electric Corp. v. United States*,
898 F.2d 1577 (Fed. Cir. 1990)........................................................................ 26, 37

*Mokdad v. Lynch*,
804 F.3d 807 (6th Cir. 2015) ............................................................................... 25

*Mosaic Co. v. United States*,
659 F. Supp. 3d 1285 (Ct. Int’l Trade 2023) ........................................................ 37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*.,
463 U.S. 29 (1983)................................................................................................ 33

*M S Int’l, Inc. v. United States*,
32 F.4th 1145 (Fed. Cir. 2022) ....................................................................... passim

*Ningbo Dafa Chem. Fiber Co. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009) ........................................................................... 11

*NMB Singapore Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) ........................................................................... 33

*Norsk Hydro Canada, Inc. v. United States*,
472 F.3d 1347, 1350 (Fed. Cir. 2006) ................................................................. 18

*NTN Bearing Corp. of America v. United States*,
747 F. Supp. 726 (Ct. Int’l Trade 1990). ....................................................... 27, 28

*PPG Indus., Inc. v. United States*,
712 F. Supp. 195 (Ct. Int’l Trade 1989) *aff’d*,
978 F.2d 1232 (Fed. Cir. 1992)............................................................................ 25

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014)............................................................................ 18

*Rodriguez v. Dep’t of Veterans, Affs*.,
8 F.4th 1290 (Fed. Cir. 2021) .............................................................................. 24

*Royal Business Machs., Inc. v. United States*,
507 F. Supp. 1007(Ct. Int’l Trade 1980), *aff'd*,
669 F.2d 692 (CCPA 1982) .................................................................................. 36

*Simod Am. Corp. v. United States*,
872 F.2d 1572 (Fed. Cir. 1989) ........................................................................... 36

*Sunpreme Inc. v. United States*,
946 F.3d 1300 (Fed. Cir. 2020) ........................................................................... 36

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019) ... 16

*Tokyo Kikai Seisakusho, Ltd. v. United States*,
529 F.3d 1352 (Fed. Cir. 2008) ... 23

*Torrington Co. v. United States*,
790 F. Supp. 1161 (Ct. Int'l Trade 1992) ... 21

*Trendium Pool Prods., Inc. v. United States*,
399 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ... 34, 35

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ... 11

*United States v. Morales*,
807 F.3d 717 (5th Cir. 2015) ... 20

*Univ. of Tex. Southwestern Medical Center v. Nassar*,
570 U.S. 338 (2013) ... 17

*USX Corp. v. United States*,
682 F. Supp. 60 (1988) ... 21

*Wall v. Kholi*,
562 U.S. 545 (2011) ... 18, 20

*Whitman v. American Trucking Assns.,Inc.*,
531 U.S. 457 (2001) ... 19

**STATUTES**

19 U.S.C. § 1322(a) ... 7

19 U.S.C. § 1516a ... 9

19 U.S.C. § 1516a (b)(1)(B)(i) ... 11

19 U.S.C. §§ 1671a, 1673a ... 9

19 U.S.C. § 1671 ... 12, 13, 14

19 U.S.C. § 1671a ... passim

19 U.S.C. § 1671c ... 9

19 U.S.C. § 1671e ........ 26

19 U.S.C. § 1675 ........ passim

19 U.S.C. § 1677(7)(G) ........ 21

19 U.S.C. § 1677(25) ........ 26

19 U.S.C. § 1677a ........ 38

19 U.S.C. § 1677k ........ 38

28 U.S.C. § 1738 ........ 24

28 U.S.C. § 2637(d) ........ 24

**REGULATIONS**

19 C.F.R. § 207.5(c) (1978) ........ 17

19 C.F.R. § 351.204(b)(1) ........ 5

19 C.F.R. § 351.216(d) ........ 16

19 C.F.R. § 351.225 ........ 34

**ADMINISTRATIVE DETERMINATIONS**

*Hydrofluorcarbon Blends and Components Thereof from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*,
81 Fed. Reg. 42,314 (Dep't of Commerce, June 29, 2016) ........ 29

*Silicon Metal From Australia, Brazil, Kazakhstan, and Norway*,
83 Fed. Reg. 16382 (Apr. 16, 2018) ........ 22

*Silicon Metal from the Republic of Kazakhstan: Initiation of Countervailing Duty Investigation*,
85 Fed. Reg. 45,173 (July 27, 2020) ........ 22

*Glass Containers From China*,
85 Fed. Reg. 7065 (Nov. 5, 2020) ........ 22

*Utility Scale Wind Towers from Spain: Antidumping Duty Order*,
86 Fed. Reg. 45,707 (Dep't. of Commerce Aug. 16, 2021) ........ 37

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*,
67 Fed. Reg. 15,539 (Dep't Commerce, Apr. 2, 2002) ........................................................... 14

*Freight Rail Coupler Systems and Components from China, International Trade Commission's Determinations*,
87 Fed. Reg. 41,144 (Int'l Trade Comm. July 11, 2022)..................................................... 3, 22

*Certain Freight Rail Couplers and Parts Thereof from China: Initiation of Countervailing Duty Investigation*,
87 Fed. Reg. 64,440 (Dep't of Commerce, Oct. 25, 2022)....................................................... 4

*Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China (China): Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination* (*Freight Rail Couplers from China*)
88 Fed. Reg. 32,184 (Dep't of Commerce May 19, 2023) .................................................... 1, 2

*Certain Freight Rail Couplers and Parts Thereof from China*,
USITC Pub. 5438 (July 2023) ........................................................................................ 40

*Certain Glass Wine Bottles From Chile, the People's Republic of China, and Mexico: Initiation of Less-Than-Fair- Value Investigations*,
89 Fed. Reg. 4911 (Dep't of Commerce Jan. 25, 2024) ......................................................... 22

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

WABTEC CORPORATION,

Plaintiff,

and

STRATO, INC.,

Plaintiff-Intervenor,

v.

UNITED STATES,

Defendant,

and

COALITION OF FREIGHT COUPLER PRODUCERS,

Defendant-Intervenor.

Court No. 23-00161

**DEFENDANT'S RESPONSE TO PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully responds to the motions for judgment on the administrative record filed by plaintiff, Wabtec Corporation (Wabtec), and plaintiff-intervenor, Strato, Inc. (Strato). Wabtec and Strato challenge the final determination by the Department of Commerce in *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China (China): Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination* (*Freight Rail Couplers from China*), 88 Fed. Reg. 32,184 (Dep't of Commerce May 19, 2023),

Appx12226-12229,[1] and the accompanying Issues and Decision Memorandum (IDM), Appx12211-12222. As explained below, the motions should be denied because Commerce's final determination is lawful and supported by substantial evidence. Accordingly, we respectfully request that the Court deny Wabtec and Strato's motions and enter judgment for the United States.

## RULE 56.2 STATEMENT

### I. The Administrative Determination Under Review

This action challenges Commerce's final determination in a countervailing duty investigation of freight rail couplers from China. *See Freight Rail Couplers from China*, 88 Fed. Reg. 32,184 (May 19, 2023), Appx12226-12229, and accompanying IDM (May 15, 2023), Appx12211-12222. The final determination incorporates by reference the analysis in Commerce's final scope memorandum, which plaintiff and plaintiff-intervenor also challenge. Appx12230-12247. The period of investigation is January 1, 2021, through December 31, 2021. Appx12213.

### II. Issues Presented For Review

1. Whether Commerce lawfully initiated and declined to terminate the investigations on freight rail couplers from China and Mexico, following receipt of a petition that satisfied all statutory requirements.

2. Whether Commerce reasonably exercised its discretion to define the class or kind of merchandise covered by the scope of the investigation by including freight rail couplers whether or not mounted on or joined to a railcar.

---

[1] Appx__ refers to the Bates-numbered pages of the combined joint appendix to this case.

## STATEMENT OF FACTS

### I. The Domestic Industry Petitions For Relief From Alleged Unfair Trade Practices From Imports Of Freight Rail Couplers From China And Mexico

On September 28, 2022, the Coalition of Freight Coupler Producers (petitioner) filed antidumping duty petitions concerning imports of freight rail couplers from China and Mexico, as well as a countervailing duty petition regarding freight rail couplers from China. Appx10465; *see also* Appx1000-10003. The petitions were filed on behalf of the domestic industry producing the domestic like product in the United States, Appx7885-7888, Appx8801-8802, and alleged that the Chinese and Mexican imports of subject merchandise had "materially injured the domestic railcar coupler industry and threaten to cause further injury," Appx7899 (capitalization altered); *see also* Appx7884, Appx7899-7900, Appx7909-7940.

The petitioner acknowledged an earlier investigation regarding imports of freight rail coupler systems and components thereof from China, in which the International Trade Commission (ITC) made a negative injury determination (*Freight Rail Couplers I*). Appx7888-7889 (citing *Freight Rail Coupler Systems and Components from China, International Trade Commission's Determinations*, 87 Fed. Reg. 41,144 (Int'l Trade Comm. July 11, 2022)); Appx1134-1135. In *Freight Rail Couplers I*, Commerce determined that imports from China were subsidized and sold at less-than-fair-value, but the Commission made a negative injury determination.[2] Appx1196-1245 (final report) (Exhibit I-21 to the petition); Appx1206 (citing

[2] In the prior investigation (*Freight Rail Couplers I*), the Commission found that the record did "not show a causal nexus between subject imports and the domestic industry's declining performance during the {period of investigation}," when such performance declined in tandem with imports of subject merchandise. Appx1239. At the same time, the market share of nonsubject imports "increased" from 2019 to 2021, and "Mexico was the leading source of nonsubject imports" during the relevant period. Appx1220-1221.

87 Fed. Reg. 30869 (Dep't of Commerce, May 20, 2022); 87 Fed. Reg. 32,121 (Dep't of

Commerce, May 27, 2022)) (Exhibit I-21 to the petition).

The petitioner explained that the later petition (*Freight Rail Couplers II*) "involve{d} a

modified scope . . . and the addition of Mexico as a subject country." Appx7889; *see also* 19

U.S.C. § 1677(7)(G)(i) (governing cumulation); *id.* § 1677(7)(G)(ii) (listing exceptions). The

*Freight Rail Couplers II* petition alleged injury based on "{t}he *cumulative* effect of Mexican

and Chinese subject imports on the U.S. {freight rail coupler} market and the domestic

industry." Appx7899 (emphasis added). Petitioner alleged that these cumulated imports

materially injured the U.S. domestic industry and threatened to cause further material injury

absent relief. Appx7905-7940.

The petitioner described the scope of the proposed investigation as covering "certain

freight railcar couplers" and "parts thereof," Appx7889, which were "imported from China and

Mexico," Appx7895. As the petition explained, freight rail couplers are generally "used to

connect freight railcars together." Appx7891. The proposed scope of the investigation included

the "two main parts" of freight railcar couplers—"knuckles and coupler bodies"—as well as

"other items," such as "coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and

rotors." Appx7889. The petition proposed that the scope should include freight rail coupler

parts "whether mounted or unmounted, or if jointed with nonsubject merchandise, such as other

nonsubject parts or a completed railcar." Appx7889. However, "{w}hen a subject coupler or

subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the

coupler or subject parts are covered by the scope." Appx7890.

The petition alleged that the Government of China maintains a system of programs and policies that have conferred, and continue to confer, countervailable subsidies to Chinese producers of subject merchandise. Appx1014.

## II. Commerce Initiates An Investigation Of Certain Freight Rail Couplers From China

On October 25, 2022, Commerce published its decision to initiate the antidumping and countervailing duty investigations requested in the petition. Appx8590-8594; Appx10465 (citing, *e.g.*, *Certain Freight Rail Couplers and Parts Thereof from China: Initiation of Countervailing Duty Investigation*, 87 Fed. Reg. 64,440 (Dep't of Commerce, Oct. 25, 2022)).

Commerce explained that the petition satisfied each of the statutory requirements "{i}n accordance with section 702(b)(1) of the Tariff Act of 1930, as amended," codified at 19 U.S.C. § 1671a(b)(1). Appx8591. "Based on the petition and supplemental responses, Commerce found "sufficient information to initiate a {countervailing duty} investigation" with respect to all of the alleged programs in the petition. Appx5893. For each of these alleged programs, Commerce determined that the petition was "supported by information reasonably available to the petitioner." Appx8591. As to material injury, Commerce "assessed the allegations and supporting evidence regarding material injury, threat of material injury, causation, as well as negligibility," and "determined that these allegations are properly supported by adequate evidence." Appx8592. Accordingly, Commerce found that the petitions met the statutory requirements for initiation. Appx8591-8593; *see also* Appx8799-8841 (initiation checklist). The period of investigation was January 1, 2022, through December 31, 2022. Appx10467.

## III. After Receiving The International Trade Commission's Preliminary Affirmative Injury Determination, Commerce Issues A Preliminary Affirmative Determination

In November 2022, the ITC notified Commerce that it had issued a preliminary affirmative determination with respect to injury to the domestic industry. Appx9634. On March

3, 2023, Commerce published its affirmative preliminary determination in the Federal Register. Appx10500-10501. In the preliminary determination, Commerce applied facts available with an adverse inference to respondent producers because they refused to participate in the investigation, resulting in a countervailing duty rate of 265.99%. Appx10500-10501; *see also* Appx10470-10477 (Preliminary Decision Memorandum (PDM)). Commerce assigned the same estimated subsidy rate as the all-others rate for producers or exporters not individually examined. Appx10500-10501; Appx10470-10477.

IV. Commerce Issues A Preliminary Scope Determination

On March 28, 2023, Commerce issued a preliminary scope memorandum addressing comments regarding the scope of the investigation, including comments by Amsted Rail Company, Inc. (Amsted), Wabtec and Strato. Appx11963-11964. Among other issues, the preliminary scope memorandum addressed whether the scope language should include freight rail couplers that are attached to or mounted on railcars. Appx11966-11973. Commerce declined to exclude freight rail couplers attached to freight railcars, and instead determined that "freight rail couplers attached to or mounted on to railcars are the same class or kind" as covered by the investigation. Appx11972. Commerce explained that "couplers are not a permanent part of the railcar," and that couplers "are not substantially transformed into a separate class or kind of merchandise" when attached to a railcar. Appx11972. Further, including such merchandise in the scope of the investigation was consistent with Commerce's "well-established practice . . . to defer to the petitioner with respect to scope language." Appx11972 (citing, *e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1174-75 (2009)). Commerce further preliminarily determined "that the information necessary to administer the scope of these investigations, assuming there is an entry for consumption, is tracked in the ordinary course of

business." Appx11980. Thus, Commerce preliminarily continued to include freight rail couplers, whether or not attached to freight railcars, in the scope of the investigation. *See* Appx11971.

V.    Commerce Issues The Final Scope Determination And Final Affirmative Determination

After considering comments from interested parties, Commerce issued a final scope determination on May 15, 2023, maintaining the same scope adopted in the preliminary scope determination. Appx12230-12249.

On May 19, 2023, Commerce published its final affirmative determination that countervailable subsidies are being provided to producers and exporters of certain freight rail couplers and parts thereof. Appx12226-12229. No interested party submitted comments on the subsidy rates selected in the preliminary determination, and Commerce made no changes to the subsidy rates assigned to the respondents and the non-responsive companies, or to the selection of the all-others rate. Appx12227.

Commerce also rejected Wabtec's argument that the ITC's prior negative injury determination in *Freight Rail Couplers I* prohibited Commerce from initiating the investigation or required termination of the investigation. Appx12224-12225. Wabtec argued that Commerce should apply a statutory provision codified at 19 U.S.C. § 1675(b)(4), to require "good cause" to "review" *Freight Rail Couplers I*. Appx12222-12223 (citing Section 751(b)(4) of the Tariff Act of 1930, as amended, codified at 19 U.S.C. § 1675(b)(4)). According to Wabtec, the petition failed to satisfy the good cause requirement pursuant to section 1675(b)(4). Appx12222-12223 (citing Section 751(b)(4) of the Tariff Act of 1930, as amended, codified at 19 U.S.C. § 1675(b)(4)).

Commerce rejected this argument, explaining that it initiated the investigation because "the petition met the requirements" of the governing statute. Appx12224; *see* 19 U.S.C. § 1671a(b). Commerce explained that the provision cited by Wabtec, codified at 19 U.S.C. § 1675(b)(4), covers "Reviews Based on Changed Circumstances," relating to "the period for Commerce to conduct a changed circumstances review" for a completed investigation. Appx12224. But the current investigation was not a changed circumstances review. Instead, the *Freight Rail Couplers II* proceeding was "a separate investigation" with a different period of investigation and a different mix of merchandise from both China and Mexico—and, thus, not governed by section 1675(b)(4). Appx12224-12225. Further, "once Commerce has initiated an investigation," Commerce discerned no statutory basis to terminate it, unless the petition was withdrawn, which had not occurred in this proceeding. Appx12225; *see also* 19 U.S.C. § 1671c.

Wabtec filed a timely challenge in this Court pursuant to 19 U.S.C. § 1516a, *see* Compl., ECF No. 10, and Strato intervened as a plaintiff-intervenor, Order, ECF No. 28. The Coalition of Freight Rail Producers intervened as a defendant-intervenor. *See* Order, ECF No. 19.[3]

SUMMARY OF ARGUMENT

As an initial matter, Commerce lawfully initiated the investigation and declined to terminate it. Contrary to Wabtec's claims, there is nothing unlawful with initiating a new investigation close in time to a previous one. Instead, the question is whether the petition satisfies the clear statutory requirements governing the initiation of new investigations. *See* 19

[3] Strato submitted a motion incorporating by reference the issues and arguments presented in the motion for judgement on the agency record filed by Wabtec. *See* ECF No. 34. Thus, unless otherwise stated, references to Wabtec's arguments also reflect arguments adopted by Strato.

U.S.C. §§ 1671a, 1673a.  Applying these requirements, Commerce reasonably determined that the petition satisfied the relevant statutory factors.  *See* 19 U.S.C. §§ 1671a, 1673a.

In challenging Commerce's decision to initiate the investigation, Wabtec invokes the statute requiring "good cause" to conduct a changed circumstances review within 24 months of the final determination or suspension agreement under review.  *See* 19 U.S.C. § 1675(b)(4).  As Commerce explained, however, section 1675(b)(4) governs changed circumstances reviews, and does not apply when determining whether to initiate a new investigation.  Further, under any meaning of the term "review," Commerce's initiation of a new investigation did not "review" the ITC's prior negative injury determination in *Freight Rail Couplers I*.  Instead, Commerce initiated a new investigation based on new allegations of material injury, covering a distinct period of investigation and a different mix of merchandise from both China and Mexico.

Having properly initiated the investigation, Commerce correctly declined to terminate it. Contrary to Wabtec's argument, Commerce was not required to reconsider its initiation decision based on section 1675(b)(4) because that provision does not apply when initiating a new investigation.  Further, to the extent Wabtec attempts to rely on non-statutory finality principles, it has waived any such argument and failed to exhaust administrative remedies by failing to adequately develop the argument before Commerce or this Court.

Commerce also acted within its discretion in defining the class or kind of merchandise covered by the investigation to include freight rail couplers whether or not mounted or joined to nonsubject merchandise such as freight railcars.  Commerce possesses ultimate authority to define and clarify the scope of an investigation and is owed great deference in its decision with respect to scope.  Commerce reasonably exercised its discretion by deferring to the petitioner's proposed scope, consistent with prior caselaw and the statutory scheme.

Relatedly, substantial evidence supports Commerce's factual findings that attaching freight rail couplers to railcars does not substantially transform the freight rail couplers into a new article of commerce. As Commerce explained, freight rail couplers are not a permanent component of a railcar. Instead, freight rail couplers are connected to freight railcars only by a key or pin, and are designed to be removed from the railcar and replaced without undergoing physical changes. Although Wabtec raises a series of creative challenges regarding the scope, at bottom, Wabtec simply disagrees that freight rail couplers retain their distinct identity when attached to railcars—a factual finding reviewed under the deferential substantial evidence standard. Because the record supports Commerce's findings, the Court should sustain Commerce's final determination.

## ARGUMENT

### I. Standard Of Review

The Court upholds Commerce determinations that are supported "by substantial evidence on the record" and otherwise "in accordance with law{.}" 19 U.S.C. § 1516a(b)(1)(B)(i). Commerce's factual findings "are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) (citation omitted)). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009). Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). An agency decision may not be overturned "simply because the reviewing court would have reached

a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

## II. Commerce Lawfully Initiated The Investigation And Declined To Terminate It

Commerce's decisions to initiate and decline to terminate the investigation are lawful and supported by substantial evidence.

### A. Commerce Correctly Initiated The Investigation, Based On Its Findings That The Petition Satisfied Each Of The Statutory Requirements

#### 1. Initiation Of An Investigation Is Governed By Statute

Antidumping and countervailing proceedings are creatures of statute. *See* 19 U.S.C. §§ 1671-1677n. The applicable statute provides clear instructions governing initiation of antidumping and countervailing duty proceedings. 19 U.S.C. §§ 1671a, 1673a. As Commerce explained, a countervailing duty investigation "*shall be initiated* whenever an interested party . . . files a petition with {Commerce}, on behalf of an industry," alleging (with requisite support) "the elements necessary" for a countervailing duty imposed pursuant to 19 U.S.C. § 1671. Appx12224 (quoting 702(b) of the Tariff Act of 1930, codified at 19 U.S.C. § 1671a(c)(2)). These necessary elements for a countervailing duty generally include (1) a determination by Commerce that the government of a country is providing "a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United State," and (2) a determination by the ITC that "an industry in the United States" is materially injured or threatened with material injury by reason of the imports. *See* 19 U.S.C. § 1671.

To satisfy the requirements for initiation, a petitioner is not required to definitively prove each required element. Instead, the petition must be accompanied by "information reasonably available to the petitioner supporting [its] allegations" as to each required element. Appx12224

(quoting 702(b) of the Tariff Act of 1930, codified at 19 U.S.C. § 1671a(c)(2)). Further, Commerce need not determine whether dumping or material injury has in fact occurred at the initiation stage. Instead, the question is simply whether, based on the statutory elements, "a formal investigation is warranted" into the matter. 19 U.S.C. § 1671a(a).

Commerce generally has only 20 days after a petition is filed to determine whether the petition is sufficient. *See* 19 U.S.C. § 1671a(c). If Commerce determines that these requirements are satisfied, it "*shall* initiate an investigation to determine whether a countervailable subsidy is being provided with respect to the subject merchandise." 19 U.S.C. § 1671a(c)(2) (emphasis added). By requiring that an investigation "shall" be initiated when necessary elements are satisfied, Congress established a "mandatory" obligation "impervious to judicial discretion." *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)) (explaining that Congress's use of the term "shall" generally connotes a mandatory requirement).

2. Commerce Reasonably Determined That The Petition Satisfied Each Statutory Element Required For Initiation

Commerce reasonably determined that the petition satisfied each of the statutory requirements for initiation. Appx2969-2970, Appx8799-8841; *see also* 19 U.S.C. § 1671a(b)(1); 19 U.S.C. § 1671. First, Commerce found that the petition "established support from domestic producers (or workers) accounting for more than 50 percent of the total production of the domestic like product." Appx8592; 19 U.S.C. § 1671a(c)(4); *see also* Appx8801-8802 (initiation checklist). Second, as to material injury, Commerce "assessed the allegations and supporting evidence regarding material injury, threat of material injury, causation," and "negligibility," and "determined that these allegations are properly supported by adequate evidence, and meet the statutory requirements for initiation." Appx8592 (citation omitted); *see also* Appx8802-8804,

Appx8853-8859 (initiation checklist).[4] Finally, Commerce determined that "there is sufficient information to initiate a {countervailing duty} investigation on all 33 of the alleged programs." Appx8593. "For each program, the petitioner alleged the elements of a subsidy, *i.e.*, financial contribution, benefit, and specificity." Appx8804-8805.

Despite challenging Commerce's initiation of the investigation, Wabtec does not dispute the factual basis for Commerce's determination that initiation of an investigation was warranted based on the petition. *See* 19 U.S.C. § 1671a(a). In sum, based on its assessment on each statutory element, Commerce reasonably determined "that a formal investigation is warranted." 19 U.S.C. § 1671a(a). Based on that determination, Commerce was statutorily mandated to initiate the investigation. 19 U.S.C. § 1671a(a), (b)(1), (c)(2).[5]

B. The Statutory Provisions Governing Changed Circumstances Reviews Do Not Apply To The Initiation Of A New Investigation

None of Wabtec's arguments demonstrate error in Commerce's decision to initiate the investigation. *See* Wabtec Br. at 13-21, ECF Nos. 32, 33. Contrary to Wabtec's claims, there is nothing unlawful with initiating a new investigation close in time to a previous one. Instead, the question is whether the petition satisfies the statutory requirements for initiation. 19 U.S.C.

[4] Ultimately, the ITC, not Commerce, would be required to investigate and make the "final determination with respect to injury, or threat thereof, negligibility, and causation." Appx8859.

[5] "The legislative history of § 1671 {and 1673} makes clear that Congress intended petitions filed 'to result in investigations being initiated unless the authority {was} convinced that the petition and supporting information fail{ed} to state a claim upon which relief {could} be granted under {19 U.S.C. §§ 1671 and 1673},'" or failed to "'provide information supporting the allegations which was reasonably available to him.'" *See Comeau Seafoods Ltd. v. United States*, 724 F. Supp. 1407, 1411 (Ct. Int'l Trade 1989) (quoting S. Rep. No. 249, 96th Cong., 1st Sess. 2, *reprinted in* 1979 U.S.C. Cong. & Admin. News 381, 433)); *see also Notice of Final Determination of Sales at Less Than Fair Value: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15,539 (Dep't Commerce, Apr. 2, 2002), and accompanying IDM at Cmt. 1 (discussing that Commerce "was obligated to initiate an investigation" when "the petition included reasonably available information indicating an investigation was warranted").

§§ 1671, 1671a(a), (b). Again, Wabtec does not argue that the petition fails to satisfy the statutory requirements set forth in 19 U.S.C. § 1671a(a). Instead, Wabtec's primary claim is that Commerce erred by initiating the investigation without any finding of "good cause" pursuant to Section 751(b)(4) of the Tariff Act of 1930, codified at 19 U.S.C. § 1675(b)(4). *See, e.g.*, Wabtec Br. at 2, 16-17. This argument is unpersuasive.

1. Section 1675(b)(4) Does Not Apply To Petitions To Initiate A New Investigation

Section 1675(b)(4) states, in relevant part, that absent good cause shown, Commerce "may not review" a final determination "less than 24 months after the date of publication of notice." 19 U.S.C. § 1675(b)(4). As Commerce explained, however, this provision covers 'Reviews Based on Changed Circumstances,'" Appx12224—a specialized type of proceeding governed by statute. 19 U.S.C. § 1675(b). Changed circumstances reviews ordinarily occur when Commerce receives a request from an interested party for a "review" of "'a final affirmative determination' that 'shows changed circumstances sufficient to warrant a review of such determination.'" *Government of Argentina v. United States*, 542 F. Supp. 3d 1380, 1385 (Ct. Int'l Trade 2021) (quoting 19 U.S.C. § 1675(b)(1)). The good cause provision cited by Wabtec in 19 U.S.C. § 1675(b)(4), in turn, "requires 'good cause' for Commerce *to conduct a changed circumstances review* within 24 months after an investigation." *Inmax Sdn. Bhd. v. United States*, 277 F. Supp. 3d 1367, 1371 (Ct. Int'l Trade 2017) (quoting 19 U.S.C. § 1675(b)(4)) (emphasis added).[6] Therefore, as Commerce explained, "section 751(b) of the

[6] In describing the good cause standard pursuant to section 1675(b)(4), this Court explained that "[i]f a typical changed circumstances review requires changed circumstances, then logic dictates that Commerce's 'higher' standard requires something more than just changed circumstances, or more simply, changed circumstances 'plus.'" *Inmax Sdn. Bhd.*, 277 F. Supp. 3d at 1371.

Act," codified at section 1675(b)(4), "covers 'Reviews Based on Changed Circumstances' and relates to the period for Commerce to conduct a changed circumstances review related to a completed investigation{.}" Appx12224.

Thus, section 1675(b)(4) has no application in this case. As Commerce explained, this investigation "is not a changed circumstances review of the earlier freight rail coupler systems investigation but, rather, a separate investigation initiated based on petitions covering a different {period of investigation} and a different mix of merchandise from both China and Mexico." Appx12224-12225.

Basic canons of statutory interpretation support Commerce's determination that section 1675(b)(4) does not apply when initiating a new investigation pursuant to 19 U.S.C. § 1671a. It is a "'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995) (quoting *Dep't of Revenue of Ore. v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)). Throughout section 1675(b), the term review refers to a "changed circumstances review." For example, subsection (b)(1) provides "general" information governing the availability of changed circumstances reviews to review eligible final affirmative determinations or suspension agreements. 19 U.S.C. § 1675(b)(1). Subsections (b)(2) and (b)(3) likewise provide for ITC review and burdens of persuasion in conducting "a review"—namely, a changed circumstances review. 19 U.S.C. § 1675(b)(2), (3). The reference to "review" in section 1675(b)(4) must be understood in this context.[7]

---

[7] Commerce's regulations implementing section 1675(b) likewise link the term "review" with a changed circumstances review. 19 C.F.R. § 351.216(d). Specifically, if Commerce "decides that changed circumstances sufficient to warrant a *review* exist, the Secretary will conduct a *changed circumstances review* in accordance with § 351.221." 19 C.F.R. § 351.216(d) (emphases added).

"Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Univ. of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 353 (2013) (citation omitted); *see also id.* ("{t}ext may not be divorced from context"); *Graham Cnty. Soil and Water Conservation Dist. v. United States*, 559 U.S. 280, 289–90 (2010)). Subsection (b)(4) is a subparagraph within section 1675(b) and placed after three subparagraphs governing "changed circumstances review." *See* 19 U.S.C. § 1675(b)(4); Appx12224-12225. Accordingly, as with the other subparagraphs in section 1675(b), subsection (b)(4) likewise provides standards for conducting changed circumstances reviews. By contrast, the standards for initiating a new countervailing duty investigation are placed in a different section of the statute entirely. *See* 19 U.S.C. § 1671a.

Finally, "{w}here Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (quoting *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019)) (cleaned up). When interpreting section 1675(b) in prior cases, this Court has considered "the regulatory framework from which § 1675(b)(1) has evolved." *Avesta AB v. United States*, 689 F. Supp. 1173, 1178 (Ct. Int'l Trade 1988). The regulatory precursor to the "good cause" provision in section 1675(b)(4) provided that absent good cause, no changed circumstances investigation shall be made before two years "*since the publication of the finding of dumping* by the Secretary of the Treasury." *Id.* (quoting 19 C.F.R. § 207.5(c) (1978)) (emphasis added). This regulatory history confirms that Commerce correctly determined that the good cause provision in section 1675(b)(4) does not apply when determining whether to initiate a new investigation.

2. <u>Wabtec's Interpretation Of "Review" Is Unpersuasive</u>

Wabtec proposes a different meaning of section 1675(b)(4), arguing that Commerce conducted a "review" within the meaning of subsection (b)(4) because "success on {the petitioner's} claim necessarily entailed nullifying the previous negative determination." Wabtec Br. at 2. According to Wabtec, "in a legal context, 'review' means 'a judicial . . . reexamination of a judgment or claim." Wabtec Br. at 17 (citing *Wall v. Kholi*, 562 U.S. 545, 553 (2011)). Thus, Wabtec claims that section 1675(b)(4) requires good cause to reexamine any prior final determination, including negative determinations. *Id.* at 2, 17.

There is no support for Wabtec's interpretation. Subsection (b)(4) must be read in context with the neighboring subparagraphs in section 1675(b), not, as Wabtec would have it, treating them as "a series of unrelated and isolated provisions." *See Gustafson*, 513 U.S. at 570; *see also Graham Cnty. Soil and Water Conservation Dist.*, 559 U.S. at 289–90. Even if Wabtec's interpretation of "review" could be reasonable if "'viewed in isolation,'" such a reading is "'untenable in light of {the statute} as a whole.'" *King v. Burwell*, 576 U.S. 473, 497–98 (2015) (quoting *Dep't of Revenue of Ore.*, 510 U.S. at 343) (relying on "context and structure" to interpret the statute).

For example, Wabtec's interpretation of "review" is at odds with the many references to "review" in section 1675. Section 1675 is titled "{a}dministrative review of determinations," and governs administrative *reviews*, new shipper *reviews*, five-year *reviews*, and changed circumstances *reviews*. *See generally* 19 U.S.C. § 1675. Each of these references to "review" refers to a type of proceeding with specific statutory rules established in section 1675. For example, antidumping and countervailing duty orders "undergo periodic administrative review pursuant to 19 U.S.C. § 1675(a)." *Government of Argentina*, 542 F. Supp. 3d at 1385. In

administrative reviews, "Commerce must 'review and determine the amount of any net countervailable subsidy,' which is the basis for a {countervailing duty} determination." *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1350 (Fed. Cir. 2006) (citing 19 U.S.C. § 1675(a)(1)(A)). New shipper reviews, in turn, "cover imports made during a period subsequent to the period of review for the initial investigation." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1381 (Fed. Cir. 2014). In conducting such reviews, "Commerce may change its conclusions from one review to the next," and "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Id.* at 1387.

Consistent with the types of reviews listed in section 1675, section 751(b) of the Act (including subparagraph (b)(4)) covers "Reviews Based on Changed Circumstances." Appx12224. If Congress had intended the provision to carry the broader meaning claimed by Wabtec, there would be no reason to hide it in a statute governing reviews of antidumping and countervailing duty orders, 19 U.S.C. § 1675, and, specifically, in a subsection governing changed circumstances reviews, *id.* § 1675(b). Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).

Wabtec's argument that Commerce conducted a "review" within the meaning of 1675(b)(4) by initiating a new investigation also conflicts with the separate statutory provision governing initiation. Congress established clear standards governing initiation of a new investigation in a completely different part of the statute. *Compare* 19 U.S.C. § 1671a (governing initiation of a new countervailing duty investigation) *with* 19 U.S.C. § 1675 (governing changed circumstances reviews and other types of reviews).

Wabtec is correct that titles alone should not override the plain meaning of the text. Wabtec Br. at 17-18 (citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 221-22 (2012); *see also Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528-29 (1947)).  In this case, however, the text, structure, and context of subsection (b)(4) and the surrounding provisions all support the understanding that "review" in section 1675(b)(4) refers to changed circumstances reviews governed by section 1675(b).  Wabtec also claims that the absence of the phrase "under this subsection" in subsection (b)(4) demonstrates that Congress did not intend to limit the provision to changed circumstances review.  Wabtec Br. at 14.  But that is a slender reed on which to lean.  Given the use of "review" throughout section 1675 to refer to specific types of proceedings and the placement of subparagraph (b)(4) in the subsection governing changed circumstances reviews, the absence of the phrase "under this subsection" in subsection (b)(4) does not support the divergent meaning proposed by Wabtec.

Finally, Wabtec argues that "changed circumstances review" in the title of section 1675(b) does not refer *only* to changed circumstances reviews as defined in subsection 1675(b)(1), but instead references some broader subset of review based on changed circumstances.  Wabtec Br. at 17 (citing *Wall*, 562 U.S. at 553; *United States v. Morales*, 807 F.3d 717, 723-24 (5th Cir. 2015)).  As support for this claim, Wabtec relies on one case discussing changed circumstances amounting to "good cause to modify {a} protective order," *United States v. Morales*, 807 F.3d 717, 723–24 (5th Cir. 2015), and another case involving changed circumstances to justify reduction of a criminal sentence under Rhode Island law, *Wall*, 562 U.S. at 554.  These examples are far afield from the specialized proceedings defined in section 1675(b).  *See* 19 U.S.C. § 1675(b)(1).  Wabtec has not supported its argument that

changed circumstances reviews in subsection (b) might refer to *other* changed circumstances or *other* reviews not defined by section 1675(b)(1).

3.    Even Under Wabtec's Proposed Definition Of Review, Commerce's Initiation Of The Investigation Did Not "Review" The Negative Material Injury Determination In *Freight Rail Couplers I*

Wabtec's challenge should be rejected for the additional reason that even under its incorrect interpretation of "review," Commerce's initiation of a new investigation did not reexamine the prior determination in *Freight Rail Couplers I*.  Instead, Commerce explained that it initiated a *new* investigation covering a different period of investigation "and a different mix of merchandise from both China and Mexico."  Appx12224-12225.

Wabtec nonetheless argues that the overlap in "scope and periods of investigations" demonstrates that initiating the second investigation required "nullifying the previous negative determination."  *See* Wabtec Br. at 2.  But this is incorrect.  As a general matter, "{f}indings in related determinations regarding threat or material injury are generally not dispositive on subsequent determinations."  *Torrington Co. v. United States*, 790 F. Supp. 1161, 1169 (Ct. Int'l Trade 1992) (citing *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1094 (1988)).  This aligns with "the remedial purpose of duties which are intended merely to prevent future harm to the domestic industry by reason of unfair imports that are *presently* causing material injury."  *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1103 (Fed. Cir. 1990) (citing S. Rep. No. 249, 96th Cong., 1st Sess. 87, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381, 473)).

Again, unlike the prior proceeding in *Freight Rail Couplers I*, Commerce explained that this proceeding required it to assess whether to initiate new investigations based on "petitions covering a different {period of investigation} and a different mix of merchandise from both

China *and* Mexico." Appx12224-12225 (emphasis added). By statute, petitions from different countries filed on the same day "shall" be cumulated. 19 U.S.C. § 1677(7)(G). Further, "the 'purpose of cumulation is to avoid a negative injury determination when unfairly traded imports from various sources *together* injure an industry.'" *Hosiden Corp. v. Advanced Display Mfrs. of Am.*, 85 F.3d 1561, 1569 (Fed. Cir. 1996) (quoting *USX Corp. v. United States*, 12 Ct. Int'l Trade 205, 219, 682 F. Supp. 60, 73 (1988)) (emphasis added).[8]

Wabtec nonetheless argues that "even with cumulation by the ITC, Commerce and the ITC still conducted distinct investigations of Chinese and Mexican imports and made distinct final determinations for each, issued months apart." Wabtec Br. at 18-19. But the multiple decisions by Commerce and the ITC simply reflect the mechanics of parallel investigations spanning antidumping and countervailing duty investigations covering imports from different countries—as required by statute. *See* 19 U.S.C. §§ 1671, 1671b, 1671d, 1673, 1673b, 1673d. These mechanics do not support Wabtec's claim that Commerce "reexamine{ed}" the ITC's prior negative injury determination by initiating a new investigation. *See* Wabtec Br. at 17.

Finally, Commerce's initiation in this investigation is not unusual. There are other instances where a petitioner brought a new antidumping or countervailing duty petition following negative determinations by Commerce or the ITC. *See e.g., Certain Glass Wine Bottles From Chile, the People's Republic of China, and Mexico: Initiation of Less-Than-Fair- Value Investigations*, 89 Fed. Reg. 4911, (Dep't of Commerce Jan. 25, 2024) (second initiation of a

[8] With respect to the distinct periods of investigation, the negative injury determination in *Freight Rail Couplers I* considered imports of freight rail couplers from China during the period from January 2019 through December 2021, Appx1208, whereas the petition initiating the investigation in *Freight Rail Couplers II* alleged material injury from imports of freight rail couplers from China and Mexico during the period from "2019 through June 2022," Appx7897 (referencing period of 2019 through June 2022).

subset of the prior investigation covering glass containers from China); *see also Glass Containers From China*, 85 Fed. Reg. 70651, (Nov. 5, 2020) (prior ITC negative determination); *Silicon Metal from the Republic of Kazakhstan: Initiation of Countervailing Duty Investigation*, 85 Fed. Reg. 45,173 (July 27, 2020) (second initiation); *see also Silicon Metal From Australia, Brazil, Kazakhstan, and Norway*, 83 Fed. Reg. 16382 (Apr. 16, 2018) (prior ITC negative determination).

C. After Initiation, Commerce Correctly Declined To Terminate The Investigation

Having initiated the investigation, Commerce correctly declined to terminate it. "If the investigation reveals dumping or foreign subsidies that injure the domestic industry, Commerce must issue an order imposing countervailing or antidumping duties." *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 913 (Fed. Cir. 2019). Commerce explained that it does not have authority to terminate an investigation, except in narrow circumstances such as when the petition is withdrawn pursuant to 19 U.S.C. § 1671c(a). *See* Appx12225. Because the petitioner did not withdraw the petition, Commerce lawfully declined to terminate the investigation. Appx12225.

1. Wabtec's Inherent Authority Argument Is Unpersuasive Because There Was No Need For Commerce To Reconsider The Sufficiency Of The Petition Based On Section 1675(b)(4)

Wabtec continues to conflate changed circumstances review with initiation of a new investigation by arguing that Commerce had inherent authority to reconsider initiation once "apprised of the statutory bar" in 19 U.S.C. § 1675(b)(4). Wabtec Br. at 20.

The cases cited by Wabtec stand only for the unremarkable proposition that Commerce possesses inherent authority to reconsider a prior decision. *Id.* at 19-20 (citing, *e.g.*, *Gilmore Steel Corp. v. United States*, 585 F. Supp. 670, 674 (Ct. Int'l Trade 1984); *Kokusai Elec. Co. v. United States*, 632 F. Supp. 23, 28 (Ct. Int'l Trade 1986); *Blaw Knox Const. Equip. Co. v. United*

*States*, 596 F. Supp. 476, 478 (Ct. Int'l Trade 1984); *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008)). It is blackletter law that "{t}he power to reconsider is inherent in the power to decide." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008) (citation omitted). But such authority does not aid Wabtec because section 1675(b)(4) relates only to changed circumstances reviews. *See* Section II.B. Thus, the opportunity to reconsider initiation based on section 1675(b)(4) does not affect the reasonableness of Commerce's initiation decision.

The cases cited by Wabtec are distinguishable. *See* Wabtec Br. at 19-20. In *Gilmore Steel*, for example, the Court sustained Commerce's decision to reconsider initiation when it transpired that the petition was not filed on behalf of the United States industry—one of the petition requirements pursuant to 19 U.S.C. § 1673a(b). *Gilmore Steel*, 585 F. Supp. at 672-675. The Court held that there was no "prohibition against" Commerce reconsidering its initiation decision after the 20-day deadline to "correct a manifest error which taints its proceeding." *Id.* at 674. Unlike the "defect" in *Gilmore Steel*, however, the supposed "defect" alleged here is Commerce's failure to apply 19 U.S.C. § 1675(b)(4) at initiation. But, again, section 1675(b)(4) does not apply when initiating a new investigation. Thus, there was no need for Commerce to "reconsider" its prior decision regarding initiation.[9]

[9] Wabtec also argues that "Commerce can reopen its proceedings to address fraud, despite having no explicit statutory basis for that authority." Wabtec Br. at 20 (citing *Home Prods. Int'l, Inc. v. United States*, 633 F.3d 1369, 1381 (Fed. Cir. 2011); *Chemours Co. FC LLC v. United States*, 393 F. Supp. 3d 1186, 1194 (Ct. Int'l Trade 2019); *Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 1321 (Ct. Int'l Trade 2002)). But it is unclear how this helps Wabtec, which has not alleged fraud.

2. Wabtec Has Waived Reliance On General Principles Of Finality By Failing To Present Any Coherent Argument On This Point

To the extent Wabtec attempts to argue that Commerce was required to terminate the investigation based on non-statutory principles of finality (rather than based on 19 U.S.C. § 1675(b)(4)), it has waived this claim and failed to exhaust administrative resources by failing to develop any coherent argument on this point. *See* Wabtec Br. at 19-21.

"An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived." *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021). Wabtec's vague argument that Commerce possesses "inherent authority in administering the Tariff Act to guarantee the integrity and finality of previous countervailing-duty determinations" Wabtec at 20, fails to articulate any legal entitlement to relief. To the extent Wabtec attempts to invoke any of the non-statutory "doctrines that limit reconsideration of judicial decisions"—such as "*stare decisis*, law of the case, res judicata, [or] collateral estoppel"—it has failed to present coherent argument that any of these doctrines apply. *See Cabot Corp. v. United States*, 694 F. Supp. 949, 954 & n.5 (Ct. Int'l Trade 1988); *PPG Indus., Inc. v. United States*, 712 F. Supp. 195, 199 (Ct. Int'l Trade 1989), *aff'd*, 978 F.2d 1232 (Fed. Cir. 1992) (imposing an "exacting" burden on parties seeking to invoke collateral estoppel in the trade context, in light of the detailed statutory scheme).

Because Wabtec's arguments to Commerce were equally vague, Wabtec has also failed to exhaust administrative remedies with respect to any non-statutory finality argument. By statute, this Court "shall, where appropriate, require the exhaustion of administrative remedies." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting 28 U.S.C. § 2637(d)). Before Commerce, Wabtec failed to raise any non-statutory finality arguments in any developed fashion. *See* Appx12004-12005, Appx12006-12008. Thus, Wabtec has failed to

exhaust administrative remedies with respect to any argument based on general principles of finality. In any event, as demonstrated above, Wabtec fails to identify anything in the statute demonstrating that such concepts of finality apply when initiating a new investigation. *See* Sections II.A&B; 19 U.S.C. § 1671a.

3. Wabtec Has Not Demonstrated That The Legal Principles In *City Of Tacoma* Are Applicable In This Case

Equally perplexing is Wabtec's reliance on *City of Tacoma v. Taxpayers of Tacoma*. Wabtec Br. at 21 (citing *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958)). *City of Tacoma* is the "seminal Supreme Court case discussing the scope of exclusive jurisdiction provisions." *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001) (citations omitted). The statutory provision in *City of Tacoma* was section 313(b) of the Federal Power Act, which vested the court of appeals with exclusive jurisdiction to review orders of the Federal Power Commission. *City of Tacoma*, 357 U.S. at 335. To effectuate such statutory provisions, other tribunals, such as state courts or Federal district courts, may not judicially review relevant agency orders or matters that are "inescapably intertwined" with such orders. *See, e.g.*, *Merritt*, 245 F.3d at 187, 189; *Mokdad v. Lynch*, 804 F.3d 807, 812-813 (6th Cir. 2015); *Adorers of the Blood of Christ United States Province v. Transcon. Gas Pipe Line Co LLC*, 53 F.4th 56, 63 (3d Cir. 2022); *City of Tacoma*, 357 U.S. at 340-341. "{T}he purpose of the doctrine of inescapable intertwinement is to prevent plaintiffs from circumventing specialized review statutes set up by Congress." *Mokdad*, 804 F.3d at 815.

Wabtec has failed to demonstrate that the reasoning in *City of Tacoma* applies in this case. At bottom, *City of Tacoma* and its progeny are statutory interpretation cases, effectuating Congressional direction regarding exclusive jurisdiction provisions. At issue in this case, by contrast, is the statutory provision requiring that Commerce "shall" initiate a countervailing duty

investigation within 20 days after a sufficient petition is filed. 19 U.S.C. § 1671a(a), (c)(2). Wabtec's allusions to cases involving exclusive jurisdiction fail to demonstrate any error in Commerce's application of this clear statutory provision.

III. Commerce's Scope Determination Is Lawful And Supported By Substantial Evidence

The scope of the investigation covered "certain freight railcar couplers . . . and parts thereof," including freight rail couplers "whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar." Appx12228-12229. Additionally, "{w}hen a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope." Appx12229. Commerce reasonably declined to remove from the scope freight rail couplers mounted or joined to railcars. Appx12237-12241. Wabtec's arguments to the contrary are unpersuasive. *See generally* Wabtec Br. at 3-4.

A. Commerce Possesses Authority To Define The Scope Of Antidumping And Countervailing Duty Orders

Following affirmative determinations by Commerce and the ITC in an investigation, Commerce must publish a countervailing duty order with "a description of the subject merchandise, in such detail as the administering authority deems necessary," 19 U.S.C. § 1671e(a)(2), defining "the class or kind of merchandise that is within the scope of an investigation" or "an order." 19 U.S.C. § 1677(25). Commerce possesses significant discretion in making this decision. *Mitsubishi Electric Corp. v. United States*, 898 F.2d 1577, 1582-1583 (Fed. Cir. 1990) (*Mitsubishi II*).

Indeed, Commerce possesses "inherent power to establish the parameters of the investigation." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (citation omitted). Although "petitioners and other interested parties in the investigation may

propose the scope of merchandise to be investigated, Commerce alone defines the scope of the . . . order." *M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed. Cir. 2022) (quoting *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1345 (Fed. Cir. 2012)). Under this framework, the petition filed by a domestic industry "initially determines the scope of the investigation." *Duferco Steel*, 296 F.3d at 1089. Nevertheless, a "petition may be amended at such time, and upon such conditions, as {Commerce} and the {ITC} may permit." 19 U.S.C. § 1671a(b)(1); *Duferco Steel*, 296 F. 3d at 1089.

For example, Commerce "may depart from the scope as proposed by a petition if it determines that petition to be 'overly broad, or insufficiently specific to allow proper investigation, or in any other way defective." *M S Int'l*, 32 F.4th at 1151 (citing *Ad Hoc Shrimp*, 637 F. Supp. 2d at 1175; *NTN Bearing Corp. of Am. v. United States*, 747 F. Supp. 726, 731 (Ct. Int'l Trade 1990)). Commerce may also establish the scope to prevent "the intentional evasion or circumvention" of an order. *Id.* (citing *Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555 (1988); *NTN Bearing*, 747 F. Supp. at 732)).

B. Commerce Reasonably Exercised Its Discretion By Deferring To The Scope In The Petition

In exercising its "inherent power," *Duferco Steel*, 296 F.3d at 1089, Commerce applied its "well-established practice" to "defer to the petitioner with respect to scope language," Appx12237.[10] Commerce reasonably determined that there was no reason to depart from its usual practice to defer to the petitioner's scope in this case. Appx12237-12238. As Commerce

[10] Appx12237 (citing, *e.g.*, *Ad Hoc Shrimp*, 637 F. Supp. 2d at 1174-75; and *Hydrofluorcarbon Blends and Components Thereof from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 Fed. Reg. 42,314 (Dep't of Commerce, June 29, 2016), and accompanying IDM at Comment 2).

explained, "the scope is clearly written to include freight rail couplers attached to railcars that enter the United States for consumption." Appx12243-12244.

Commerce's general practice to defer to the petitioner's intended scope is reasonable and consistent with this Court's case law and the statutory scheme. When Commerce initiates an investigation "upon the petition of an interested party," (as occurred in this case), "'Commerce owes deference to the petitioner's intended scope' of the investigation." *Matra Americas, LLC v. United States*, -- F. Supp. 3d --, 2024 WL 575265, at *5 (Ct. Int'l Trade Feb. 8, 2024) (quoting *M S Int'l*, 32 F.4th at 1151 (citing 19 U.S.C. § 1673a(b)). The petition "initially determines the scope of the investigation," *M S Int'l*, 32 F.4th at 1151, and, if the petition is deemed sufficient, Commerce must ensure "that the proceedings are maintained in a form which corresponds to the petitioner's clearly evinced intent and purpose." *NTN Bearing Corp.*, 747 F. Supp. at 730 (citation omitted).

In one case, for example, this Court held that Commerce failed to properly defer to the petitioners' intent regarding the proposed scope of an investigation by excluding "dusted shrimp" and failing to adequately explain its departure from the language of the petition. *See Ad Hoc Shrimp Trade Action Committee v. United States*, 637 F. Supp. 2d 1166, 1170-73 (Ct. Int'l Trade 2009). In another example, the Court sustained Commerce's determination to include rod ends and rod end bearings within the scope of the investigations, based on "evidence in the petition and in {the petitioner's} additional submissions which support{} their inclusion." *Minebea Co. v. United States*, 782 F. Supp. 117, 121 (Ct. Int'l Trade 1992), *aff'd*, 984 F.2d 1178 (Fed. Cir. 1993). The Court explained that Commerce's "discretion concerning scope clarification at the investigatory stages is extensive," and that the record supported Commerce's determination "that the petitioner intended for rod ends and rod end bearings to be included." *Id.*

As in *Minebea* and *Ad Hoc Shrimp*, the intent of the petition in this investigation was clear.  The petition explicitly stated that the petitioner intended to include freight rail couplers "whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar."  Appx7889 (petition).  The petitioner confirmed this point through submissions to Commerce.  *See, e.g.*, Appx12083, 12087-12094, Appx12125, 12134-12138 (petitioner scope briefs); Appx12232, 12235-12236 (listing petitioner's scope comments).  Thus, Commerce acted within its significant discretion in deferring to the petitioner's intended scope.

   C.    Commerce Reasonably Explained That Freight Rail Couplers Are Not Substantially Transformed Into A New Article Of Commerce When Attached To Railcars

Commerce also rejected the argument that freight rail couplers are substantially transformed into a new article of commerce when attached to railcars.  Appx12238-12240.  The scope language is clear that the investigations did not cover railcars themselves; instead, "{w}hen a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, *only the coupler or subject parts* are covered by the scope."  Appx12229 (emphasis added).  Commerce found "that freight rail couplers are not substantially transformed into a distinct class or kind of merchandise when they are attached to a freight railcar."  Appx12238.

"A substantial transformation occurs where, 'as a result of manufacturing or processing steps,'" the product "'loses its identity and is transformed into a new product having a new name, character and use.'"  Appx12240 (quoting *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)).  In this case, Commerce reasonably found that freight rail couplers do not undergo further processing when attached to a freight rail car, and, thus, did not undergo a substantial

transformation to another class or kind of merchandise. *See* Appx12239-12240. As Commerce explained, "freight rail couplers are not permanently affixed to railcars and *do not undergo further processing or physical changes* when attached to or removed from railcars." Appx12239 (emphasis added). "As a result, freight rail couplers attached to or mounted on railcars are not substantially transformed into a separate class or kind of merchandise from freight rail couplers imported on their own, and, thus, meet the physical description of the merchandise in the scope of these investigations." Appx12239.

Substantial evidence supports Commerce's finding that freight rail couplers are not substantially transformed when attached to a freight railcar. For example, record evidence shows that "freight rail couplers are not directly attached to railcars, but are attached to yokes that are attached to railcars by bolted plates." Appx12238 (citing Appx10061, Appx10683-10686 (Petitioner's Response to CBP Memorandum at 5 and Exhibit 1)). This understanding is "consistent with diagrams" showing "that there are several parts that fit between the end sill of a freight railcar and the freight rail coupler and, therefore, the coupler is not directly attached to the railcar." Appx12238 (citing Appx10571-10578 (Amsted NFI at Attachment 1)). Further, "freight rail couplers are connected to freight railcars only by a key or pin." Appx12238 (citing Appx10571-10578 (Amsted NFI at Attachment 1)). In sum, a freight rail coupler "is attached to an item that is itself not permanently attached to a railcar, and which is only held in place by a pin or a key." Appx12238.

Further, Commerce found that "evidence on the record demonstrates that knuckles and coupler bodies are designed to be removable and replaceable without undergoing physical changes when attached to or removed from railcars." Appx12239; *see also id.* (citing, *e.g.*, Appx10571-10578 (Amsted NFI at Attachment 1)). Even Strato had previously agreed "that

freight rail couplers are removed and replaced when their useful life has ended and added that 'the physical nature of these components is not changed when they are removed from a railcar.'" Appx12239 (citing Appx9302 (Strato's Prior Investigations Scope Response at 18)). In a prior response placed on the record in this proceeding, Strato also "described the assembly of a freight rail coupler to a railcar indicating that a freight rail coupler is not a permanently affixed component" when attached to a railcar. Appx12238 (citing Appx9295-9297 (Strato's Prior Investigations Scope Response at 11-13)).

As further support that freight rail couplers are not a permanent part of the railcar, Commerce explained that "freight rail couplers have a shorter useful life than freight railcars." Appx12239 (citing Appx10061-10062 (Petitioner's Response to CBP Memorandum at 5-6); Appx10571-10578 (Amsted NFI at Attachment 1)). Indeed, record evidence showed that original equipment manufacturers "design freight railcars without any couplers because railcars can often be used with a variety of coupler types, and couplers are replaced periodically." Appx12239 (citing, *e.g.*, Appx10061, Appx10683-10686 (Petitioner's Response to CBP Memorandum at 5 and Exhibit 1)).

Accordingly, Commerce reasonably determined that attaching a freight rail coupler to a railcar with a pin or key is not a "manufacturing process" that results in freight rail couplers being substantially transformed into "a new product having a new name, character and use." *See* Appx12240 (citing *Bestfoods*, 165 F.3d at 1373).

D. Wabtec's Arguments Regarding Substantial Transformation Are Unpersuasive

Wabtec argues that Commerce should have found that freight rail couplers undergo a substantial transformation when they are attached to railcars because, according to Wabtec, "they

are transformed into an integral part of a complete railcar." Wabtec Br. at 42. Wabtec's arguments are unpersuasive.

As an initial matter, Wabtec claims that Commerce erred by failing to cite "the governing five-factor *Bell Supply* test." Wabtec Br. at 42-43 (citing *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018)). *Bell Supply*, like many cases cited by Wabtec, involves a scope ruling, in which Commerce interprets an existing antidumping duty order pursuant to the standards set forth in 19 C.F.R. § 351.225. *Bell Supply*, 888 F.3d at 1228.[11] But Commerce need not apply the same analysis when establishing the scope of an order as when deciding whether a particular product falls within the scope of an existing order. *See M S Int'l*, 32 F.4th at 1152. "Commerce enjoy{s} greater discretion" in the former situation, namely, when establishing the scope before the antidumping or countervailing duty order issues. *Id.* (citation omitted); *see also Matra Americas*, -- F. Supp. 3d --, No. 21-00632, 2024 WL 575265, at *5.

In any event, even under the *Bell Supply* standard, Commerce reasonably explained that no substantial transformation occurred. As explained in *Bell Supply*, "{a} substantial transformation occurs where, 'as a result of *manufacturing or processing steps*, the product loses its identity and is transformed into a new product having a new name, character and use." *Bell Supply*, 888 F.3d at 1228 (quoting *Bestfoods*, 165 F.3d at 1373) (cleaned up and emphasis added). In this case, however, Commerce found that freight rail couplers "*do not undergo further processing or physical changes*" when attached to or removed from railcars. Appx12239

[11] Specifically, *Bell Supply* addresses the factors to determine substantial transformation for country of origin in scope rulings, which are also set forth in Commerce's regulation governing scope rulings. *See* 19 C.F.R. § 351.225(j)(1). Section 351.225(j)(1) provides for consideration of numerous factors "on a case-by-case basis," including "{w}hether the processed downstream product is a different class or kind of merchandise than the upstream product." 19 C.F.R. § 351.225(j)(1).

(emphasis added).  Thus, the merchandise fails the threshold element of the substantial

transformation analysis—because attaching freight rail couplers to railcars does not qualify as

"further processing or physical changes" compared to freight rail couplers imported on their

own.  *See* Appx12238-12239.

Wabtec argues that respondents addressed each *Bell Supply* factor "at length," and that

Commerce did not provide a satisfactory basis for rejecting their arguments.  Wabtec Br. at 43

(citing, *e.g.*, Appx9522–9528, Appx12110 n.4).  But Commerce's "path may reasonably be

discerned."  *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009)

(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

In their arguments to Commerce, respondents focused on the processing, production, intended

end use, and cost of freight railcars compared with freight rail couplers.  *See* Appx9522-9528.

As reflected by Commerce's reasoning, that is not the correct inquiry.  *See* Appx12238-12239.

Instead, the question is whether "freight rail couplers attached to or mounted on railcars" are

"substantially transformed into a separate class or kind of merchandise from freight rail couplers

imported on their own."  *See* Appx12239.  To the extent respondents addressed freight rail

couplers at all, their arguments do not undermine the substantial evidence supporting

Commerce's finding that freight rail couplers themselves do not undergo further processing

when attached to a freight rail car.  *See* Appx9522–9528.

Wabtec next disagrees with Commerce's finding that "couplers are not a permanent part

of the railcar."  Appx12239; *see also* Wabtec Br. at 43-46.  According to Wabtec, "{i}t is

undisputed that {freight rail couplers} are permanently affixed to railcars in the sense that, once

attached, they 'are not removed until they are worn and/or damaged and need to be repaired or

replaced.'"  Wabtec Br. at 43-44 (citing Appx9302; Appx12239).  This argument fails because

"freight rail couplers have a shorter useful life than freight railcars," and "coupler knuckles have a useful life of merely five to seven years." Appx12239 (citing Appx10061-10062 (Petitioner's Response to CBP Memorandum at 5-6); Appx10571-10578 (Amsted NFI at Attachment 1)). This evidence, alongside evidence that freight rail couplers are connected to railcars "only by a key or pin," is sufficient for a reasonable mind to conclude that the freight rail couplers are not a permanent part of the railcar. *See* Appx12238-12239; *Downhole Pipe & Equip. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir. 2015) (defining substantial evidence as evidence that a reasonable mind might accept as adequate to support a conclusion) (citations omitted). Nothing more is required for Commerce's determination to be supported by substantial evidence. *See Downhole Pipe*, 776 F.3d at 1374 (quoting *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)).[12]

Wabtec is also wrong in claiming that Commerce's reasoning conflicts with decisions from this Court. The two cases cited by Wabtec are distinguishable, as both involve scope rulings determining whether a product falls within an existing order—unlike this case, in which Commerce exercised its discretion to *establish* the scope of a forthcoming order. *See* Wabtec Br. at 47 (citing *MacLean Power, LLC v. United States*, 359 F. Supp. 3d 1367, 1373 (Ct. Int'l Trade 2019); *Trendium Pool Prods., Inc. v. United States*, 399 F. Supp. 3d 1335, 1344 (Ct. Int'l Trade 2019)). The Court's order in *MacLean Power* involved an antidumping order on certain helical spring lock washers (HSLWs) from China, which did "not mention HSLWs imported as assembled into other merchandise or as a part of a set or kit containing multiple items."

[12] Wabtec also challenges Commerce's reasoning that freight rail couplers are not altered when removed from a railcar. Wabtec Br. at 46-47 (citing, *e.g.*, Appx12112 n.10; Appx12239). This amounts to mere disagreement with Commerce's factual findings, and does not suffice under the deferential substantial evidence review. *See Downhole Pipe*, 776 F.3d at 1374.

*MacLean Power*, 359 F. Supp. 3d at 1369. And the order in *Trendium Pool Products* covered corrosion resistant steel and did "not cover downstream products." *Trendium Pool Prods.*, 399 F. Supp. 3d at 1346. These cases "do not apply" to Commerce's decision to establish the scope of an investigation—an area in which Commerce enjoys "greater discretion" than in scope rulings. *See M S Int'l*, 32 F.4th at 1152.

E. Wabtec Is Incorrect In Arguing That Freight Rail Couplers Become A Different "Class Or Kind" Of Merchandise Once Attached To Railcars

Wabtec further contends that Commerce asked the wrong question by deciding that a freight rail coupler attached to a railcar is not a separate class or kind of merchandise from a freight rail coupler by itself. Wabtec Br. at 33-34. According to Wabtec, Commerce should have assessed whether a freight rail coupler is a different class or kind of merchandise than a railcar. *Id.* at 33. But railcars are not included in the final scope language. Appx12228-12229. As Commerce explained, "on this point the scope language is clear: "When a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, *only the coupler or subject parts are covered by the scope*." Appx12241 (citing Appx12248-12249) (emphasis from Commerce). Commerce reasonably declined "to compare the finished downstream product," *i.e.*, railcars, to freight rail couplers because "the scope language does not cover" railcars. Appx12238.

Contrary to Wabtec's argument, moreover, Commerce did not "presume{}" that freight rail couplers are separate from the railcar. Wabtec Br. at 35. Instead, Commerce engaged in detailed factual findings that: (1) "freight rail couplers are connected to freight railcars only by a key or pin," (2) "knucklers and coupler bodies are designed to be removable and replicable without undergoing physical changes," and (3) freight rail couplers are "not a permanent

component of a railcar." Appx12238-12239 (citations omitted). As discussed above, these findings are supported by substantial evidence in the record. *See* Section III.C.

Wabtec argues that Commerce must nonetheless consider the railcar itself, based on "a principle of Customs law that imported merchandise is dutiable in its condition as imported." *See, e.g.*, *Simod Am. Corp. v. United States*, 872 F.2d 1572, 1577 (Fed. Cir. 1989); *Dell Prod. LP v. United States*, 642 F.3d 1055, 1058 (Fed. Cir. 2011); *MacLean Power,* 359 F. Supp. 3d at 1371; Wabtec Br. at 35 (citing cases). But Customs rules do not dictate the exercise of Commerce's discretion to fashion the scope antidumping or countervailing duty orders. "Customs has a merely ministerial role" in implementing Commerce's instructions regarding antidumping and countervailing duty proceedings and "cannot 'modify Commerce's determinations, their underlying facts, or their enforcement.'" *Mitsubishi Elecs. Am., Inc. v. United States*, 44 F.3d 973, 977 (Fed. Cir. 1994) (quoting *Royal Business Machs., Inc. v. United States*, 507 F. Supp. 1007, 1014 n. 18 (Ct. Int'l Trade 1980), *aff'd*, 669 F.2d 692 (CCPA 1982)) (cleaned up). Customs may not "impinge upon Commerce's authority to issue and set the scope of duty orders." *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1321 (Fed. Cir. 2020) (citation omitted). It is Commerce, not Customs, that "has discretion to set the scope of {antidumping and countervailing duty} investigations." *See M S Int'l, Inc.*, 32 F.4th at 1148. Thus, it is Commerce's scope language—not Customs rules—that define whether merchandise is subject to the scope. In this case, the scope language plainly does not reach railcars, but only applies to freight rail couplers, whether or not attached to railcars. Appx12228-12229; Appx12241.[13]

[13] Wabtec again relies on *MacLean Power*, Wabtec Br. at 36, 38, a scope ruling that is inapposite to this case involving Commerce's discretion to establish the scope in the first place.

Wabtec nonetheless insists that Commerce has included more than "one class or kind of merchandise" in the scope. Wabtec Br. at 41 (citation omitted). In second-guessing Commerce's authority in this area, Wabtec cites *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1295 (Ct. Int'l Trade 2023), in which the Court raised the question whether Commerce could impose "countervailing duties only upon an ingredient in the imported merchandise, not the merchandise itself that was imported or sold for importation." *See* Wabtec Br. at 41. But the parties in *Mosaic* had not raised the issue and the Court declined to "opine in *dicta* whether such arguments would have merit." *Mosaic Co.*, 659 F. Supp. 3d at 1295.

Having raised the issue in this case, Wabtec has failed to show that the argument has any merit. It is not novel or unique for Commerce to include scope language covering subject merchandise whether or not commingled with non-subject merchandise. Commerce explained that "there is precedent for scopes covering subject merchandise imported together with or commingled with non-subject merchandise." Appx12237 (citing, *e.g.*, *Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 Fed. Reg. 45,707 (Dep't. of Commerce Aug. 16, 2021)). Wabtec's insistence that Commerce must instead consider the imported article—and not the scope language defining subject merchandise—would prevent Commerce from fashioning the scope to "best effectuate the purpose of the antidumping and countervailing duty laws and the violation found." *Canadian Solar*, 918 F.3d at 918 (quoting, *e.g.*, *Mitsubishi II*, 898 F.2d at 1583). Contrary to Wabtec's claims, Commerce possesses "inherent power to establish the parameters of the investigation" and the resulting antidumping or countervailing duty order. *M S Int'l, Inc.*, 32 F.4th at 1151-1152 (citing *Duferco Steel*, 296 F.3d at 1089). Because Commerce reasonably exercised its discretion in this case, its scope decision should be sustained.

F. Wabtec's Arguments Regarding Third-Country Dumping Are Unpersuasive

Finally, Wabtec is also incorrect in arguing that Commerce lacked discretion to define the scope because (according to Wabtec), the petitioner's "theory of injury" addressed alleged third-country dumping that "is not cognizable in these countervailing-duty proceedings." *See* Wabtec Br. at 22-32 (capitalization altered). As an initial matter, this case involves a countervailing duty proceeding, not an antidumping duty proceeding and, thus, the statute governing third-country dumping does not apply. 19 U.S.C. § 1677k. Wabtec's argument should be rejected for this reason alone.

To the extent the Court nonetheless reaches the merits, Wabtec's argument should be rejected because it is based on the incorrect premise that freight rail couplers lose their distinct identity once attached to railcars. Appx12238-12239. The foundation for Wabtec's third-country-dumping argument is that the scope includes freight rail couplers from China that enter the United States attached to railcars from Mexico. Wabtec Br. at 23 (citing Appx7908–7909, Appx8983–8984, Appx9612). Wabtec claims that this is a problem because the scope of a countervailing-duty order "must be limited to circumstances where a domestic industry has been materially injured 'by reason of *imports*' of subject merchandise." Wabtec Br. at 24 (citing, *e.g.*, 19 U.S.C. § 1671(a)(2)). Specifically, Wabtec argues that imports of freight rail couplers attached to railcars are not imports of subject merchandise, and thus, any injury occurs when the freight rail couplers are imported to Mexico—not when the freight rail couplers are imported to the United States when mounted on a freight railcar. *See* Wabtec Br. at 24-25 (citation omitted). According to Wabtec, this factual scenario presents at most "third-country dumping" governed by 19 U.S.C. § 1677k. *Id.* at 25-26 (citing 19 U.S.C. § 1677k).

But, as Commerce explained, this argument is merely another variant of Wabtec's claim that "freight rail couplers lose their distinct identity when mounted or joined to freight railcars"—an argument that Commerce found "unpersuasive."  Appx12241.  Wabtec's proposed framework wrongly assumes that freight rail couplers are no longer subject merchandise once mounted or attached to railcars.  Commerce rejected Wabtec's argument on this point, explaining that freight rail couplers do not lose their distinct identity once mounted to a railcar.  *See* Section III.C; Appx12238-12239.  This decision was a reasonable exercise of Commerce's discretion to establish the scope, reflected appropriate deference to the petitioner's intended scope, and was supported by substantial evidence in the record.  *See* Sections III.A-III.C.

To the extent relevant in this countervailing duty case, Wabtec's argument regarding third-country dumping is also at odds with other portions of the statute governing antidumping duty proceedings.  Appx12240.  Specifically, the antidumping duty statute contemplates that export price covers sales by a producer or exporter of the subject merchandise "before the date of importation" to "an unaffiliated purchaser in the United States" or "an unaffiliated purchaser for exportation to the United States."  Appx12240 (citing Section 772(a) of the Tariff Act of 1930, as amended, codified at 19 U.S.C. § 1677a).[14]  Commerce explained that this definition of export price would apply "{t}o the extent that railcar manufacturers are purchasing freight rail couplers and exporting finished railcars with attached or mounted freight rail couplers."  Appx12240.  In

---

[14]  The relevant provision states:

> The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

19 U.S.C. § 1677a(a).

such a scenario, "the dumping law authorizes Commerce to examine such sales if they enter the United States for consumption" because the railcar manufacturers "are the parties exporting . . . the freight rail couplers to the United States."  Appx12240.

To the extent Wabtec raises any other arguments regarding material injury, this case is not the correct venue to raise such arguments.  It is the ITC, not Commerce, that determines whether the domestic industry has suffered the requisite material injury.  Appx12241.  Thus, it is no surprise that one of the few authorities cited by Wabtec regarding material injury is a case challenging the *ITC's* determination.  Wabtec Br. at 24 (citing *Changzhou Trina Solar Energy Co. v. ITC*, 879 F.3d 1377, 1382 (Fed. Cir. 2018)).  As Commerce explained in the final scope memorandum, "{t}he ITC will make its final injury determination with regard to imports of subject freight rail couplers following the completion of Commerce's investigations, if affirmative."  Appx12241; *see also Certain Freight Rail Couplers and Parts Thereof from China*, USITC Pub. 5438 (July 2023) at 4.  To the extent Wabtec contests the ITC's finding of material injury, it may seek to pursue such theories in the separate litigation challenging the ITC's determination.  *See Strato Inc. v. United States*, CIT No. 23-158 (filed Aug. 14, 2023); *Wabtec Corp. v. United States*, CIT No. 23-157 (filed Aug. 14, 2023).  Such arguments do not demonstrate error in Commerce's scope decision.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Wabtec's and Strato's motions for judgment upon the agency record, sustain Commerce's final determination in all respects, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Emma E. Bond
EMMA E. BOND
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480
Washington, DC 20044
(202) 305-2034
Email: emma.e.bond@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

BENJAMIN JUVELIER
Attorney
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

April 5, 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 11,784 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Emma E. Bond

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

WABTEC CORPORATION,

Plaintiff,

and

STRATO, INC.,

Plaintiff-Intervenor,

v.

UNITED STATES,

Defendant,

and

COALITION OF FREIGHT COUPLER PRODUCERS,

Defendant-Intervenor.

Court No. 23-00161

**ORDER**

Upon consideration of the motions for judgment upon the agency record filed by plaintiff and plaintiff-intervenors, all responses thereto, the administrative record, and other pertinent papers, it is hereby

ORDERED that the motions are DENIED; and it is further

ORDERED that the Department of Commerce's final determination in this matter is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: ____________________, 2024
New York, NY

________________________________
JUDGE