**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |
|---|
| WABTEC CORPORATION, |
|                    **Plaintiff,** |
|    **and,** |
| STRATO, INC., |
|                    **Plaintiff-Intervenor** |
|    **v.** |
| UNITED STATES, |
|                    **Defendant,** |
|    **and,** |
| COALITION OF FREIGHT COUPLER PRODUCERS, |
|                    **Defendant-Intervenor.** |

Before:  Hon. Stephen Alexander Vaden, Judge

Court No. 23-00161

<u>**RESPONSE TO MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

        **Daniel B. Pickard, Esq.**
        **Amanda L. Wetzel, Esq.**
        **Claire M. Webster, Esq.**

        **Buchanan Ingersoll & Rooney PC**
        **1700 K Street, NW, Suite 300**
        **Washington, DC 20006**
        **(202) 452-7000**

        *Counsel to Coalition of Freight*
        *Coupler Producers*

**Dated:  April 19, 2024**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   RULE 56.2 STATEMENT ................................................................................... 1

  A.  Administrative Decision Under Review ........................................................... 1

  B.  Issues Presented and Summary of Argument .................................................. 1

    1.  Did Commerce Unlawfully Initiate a Countervailing Duty Investigation, Which Is Alleged to Have Been a Changed Circumstances Review Pursuant to Section 751(b)(4) of the Tariff Act of a Previous Negative Commission Determination in a Separate Case? ....... 1

    2.  Did Commerce Unlawfully Include FRCs Attached to Railcars, Which Were Explicitly Included in the Scope Definition, in the Scope of the Final Determination? ........................ 3

III.  STATEMENT OF FACTS……………………………………….…………………………4

IV.  STANDARD OF REVIEW……………………………………………………………5

V.    ARGUMENT………………………………………………………………...…………...6

  A.  Commerce's Determination to Initiate the Underlying Investigation Was Supported by Substantial Evidence and In Accordance with the Law ............................................................. 6

    1.  Commerce Properly Relied on the Sufficiency of the Petition to Initiate the Underlying Investigation, and Section 751(b)(4) Does Not Apply to Original Investigations ................. 6

    2.  Commerce's Decision Not to Terminate the Investigation Was Supported by Substantial Evidence and In Accordance with the Law .......................................................... 16

  B.  Commerce's Scope Determination Was Supported by Substantial Evidence and in Accordance with the Law ........................................................... 19

    1.  Arguments Regarding Cognizable Injury Are for the Commission, Not Commerce, to Decide ............................................................................................ 19

    2.  Commerce's Determination That FRCs Joined to Railcars Were Not a Different Class or Kind of Merchandise Was Supported by Substantial Evidence and in Accordance with the Law........................................................................ 24

  C.  Commerce's Decision that FRCs Maintained Their Identity as a Distinct Article of Commerce Was Supported by Substantial Evidence and in Accordance with the Law………26

1. Commerce Noted That There is Precedent for Scopes That Cover Subject Merchandise Imported with or Commingled with Non-Subject Merchandise……..…………………….28

2. FRCs Are Not Permanently Affixed, Nor Do They Undergo Further Processing……………………………………………………………………………..29

3. Plaintiffs' Reliance on Inapposite Case Law and Greek Mythology Is Not Persuasive……………………………………………………………………………33

4. Conclusion………………………………………………………………………35

VI.    CONCLUSION…………………………………………………………………....36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
637 F. Supp. 2d 1166 (Fed. Cir. 2009) ...................................................26

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
802 F.3d 1339 (Fed. Cir. 2015)............................................................20

*Auer v. Robbins*,
519 U.S. 452 (1997).........................................................................10

*Bell Supply Co. v. United States*,
888 F.3d 1222 (Fed. Cir. 2018)............................................................27

*Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*,
467 U.S. 837 (1984).........................................................................10

*Comeau Seafoods Ltd. v. United States*,
13 CIT 923, 724 F. Supp. 1407 (1989)...................................................18

*Consol. Fibers, Inc. v. United States*,
32 CIT 24, 52 F. Supp. 2d 1345 (2008) ....................................................6

*Cyber Power Sys. (USA) Inc. v. United States*,
560 F. Supp. 3d 13s47 (CIT 2022) ...................................................27, 33

*Duferco Steel, Inc. v. United States*,
296 F.3d 1087 (Fed. Cir. 2002)............................................................21

*FAA v. Cooper*,
566 U.S. 284 (2012).........................................................................15

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)....................................................................27, 28

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996)...............................................................5

*George v. McDonough*,
596 U.S. 740 (2022)....................................................................2, 14

*Gilmore Steel Corp. v. United States*,
7 CIT 219, 585 F. Supp. 670 (1984) .................................................17, 18

*Global Commodity Group LLC v. United States*,
709 F.3d 1134 (Fed. Cir. 2013) ............................................................................23

*Home Prods. Int'l Inc. v. United States*,
633 F.3d 1369 (Fed. Cir. 2011) ............................................................................18

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992) ...............................................................................................6

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
38 CIT 1632, 28 F. Supp. 3d 1317 (2014) ..........................................................5, 6

*Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*,
10 CIT 424, 640 F. Supp. 255 (1986) ..................................................................18

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .............................................................................................32

*MacLean Power, LLC v. United States*,
359 F. Supp. 3d 1367 (CIT 2019) ........................................................................34

*Mittal Steel Galati S.A. v. United States*,
31 CIT 1121, 502 F. Supp. 2d 1295 (2007) .........................................................32

*Mittal Steel Point Lisas Ltd. v. United States*,
542 F.3d 867 (Fed. Cir. 2008) .............................................................................33

*National Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) .............................................................................................14

*NSK Ltd. v. United States*,
115 F.3d 965 (Fed. Cir. 1997) .............................................................................20

*NTN Bearing Corp. of America v. United States*,
14 CIT 623, 747 F. Supp. 726 (1990) ..................................................................26

*Nucor Corp. v. United States*,
414 F.3d 1331 (Fed. Cir. 2005) ...........................................................................20

*Nucor Corp. v. United States*,
601 F.3d 1291 (Fed. Cir. 2010) ...........................................................................20

*Pokarna Engineered Stone Ltd. v. United States*,
56 F.4th 1345 (Fed. Cir. 2023) ...........................................................................10

*Rollerblade, Inc. v. United States*,
112 F.3d 481 (Fed. Cir. 1997) .............................................................................35

iv

*Royal Thai Gov't v. United States,*
   978 F. Supp. 2d 1330 (CIT 2014) ..................................................................33

*RZBC Group Shareholding Co., Ltd. v. United States,*
   100 F. Supp. 3d 1288 (CIT 2015) ..................................................................21

*Shenyang Yuanda Aluminum Indus. Eng'g Co., Ltd. v. United States,*
   776 F.3d 1351 (Fed. Cir. 2015) ....................................................................29

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) .................................................................................32, 33

*SKF USA Inc. v. United States,*
   254 F.3d 1022 (Fed. Cir. 2001) ....................................................................20

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
   966 F.2d 660 (Fed. Cir. 1992) ..................................................................20, 21

*Swiff-Train Co. v. United States,*
   37 CIT 394, 904 F. Supp. 2d 1336 (2013) .....................................................20

*Torrington Co. v. United States,*
   14 CIT 507, 745 F. Supp. 718 (1990) ............................................................25

*Torrington Co. v. United States,*
   938 F.2d 1276 (Fed. Cir. 1991) ....................................................................25

*U.S. Steel Group v. United States,*
   96 F.3d 1352 (Fed. Cir. 1996) ......................................................................20

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
   484 U.S. 365 (1988) .....................................................................................13

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951) .......................................................................................5

*Usinor v. United States,*
   28 CIT 1107, 342 F. Supp. 2d 1267 (2004) ................................................5, 26

*Vicentin S.A.I.C. v. United States,*
   42 F.4th 1372 (Fed. Cir. 2022) .....................................................................21

*Walgreen Co. of Deerfield, IL v. United States,*
   620 F.3d 1350 (Fed. Cir. 2010) ....................................................................29

**Statutes**

19 U.S.C. § 1516a .............................................................................................15

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................5

19 U.S.C. § 1671..................................................................................21, 23

19 U.S.C. § 1671(a)(1)..............................................................................25

19 U.S.C. § 1671(a)(2)..........................................................................19, 20

19 U.S.C. § 1671a(a)................................................................................16

19 U.S.C. § 1671a(b)(1)...........................................................................9, 21

19 U.S.C. § 1671a(c)(1)...........................................................................9, 21

19 U.S.C. § 1671c(a)(1)(A).....................................................................2, 16, 17

19 U.S.C. § 1675......................................................................................15

19 U.S.C. § 1675(b)...............................................................................6, 13

19 U.S.C. § 1675(b)(1)(A)–(B)....................................................................11

19 U.S.C. § 1675(b)(2)..............................................................................12

19 U.S.C. § 1675(b)(4).............................................................................6, 9

19 U.S.C. § 1677k(b)................................................................................23

## Regulations

19 C.F.R. § 207.45..................................................................................13

19 C.F.R. § 351.202(b)(10)......................................................................9, 21

19 C.F.R. § 351.203.................................................................................9, 21

19 C.F.R. § 351.216..................................................................................13

## Administrative Determinations

*Certain Chassis and Subassemblies Thereof from the People's Republic of China:*
   *Countervailing Duty Order and Amended Final Affirmative Countervailing*
   *Duty Order*, 86 Fed. Reg. 24,844 (May 10, 2021)...................................................28

*Certain Crystalline Silicon Photovoltaic Products from Taiwan: Notice of*
   *Preliminary Results of Antidumping Duty Changed Circumstances Review*, 84
   Fed. Reg. 26,816 (Dep't Commerce June 10, 2019) ..........................................11, 12

*Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part*, 88 Fed. Reg. 32,184 (May 19, 2023)..................................................................................................1

*Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 87 Fed. Reg. 64,440 (Oct. 25, 2022) ...........................................................................................................4

*Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592, USITC Pub. 5438 (July 2023) (Final) ...........................8, 22

*Certain Freight Rail Couplers and Parts Thereof from Mexico*, Inv. No. 731-TA-1593, USITC Pub. 5470 (Nov. 2023) (Final) ...............................8

*Certain Helical Spring Lock Washers from the People's Republic of China and Taiwan: Continuation of Antidumping Duty Orders*, 82 Fed. Reg. 24,301 (May 26, 2017)..........................................................................................................34

*Certain Pasta from Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 82 Fed. Reg. 26,777 (Dep't Commerce June 9, 2017) .....................12

*Certain Quartz Surface Products from India and the Republic of Turkey: Countervailing Duty Orders*, 85 Fed. Reg. 37,431 (June 22, 2020)........................................28

*Certain Softwood Lumber Products from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) at cmt. 15 .......................................................................25

*Certain Vertical Shaft Engines Between 225cc and 999cc, and Parts Thereof from the People's Republic of China: Countervailing Duty Order and Amended Final Affirmative Countervailing Duty Order*, 86 Fed. Reg. 12,619 (Mar. 4, 2021) ..................................................................................................................28

*Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China and the Socialist Republic of Vietnam: Antidumping Duty Order*, 86 Fed. Reg. 36,703 (July 13, 2021)...................................................................28

*Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 86 Fed. Reg. 58,878 (Oct. 25, 2021).....................................................................4, 7

*Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570, USITC Pub. 5331 (July 2022) (Final)...............................8, 9

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021) ...............................................................23, 24, 28

*Notice of Product Exclusions and Amendments: China's Acts, Policies, and Practice Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 52,567 (Oct. 2, 2019) ................................................34, 35

*Polyester Textured Yarn from China and India*, Inv. Nos. 701-TA-612-613 and 731-TA-1429-1430, USITC Pub. 5007 (Jan. 2020) (Final) ....................................11

*Polyester Textured Yarn from India and the People's Republic of China: Amended Final Antidumping Duty Determination for India and Antidumping Duty Orders*, 85 Fed. Reg. 1,298 (Jan. 10, 2020) .............................................10, 11

*Polyester Textured Yarn from India and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations*, 83 Fed. Reg. 58,223 (Nov. 19, 2018) ...........................................................................................................10

*Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 74,680 (Nov. 23, 2020)...........................................................................11

*Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 Fed. Reg. 45,707 (Dep't Commerce Aug. 16, 2021) .......................................................23, 28

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22, 216 (Apr. 21, 2020) .........................................................................................................28, 29

## Constitutional Provisions

U.S. Const. art. III, § 2, cl. 1 ...........................................................................................32

## Other Authorities

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> (2012)................................................................................................13, 14, 15

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)...................................................................................................14

## I.    **INTRODUCTION**

On behalf of Defendant-Intervenor, the Coalition of Freight Coupler Producers, we hereby submit the following response to the January 22, 2024, and February 5, 2024, briefs in support of the motion for judgment on the agency record filed by plaintiff Wabtec Corporation and plaintiff-intervenor Strato Inc., respectively (collectively, Plaintiffs). Pl.'s Br. in Supp. of Pls.' Mot. For J. on the Agency R. (Jan. 22, 2024), ECF No. 33 (Pls. Br.); Pl.-Intervenor's Br. in Supp. of Pls.' Mot. For J. on the Agency R. (Feb. 5, 2024), ECF No. 34. For the reasons discussed in this brief, in conjunction with those presented by Defendant United States, Defendant-Intervenor respectfully requests that this court reject the arguments raised by Plaintiff and Plaintiff-Intervenor and affirm the Final Determination of the U.S. Department of Commerce (Commerce) in its countervailing duty (CVD) investigation on *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China*.

## II.    **RULE 56.2 STATEMENT**

### A.    **Administrative Decision Under Review**

The administrative determination challenged in this appeal is Commerce's Final Determination in the CVD investigation into *FRCs from China*. *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part*, 88 Fed. Reg. 32,184 (May 19, 2023) (Final Determination), Appx12226, and the accompanying Issues and Decision Memorandum, Appx12211.

### B.    **Issues Presented and Summary of Argument**

    **1.    Did Commerce Unlawfully Initiate a Countervailing Duty Investigation, Which Is Alleged to Have Been a Changed Circumstances Review Pursuant to Section 751(b)(4) of the Tariff Act of a Previous Negative Commission Determination in a Separate Case?**

1

No.  Commerce lawfully initiated the underlying countervailing duty investigation, which was properly pled and initiated as a countervailing duty investigation and not a changed circumstances review.  Section 751(b)(4) of the Tariff Act does not apply to original investigations. Defendant-Intervenor, the Petitioner in the underlying action, filed a petition alleging that dumped and subsidized FRCs from China and dumped FRCs from Mexico were causing injury to the domestic FRC industry.  Appx7884.  Commerce initiated an investigation upon finding that the petition included all necessary information.  Appx8590-8594.  Plaintiffs' claims that Petitioner was required to show "good cause" to bring a new countervailing duty investigation on FRCs separate from a prior countervailing duty investigation on coupler systems are not borne out by the law.  The underlying petition did not seek "review" of the International Trade Commission's (the Commission) negative determination in its investigation on coupler systems.

Section 751(b)(4) of the Tariff Act applies only to changed circumstances reviews, which are a specific type of administrative proceeding that occur before Commerce or the Commission. Both agencies treat the term "changed circumstances review" as a term of art, as evidenced by their implementing regulations and caselaw.  When Congress employs a term of art obviously transplanted from another legal source, it "brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746-47 (2022).

Commerce's determination not to terminate the investigation was supported by substantial evidence and was in accordance with the law.  Commerce only has the statutory authority to terminate an investigation upon withdrawal of a petition, which did not occur here.  19 U.S.C. § 1671c(a)(1)(A).  Plaintiffs claim that, if Commerce did not have the authority to terminate the investigation once initiated, it would be required to continue the investigation with the knowledge that there was an alleged "defect" in the proceedings.  Here, though, there was no "defect," as there

was no bar on filing the underlying petition, and the petition included all information necessary to initiate the investigation.

> **2.      Did Commerce Unlawfully Include FRCs Attached to Railcars, Which Were Explicitly Included in the Scope Definition, in the Scope of the Final Determination?**

No.  Commerce's determination to include FRCs attached or "mounted" to railcars in the scope of the orders was supported by substantial evidence and in accordance with the law. Plaintiffs put forward three basic theories of error in regard to Commerce's scope determination, namely, (1) that the scope could not be supported by a "cognizable theory of injury;" (2) Commerce departed from its legal obligation that a countervailing investigation can only cover one class or kind of merchandise; and (3) Commerce's decision that FRCs maintained their identity as distinct articles of commerce was not supported by substantial evidence.

It is for the Commission, not Commerce, to determine whether imports covered by the scope result in material injury.  Contrary to Plaintiffs' assertions, Commerce and the Commission have separate statutory authorities: Commerce determines whether merchandise has been subsidized for sale in the United States, and the Commission determines whether a domestic industry is injured as a result of subject imports.  Importantly, the Commission did in fact make a final determination of injury confirming that the petition properly alleged injury to the domestic industry.

Additionally, as a matter of law, a countervailing duty investigation may cover more than one class or kind of merchandise.  However, Commerce's determination that mounted and unmounted FRCs were the same class or kind of merchandise was supported by substantial evidence and in accordance with the law.  Commerce cited to significant record evidence in the underlying investigation that FRCs are not substantially transformed when mounted to a railcar and, indeed, are not directly mounted to a railcar at all.

III.    **STATEMENT OF FACTS**

To err on the side of clarity, and for the Court's benefit, Defendant-Intervenor provides the following additional facts that may be relevant to the Court in this case. *See* CIT R. 81(k).

The antidumping and countervailing duty petitions on Freight Rail Coupler Systems (coupler systems) from China were filed on September 29, 2021. *Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation*, 86 Fed. Reg. 58,878 (Oct. 25, 2021). Commerce initiated its countervailing duty investigation into coupler systems from China on October 19, 2021. *Id.* The period of Commerce's investigation was January 1, 2020, through December 31, 2020. *Id.* at 58,879. That investigation covered freight rail coupler systems and certain components thereof, including knuckles, coupler bodies, *coupler yokes*, and *follower blocks*. *Id.* at 58,882 (emphasis added).

The antidumping and countervailing duty petitions on Certain Freight Rail Couplers and Parts Thereof (freight rail couplers or FRCs) from China and the antidumping duty petition on FRCs from Mexico were filed on September 28, 2022. *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 87 Fed. Reg. 64,440 (Oct. 25, 2022). Commerce initiated its countervailing duty investigation into FRCs from China on October 18, 2022. *Id.* at 64,441. The period of Commerce's investigation was January 1, 2021, through December 31, 2021. *Id.* That investigation covered certain freight railcar couplers, including knuckles and coupler bodies. *Id.* at 64,444. To avoid any uncertainty, while the previous case covered coupler systems, as well as subcomponents including yokes and follower blocks, the current investigation before this court did not include coupler systems, nor did it include yokes or follower blocks. Accordingly, to be more precise in the description of the

different cases, this brief will refer to the previous case as "Coupler Systems," while the underlying investigation in this matter will be referred to as "FRCs."

Moreover, as the original countervailing investigation on coupler systems had a period of investigation (POI) of January 1, 2020, through December 31, 2020, and the current matter had a POI of January 1, 2021, through December 31, 2021, in effect there was no overlapping period of the distinct POIs before Commerce.

Lastly, and as further discussed below, both the petition filed with the Department of Commerce and the final scope decision included the following language:  "Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, *whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar*."  Appx7889; *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135, 45,137 (July 14, 2023) (emphasis added).

## IV.    <u>STANDARD OF REVIEW</u>

The court reviews Commerce's decisions to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "more than a mere scintilla . . . {it is} such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

A plaintiff cannot ask the court to re-weigh the evidence on record.  *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004).  Factual findings by Commerce are afforded considerable deference.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).  The court

reviews the agency's conduct under the abuse of discretion standard. *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT 1632, 1634-35, 28 F. Supp. 3d 1317, 1323 (2014); *Consol. Fibers, Inc. v. United States*, 32 CIT 24, 35-36, 52 F. Supp. 2d 1345, 1352-54 (2008).

## V.    ARGUMENT

### A.    Commerce's Determination to Initiate the Underlying Investigation Was Supported by Substantial Evidence and In Accordance with the Law

#### 1.    Commerce Properly Relied on the Sufficiency of the Petition to Initiate the Underlying Investigation, and Section 751(b)(4) Does Not Apply to Original Investigations

Plaintiffs would have this Court believe that Defendant-Intervenor's petition in the underlying investigation was actually a request for a changed circumstances review of the Commission's negative injury determination in the case involving freight coupler systems from China. *See* Pls. Br. at 14-16. They claim that, as a result, Section 751(b)(4) of the Tariff Act of 1930, codified at 19 U.S.C. § 1675(b)(4), acted to prohibit Commerce from initiating the underlying investigation. Pls. Br. at 14-16. In other words, Plaintiffs allege before this Court and alleged before the agency that the Petition filed by the domestic industry was not for a new countervailing duty investigation but was rather an "attempt to nullify the results" of the Commission's earlier decision. *See* Appx12222-12223. Indeed, Plaintiff states that the "petition sought 'review' of that determination, since the success on its claim necessarily entailed nullifying the previous negative determination." Pls. Br. at 2.

Plaintiffs contend that 19 U.S.C. § 1675(b) requires Commerce to find "good cause" before seeking "review" of any final determination by Commerce or the Commission, if less than 24 months have elapsed. Pls. Br. at 14. The heading of this statute is titled: "Reviews based on changed circumstances." 19 U.S.C. § 1675(b). Plaintiffs nonetheless note that the language of paragraph (4) is not limited to reviews "under this subsection" and contend that it applies to "all

final determinations, whether affirmative or negative." Pls. Br. at 14-15. Plaintiffs' interpretation of the governing statutes is incorrect.

    a.    The Domestic Industry Filed a Properly Supported Petition for a
          New Countervailing Duty Investigation of FRCs from China

As an initial matter, Defendant-Intervenor's petitions seeking relief from dumped and subsidized imports of FRCs from China and Mexico were neither an administrative nor a judicial review of a prior antidumping or countervailing duty order, but instead were separate, new petitions, properly filed under 19 U.S.C. §§ 1671a(b) and 1673a(b). *See* Appx7884. Commerce's decision to initiate these investigations was supported by substantial evidence and in accordance with the law.

The underlying Department of Commerce investigation on FRCs had a different POI and covered distinct products from Commerce's investigation on coupler systems. Commerce's investigation on FRCs from China covered a POI of January 1, 2021, through December 31, 2021. Appx8591. This investigation covered FRCs, which were defined as certain freight railcar couplers and parts thereof. According to the scope as initiated, and unchanged in Commerce's final scope determination, "{FRCs} are composed of two main parts: knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors)." Appx8594, Appx12248. In contrast, Commerce's investigation on coupler systems covered a POI of January 1, 2020, through December 31, 2020. *Freight Rail Coupler Systems and Certain Components Thereof from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 86 Fed. Reg. 58,878, 58,879 (Oct. 25, 2021). The scope as initiated in the coupler systems investigation covered coupler systems, which are composed of, "at minimum, four main components (knuckles, coupler bodies, coupler yokes, and follower blocks . . .) but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle

7

throwers, and rotors)." *Id.* at 58,882.  Accordingly, the FRCs investigation and the coupler systems investigation covered different POIs and different products.

Plaintiffs challenge a Department of Commerce determination that they allege is a review of a Commission determination.  For purposes of clarity, Plaintiffs, in appealing Commerce's determination, do not appear to allege that it is an improper review of Commerce's previous decision.  Nor could they do so, as Defendant-Intervenor prevailed at the Department of Commerce in the coupler systems investigation.

To the extent that Plaintiffs conflate the International Trade Commission investigation with Commerce's investigation, which is under judicial review here, the Commission's investigation into FRCs was also materially different from its investigation into coupler systems.  The two investigations at the Commission also had distinct products, a different period of investigation, and, importantly, different subject countries.  The Commission's investigation into FRCs was coextensive with the scope of Commerce's investigation in that case.  *See Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos. 701-TA-682 and 731-TA-1592, USITC Pub. 5438 (July 2023) (Final) at 11 (Pub. 5438); *Certain Freight Rail Couplers and Parts Thereof from Mexico*, Inv. No. 731-TA-1593, USITC Pub. 5470 (Nov. 2023) (Final) at 5-6 (Pub. 5470).  The period of investigation for the Commission's FRCs investigation was 2020 through 2022.  Pub. 5438 at 16.  The Commission's FRCs investigation covered imports of FRCs from China and Mexico.  Pub. 5438 at 1; Pub. 5470 at 1.  In contrast, the Commission's investigation into coupler systems was coextensive with the scope of Commerce's investigation and, accordingly, also covered coupler systems as defined above.  *See Freight Rail Coupler Systems and Components from China*, Inv. Nos. 701-TA-670 and 731-TA-1570, USITC Pub. 5331 (July 2022) (Final) at 8.

The POI for that investigation was 2019 through 2021 and covered imports from China. *Id.* at 1, 3.

Plaintiffs' claim that the "petition sought 'review'" of the Commission's decision regarding coupler systems is demonstrably false. *See* Pls. Br. at 2. Plaintiffs also do not point to any language indicating a request made by the Petitioner for Commerce or the Commission to review the prior determination. Indeed, the petition itself demonstrates that it was alleging distinct facts from the case on coupler systems: "Petitioner {previously} filed for antidumping and countervailing duty relief on imports of FRCs *systems* from China . . . ." Appx7888 (emphasis in original). Plaintiffs assert that "success on {the FRCs petitions} necessarily entailed nullifying the previous negative determination." Pls. Br. at 2. This is also contradicted by the language of the petition: "The current petition involves a modified scope as discussed below and the addition of Mexico as a subject country." Appx7889.[1]

Commerce has promulgated regulations regarding the elements to be included in a countervailing duty petition, and these elements include that a petitioner must include "factual information regarding material injury, threat of material injury, or material retardation, and causation . . . ." 19 C.F.R. § 351.202(b)(10). According to its regulations, Commerce then determines whether to initiate an investigation based on the accuracy and adequacy of the evidence provided. 19 U.S.C. § 1671a(c)(1); 19 C.F.R. § 351.203. Commerce "shall" initiate a countervailing duty investigation "whenever an interested party" files a petition "on behalf of an

---

[1] Plaintiffs also stated that, "Thus, the only way to find injury in FRC II {FRCs} was to find injurious imports ruled non-injurious in FRC I {coupler systems}." Pls. Br. at 19. This is demonstrably false in that the FRCs case, as compared to the coupler systems case, involved different products, a different POI, and different subject countries. Importantly, Plaintiffs demonstrate a conflation of arguments involving Commerce's statutory authority and the Commission's statutory authority. As discussed further below, Plaintiffs raise similar arguments by addressing 19 U.S.C. § 1675(b)(4) but failing to address 19 U.S.C. § 1675(b)(2).

industry" that "alleges the elements necessary for the imposition of the duty imposed by section 1671(a) of this title."  19 U.S.C. § 1671a(b)(1).

Administrative agencies have the authority to interpret both statutes and their own regulations.  *See Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("we have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . ."); *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

In determining the sufficiency of the petition, Commerce used an initiation checklist to find that initiation was warranted.  *See* Appx8103.  Commerce frequently uses initiation checklists for this purpose.  *See, e.g.*, *Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1347-48 (Fed. Cir. 2023) (describing Commerce's use of an initiation checklist).  Commerce's initiation checklist in this case included confirmation that the petition had sufficient domestic industry support, Appx8105-8106; included an injury allegation, Appx8106-8107, Appx8136-8139; included subsidy allegations, Appx8109; included a clear and detailed description of the merchandise to be investigation, Appx8107; included the identify of each known exporter, foreign producer, and importer of the merchandise, Appx8108; and other requirements, Appx8107-8108. The petition met all of Commerce's requirements for initiation of a trade remedy investigation and, as a result, checked all of the boxes on the initiation checklist.  An agency carefully following its established practice can hardly be considered arbitrary or capricious.

It is not unusual for a petitioner to file a subsequent case involving the same or similar subject merchandise.  For example, a petitioner filed a petition regarding Polyester Textured Yarn from India and China on October 18, 2018.  *See Polyester Textured Yarn from India and the People's Republic of China: Initiation of Less-Than-Fair-Value Investigations*, 83 Fed. Reg.

10

58,223 (Nov. 19, 2018). Commerce and the Commission conducted investigations and made affirmative final determinations of dumping and injury, respectively. *See, e.g.*, *Polyester Textured Yarn from India and the People's Republic of China: Amended Final Antidumping Duty Determination for India and Antidumping Duty Orders*, 85 Fed. Reg. 1,298 (Jan. 10, 2020); *Polyester Textured Yarn from China and India*, Inv. Nos. 701-TA-612-613 and 731-TA-1429-1430, USITC Pub. 5007 (Jan. 2020) (Final). Nine months after the investigation into polyester textured yarn from China and India concluded, the petitioner filed a second investigation into polyester textured yarn from Indonesia, Malaysia, Thailand, and Vietnam. *See Polyester Textured Yarn from Indonesia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 74,680, 74,681 (Nov. 23, 2020).

The propriety of initiating a countervailing duty investigation depends on whether the petitioner has provided all information required under Commerce's regulations, not on the span of time that has elapsed since the conclusion, whether affirmative or negative, since a separate investigation.

      b.    <u>The Changed Circumstances Provision, Which Only Applies to Affirmative Determinations, Is Not Applicable to the Current Matter</u>

Plaintiffs essentially argue that this was a changed circumstances review of a negative Commission determination, which was prevented by 19 U.S.C. § 1675(b)(4). Pls. Br. at 14-16. Changed circumstances reviews are separate administrative proceedings filed at these agencies after an antidumping or countervailing duty order has been imposed. Under the statute, Commerce and the Commission have the authority to review a *final affirmative antidumping or countervailing duty determination* when they receive information concerning changed circumstances sufficient to review such a determination. 19 U.S.C. § 1675(b)(1)(A)–(B) (emphasis added). The quintessential example of a changed circumstances review involves Commerce's successor-in-

interest analysis: whether a company that has acquired another company excluded from an existing order is subject to that order.  *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Notice of Preliminary Results of Antidumping Duty Changed Circumstances Review*, 84 Fed. Reg. 26,816 (Dep't Commerce June 10, 2019); Issues and Decision Memorandum accompanying *Certain Pasta from Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 82 Fed. Reg. 26,777 (Dep't Commerce June 9, 2017).

The types of Commission decisions that are subject to a changed circumstances review are provided for in 19 U.S.C. § 1675(b)(2), which provides:

> In conducting a review under this subsection, the Commission shall—
>
> (A) *in the case of a countervailing duty order or antidumping duty order* or finding, determine whether revocation of the order or finding is likely to lead to continuation or recurrence of material injury,
>
> (B) in the case of a determination made pursuant to section 1671c(h)(2) or 1673c(h)(2) of this title, determine whether the suspension agreement continues to eliminate completely the injurious effects of imports of the subject merchandise, and
>
> (C) *in the case of an affirmative determination* resulting from an investigation continued under section 1671c(g) or 1673c(g) of this title, determine whether termination of the suspended investigation is likely to lead to continuation or recurrence of material injury.

19 U.S.C. § 1675(b)(2) (emphases added).  The plain text of the statute confirms that the Commission may conduct reviews as to countervailing duty orders, suspension agreements, and affirmative determinations, none of which were present here.[2]  As Plaintiffs concede, there was no affirmative determination of injury in the investigation they claim that the underlying petition

---

[2] If the petition was a request to review a Commission determination, the Commission's regulations would have required the Petitioner to file its review request only at the Commission. *See* 19 U.S.C. § 1675(b)(2).

sought to review.  *See* Pls. Br. at 5.  Nonetheless, they claim that, because paragraph (4) is not limited to review "under this subsection," it applies to any determination, including the Commission's negative injury determination in the Freight Coupler Systems investigation.  *Id.* at 14-15.  The Supreme Court has found that statutory construction is a "holistic endeavor."  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  Plaintiffs appear to have fallen into a common pitfall of statutory interpretation.  "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012).

Accordingly, section 751 of the Tariff Act should be read as a whole.  The title of the subsection (b) of that statute is "Reviews Based on Changed Circumstances."  19 U.S.C. § 1675(b).  Each subheading under subsection (b) relates back to the title "Reviews Based on Changed Circumstances."  Subheading (1) is "In General," subheading (2) involves "Commission Review," subheading (3) involves the "Burden of Persuasion," and subheading (4) provides a "Limitation on Period for Review."  *Id.*  This "limitation of period for review" refers, then, to "reviews based on changed circumstances."

"Changed circumstances" is a term of art in Commerce and Commission practice, referring to these "changed circumstances reviews" and associated administrative procedures. Commerce's regulations provide for the procedures used to conduct a changed circumstances review.  *See* 19 C.F.R. § 351.216.  These regulations reiterate that a party may request a changed circumstances review of an *order or a suspended investigation*.  *Id.* § 351.216(e) (emphasis added).  The Commission's regulations also provide procedures for investigations of changed circumstances

13

reviews, which also reiterate that such reviews are only made of outstanding, or previous affirmative, determinations. *See* 19 C.F.R. § 207.45. Here Plaintiffs' argument is that this was in fact an impermissible changed circumstance review of a previous negative Commission determination, however neither the statute, nor Commerce's regulations, nor the Commission's regulations provide for a review of a negative Commission determination.

While the title of a statute may not "override" the plain meaning of the statute's text, that plain meaning should be construed within the meaning of the terms of art that a statute contains. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *National Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007). Here, Plaintiffs understate the treatment of the term of art, "changed circumstances," encouraging this Court to adopt a meaning of the term that is contrary to the context of how it is used in practice. Pls. Br. at 17. Indeed, it is a longstanding principle in American jurisprudence that, where Congress employs a term of art obviously transplanted from another legal source, it "brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746-47 (2022). In *George*, the Supreme Court quoted from a lecture delivered by Justice Frankfurter in 1947, in which he stated: "The peculiar idiom of business or of administrative {practice} often modifies the meaning that ordinary speech assigns to language. And if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

This principle has held true since Justice Frankfurter's oration:

Every field of serious endeavor develops its own nomenclature – sometimes referred to as *terms of art*. Where the text is addressing a scientific or technical subject, a specialized meaning is to be expected . . . . And when the law is the

subject, ordinary legal meaning is to be expected, which often differs from common meaning.

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 73 (2012). That is, the usage of a term itself suffices to adopt the cluster of ideas that were attached to each borrowed word in the absence of indication to the contrary. *See FAA v. Cooper*, 566 U.S. 284, 292 (2012). Here, the meaning of "changed circumstances" before the Department of Commerce and the International Trade Commission is consistent with "changed circumstances reviews," which have their own purpose and administrative procedures.

Paradoxically, Plaintiffs attempt to disregard a second term of art in international trade practice – "review" – while also claiming that Defendant-Intervenor's petition in the underlying investigation was a type of non-judicial review. Plaintiffs claim that the Tariff Act offers "only one route for review as of right: a judicial action in this Court." Pls. Br. at 15. In fact, the Act differentiates between "administrative reviews" and "judicial reviews." Following the issuance of an order, parties may request judicial review of Commerce or the Commission's final determination. *See generally* 19 U.S.C. § 1516a. Following the issuance of an order, the Act also specifies avenues for a variety of administrative reviews by Commerce or the Commission: annual reviews of duties, often referred to as "administrative reviews" at Commerce; reviews based on changed circumstances at Commerce or the Commission; and five-year reviews of orders, often referred to as "sunset reviews" at Commerce and the Commission. *See generally id.* at § 1675.

Put simply, this matter involved a subsequent petition for initiation of a new countervailing duty investigation covering different products and a different POI. While Plaintiffs alleged that this was really a request for a changed circumstances review of previous negative Commission determination, this could not be the case as the statute does not even provide for a review of Commission negative determinations.

**2.    Commerce's Decision Not to Terminate the Investigation Was Supported by Substantial Evidence and In Accordance with the Law**

In light of the foregoing, Commerce's decision not to terminate the investigation was supported by substantial evidence and in accordance with the law.  The Tariff Act provides only for termination of an investigation upon withdrawal of a petition.  Specifically, "{A}n investigation . . . may be terminated by either {Commerce} or the Commission, after notice to all parties to the investigation, upon withdrawal of the petition by the petitioner . . . ."  19 U.S.C. § 1671c(a)(1)(A).  The statute provides for Commerce to unilaterally terminate an investigation only when Commerce self-initiated the investigation, rather than a petitioner filing a petition to initiate an investigation, as was the case here.  *Id.* §§ 1671a(a), 1671c(a)(1)(A).

In the Issues and Decision Memorandum accompanying its final determination, Commerce correctly stated that it does not have the inherent authority to terminate an original investigation.  Appx12224.  Commerce also explained that it did not have a basis to terminate the investigation because "the instant investigation is not a changed circumstances review of the earlier freight rail coupler systems investigation but, rather, a separate investigation initiated based on petitions covering a different POI and a different mix of merchandise from both China and Mexico."  Appx12224-12225.

Plaintiffs claim that, if Commerce did not have the authority to terminate the investigation once initiated, Commerce would be required to continue the investigation with the knowledge that there was an alleged "defect" in the proceedings.  Pls. Br. at 19 (citing *Gilmore Steel Corp. v. United States*, 7 CIT 219, 223, 585 F. Supp. 670, 674 (1984)).  Plaintiffs again argue that section 751(b)(4) of the Tariff Act acted as a "statutory bar" to the underlying investigation.  Pls. Br. at 20.  Here, though, there was no "defect" in the proceedings, as there was no bar on filing the underlying petition, and the petition included all information necessary to initiate the investigation.

16

Further, while Plaintiffs errantly rely on section 751(b)(4) of the Tariff Act, they do not cite to any statutory provision that affirmatively provides Commerce the authority to terminate an investigation. *See* Pls. Br. at 19-21. As previously discussed, there is only one statutory provision that provides Commerce the authority to terminate an investigation, and Commerce may only do so upon withdrawal of the petition. 19 U.S.C. § 1671c(a)(1)(A).

Plaintiffs rely heavily on *Gilmore Steel* for the proposition that Commerce had the duty to terminate the investigation. The background of that case is instructive here. In *Gilmore Steel*, the plaintiff-petitioner filed an antidumping duty petition seeking relief from imports of hot-rolled carbon steel plate in cut lengths on behalf of all U.S. producers of steel plate, but, alternatively, was brought on behalf of a regional industry. 7 CIT at 220-21. Commerce initiated an investigation within 20 days of the petition's filing, and the Commission later made an affirmative preliminary determination of injury to the full domestic industry, though only Gilmore appeared on behalf of the domestic industry at the Commission's preliminary staff conference. *Id.* at 221. Following the Commission's preliminary determination, Commerce polled the other U.S. producers to determine whether they supported the position, and all said that they did not support the petition or did not take a position. *Id.* at 221-22. Commerce then terminated the investigation for an alleged lack of domestic industry standing. *Id.* at 222. While the Court found that Commerce was correct in dismissing the petition insofar as it was brought on behalf of the national steel plate industry, it also found that Commerce acted in error by dismissing the petition to the extent that it was brought on behalf of a regional industry, because Commerce had not been presented with evidence regarding regional industry support that would warrant dismissal. *Id.* at 227-29.

Since *Gilmore Steel*, this Court has recognized that that case does not hold that Commerce has an obligation to terminate investigations if it finds inaccuracies in a petition. *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 10 CIT 424, 427, 640 F. Supp. 255, 258 (1986). "Once Commerce has commenced an investigation it is obligated to 'make a determination, based upon the best information available to it at the time of the determination, of whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold at less than fair value.'" *Id.* at 426-27 (quoting 19 U.S.C. § 1673b(b)(1) (explaining Commerce's role in an antidumping duty investigation); *see also Comeau Seafoods Ltd. v. United States*, 13 CIT 923, 927, 724 F. Supp. 1407, 1411 (1989) ("The legislative history of § 1671 makes clear that Congress intended petitions filed 'to result in investigations being initiated unless the authority {was} convinced that the petition and supporting information fail{ed} to state a claim upon which relief {could} be granted under § 701 {19 U.S.C. § 1671} or the petitioner {did} not provide information supporting the allegations which {was} reasonably available to him.'" (quoting S. Rep. No. 96-249, at 2 (1979), *as reprinted in* 1979 U.S.C.C.A.N. 381, 433)).

Plaintiffs also point to several decisions in which the Federal Circuit or this Court have found that Commerce can reopen its proceedings to address fraud. *See* Pls. Br. at 20. The holdings from these cases are limited to Commerce's authority to address fraud and cannot be applied to other alleged defects in an investigation. In *Home Products International*, the Federal Circuit stated that "Commerce has the inherent authority to reopen a case to consider new evidence that its proceedings were tainted by fraud." *See Home Prods. Int'l Inc. v. United States*, 633 F.3d 1369, 1377 (Fed. Cir. 2011). Plaintiffs have not alleged any fraud in the proceeding underlying this case, nor did they provide any support for their claim that an agency's power to administer allegations

relating to fraud "extends to guaranteeing the finality of decisions when they are attacked or manipulated." *See* Pls. Br. at 20. Accordingly, Commerce's decision not to terminate the investigation was supported by substantial evidence and in accordance with the law.

**B.** **Commerce's Scope Determination Was Supported by Substantial Evidence and in Accordance with the Law**

Plaintiffs put forward three basic theories of error in regard to Commerce's scope determination, namely, (1) that the scope could not be supported by a "cognizable theory of injury;" (2) Commerce departed from its legal obligation that a countervailing duty investigation can only cover one class or kind of merchandise; and (3) Commerce's decision that FRCs maintained their identity as distinct articles of commerce was not supported by substantial evidence. These arguments are addressed in turn below.

**1.** **Arguments Regarding Cognizable Injury Are for the Commission, Not Commerce, to Decide**

Plaintiffs' brief argues that Petitioner's theory of injury in the underlying investigation is flawed and as such could not constitute a cognizable injury under the statute. Accordingly, Plaintiffs argue that this fatally undermines Commerce's decision: "{A}ntidumping duties are not permitted where there are no 'imports' into the United States at the time of injury, which is the case where lost sales to new railcar builders in Mexico are at issue." Pls. Br. at 24.

The fundamental error in Plaintiffs' argument is that it confuses Commerce's authority to issue determinations regarding the scope of an investigation with the Commission's authority to make injury determinations. The current matter is an appeal of the Department of Commerce's determination in the underlying investigation, but it is the province of the Commission, not Commerce, to determine whether a domestic industry is injured or threatened with material injury as a result of subject imports in a countervailing duty investigation. 19 U.S.C. § 1671(a)(2). The plain language of the statute is clear: "If . . . the Commission determines that an industry in the

United States is materially injured, or is threatened with material injury . . . ." *Id.* (internal headings omitted).  This has heretofore been uncontested in the courts. For example, this Court has noted, "After assessing whether the volume, price effects, and impact of the subject imports on the domestic industry are significant, the statutory 'by reason of' language implicitly requires the Commission to 'determine whether these factors as a whole indicate that the {subject} imports themselves made a material contribution to the injury.'" *Swiff-Train Co. v. United States*, 37 CIT 394, 406, 904 F. Supp. 2d 1336, 1346 (2013).

Plaintiffs claim that, in original countervailing duty investigations, Commerce is the decider of legal issues, and the Commission is the factfinder.  *See* Pls. Br. at 30-31.  This is contradicted by the governing statute and decades of practice.  Indeed, Commerce's determinations include multiple decisions of fact, including the calculations supporting antidumping margins, *SKF USA Inc. v. United States*, 254 F.3d 1022, 1027 (Fed. Cir. 2001), weighing of evidence provided by respondents, *NSK Ltd. v. United States*, 115 F.3d 965, 973 (Fed. Cir. 1997), and determinations as to probative value, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1353 (Fed. Cir. 2015).  Similarly, the Commission makes numerous legal determinations, including whether subject imports are negligible, *see U.S. Steel Group v. United States*, 96 F.3d 1352, 1359 (Fed. Cir. 1996), whether to cumulate subject imports from multiple countries, *Nucor Corp. v. United States*, 601 F.3d 1291, 1295 (Fed. Cir. 2010), and interpretation of its governing statute, *see Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005).  Both Commerce and the Commission make legal and factual determinations, and Plaintiffs' assertion is not supported by the statute, caselaw, or the agencies' practice.

In support of this novel theory, they cite *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 n.2 (Fed. Cir. 1992). It is true that it is "Commerce who

determines that a petition is sufficient to cause the initiation of investigations – that the statutory requirements are satisfied." *Id.* These statutory requirements include that a petitioner allege the elements necessary for the imposition of countervailing duties. 19 U.S.C. § 1671a(b)(1). Commerce has promulgated regulations regarding the elements to be included in a countervailing duty petition, and these elements include that a petitioner must include "factual information regarding material injury, threat of material injury, or material retardation, and causation . . . ." 19 C.F.R. § 351.202(b)(10). Commerce then determines whether to initiate an investigation, based on the accuracy and adequacy of the evidence provided. 19 U.S.C. § 1671a(c)(1); 19 C.F.R. § 351.203. Commerce "shall" initiate a countervailing duty investigation "whenever an interested party" files a petition "on behalf of an industry" that "alleges the elements necessary for the imposition of the duty imposed by section 1671(a) of this title." 19 U.S.C. § 1671a(b)(1).

A petition functions like a civil complaint. *RZBC Group Shareholding Co., Ltd. v. United States*, 100 F. Supp. 3d 1288, 1296 (CIT 2015). Its purpose is to "propose an investigation." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002). Commerce's involvement in an injury determination in a countervailing duty investigation is limited to determining whether the Petitioner has alleged information regarding injury to a domestic industry sufficient to initiate an investigation. After the sufficiency threshold is met and an investigation is initiated, it is Commerce's province to determine whether a foreign government has subsidized the production of subject merchandise that is sold in the United States, and the Commission's province to determine whether a domestic industry is injured as a result of subject imports. 19 U.S.C. § 1671; *see also, e.g.*, *Vicentin S.A.I.C. v. United States*, 42 F.4th 1372, 1375 (Fed. Cir. 2022) (explaining Commerce's role in an antidumping duty investigation).

Plaintiffs claim that the Petitioner "originally insisted on included attached FRCs precisely because 'U.S. and Chinese FRC producers compete head-to-head for sales to rail car producers' in Mexico."  Pls. Br. at 26 (internal citations omitted).  However, examination of the petition demonstrates that Petitioner's argument was that U.S. producers were injured by unfairly priced imports when entered with or without nonsubject merchandise: "Petitioner emphasizes that further assembly or attachment of an FRC onto a railcar in a third country does not remove the merchandise from the scope."  Appx7895.  Additionally, "{U}nfairly traded imports {from China and Mexico} have materially injured the U.S. domestic industry producing FRCs and threaten to cause further material injury if relief is not granted."  *See* Appx7884.

Furthermore, in collecting data for the final phase of its investigation, the Commission collected information of standalone FRCs and mounted FRCs. Pub. 5438 at 12 n.44.  Arguably the most obvious error in Plaintiffs' argument that the petition did not allege a cognizable theory of injury is the fact that the Commission actually made an affirmative final determination of injury by reason of subject imports.  *See id.* at 3.

Additionally, the Petitioner did not allege third-country dumping in the underlying investigation.  Much as Plaintiffs would have the Court believe that the case at bar is a changed circumstances review, they would also have the Court believe that the case is a third-country dumping investigation, although Defendant-Intervenor did not plead third-country dumping in the underlying investigation.[3]

---

[3] Plaintiffs attempt to make arguments out of the fact that Commerce stated that export sales should not be included in U.S. market share.  Pls. Br. at 23.  The fact that exports should not be included in U.S. market share is not synonymous with a determination that subject imports attached to non-subject merchandise are per se non-injurious.

The petitioner in an original investigation is afforded significant deference regarding the petition it files and the type of relief sought in that petition. *Cf. Global Commodity Group LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013) (Commerce gives deference to the petitioner in determining the scope of an order). Here, the Petitioner filed a countervailing duty petition, not a petition regarding third-country dumping. *See* Appx7879. Indeed, the statute governing third-country dumping petitions specifies that, if a domestic industry "that produces a product that is like or directly competitive with merchandise produced by a foreign country may . . . submit a petition to the Trade Representative . . . ." 19 U.S.C. § 1677k(b). The underlying petition was filed at the Department of Commerce and was pled as a countervailing duty petition. It is Commerce's role to determine whether the countervailing duty petition before it sufficiently alleges that a foreign government has subsidized the production of merchandise that is sold in the United States and that the domestic industry is injured as a result of subject imports. 19 U.S.C. § 1671. The underlying petition alleged that, "{I}mports of FRCs from China and Mexico have caused material injury to the domestic industry. Unfairly traded Chinese and Mexican subject imports have taken significant market share from domestic producers." Appx7899. In other words, at no point did the Petitioner allege the basics of a third country dumping allegation, but rather alleged that imports into the United States were having negative volume and pricing effects *in the United States*. An agency must determine the facts of the case presented to it, and Commerce will decide to initiate the investigation or not based on the information provided to it in the petition.

As discussed further below, Commerce has a well-established practice of including merchandise in the scope, even if it is attached to non-subject imports. *E.g.*, *Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 Fed. Reg. 45,707 (Dep't Commerce Aug. 16, 2021); *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey,*

*and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021).  It is for the Commission to find whether those imports are injurious.  Plaintiffs' arguments that Commerce should have supplanted the Commission's authority to make determinations of causation and injury serve no basis to undermine Commerce's scope determination, and their argument that Commerce makes legal determinations and the Commission makes factual determinations is unsupported by the statute, caselaw, and agency practice.  To the contrary, both agencies make both legal and factual determinations, and Commerce determines the scope of a countervailing duty investigation, while the Commission determines whether subject imports injure the domestic industry.  Here, the Commission did find that the alleged injury did occur.

> **2.  Commerce's Determination That FRCs Joined to Railcars Were Not a Different Class or Kind of Merchandise Was Supported by Substantial Evidence and in Accordance with the Law**

Plaintiffs claim that Commerce erred by finding that FRCs joined to railcar were not a separate class or kind of merchandise and that Commerce should have applied the substantial transformation analysis to find that FRCs attached to railcars are a different class or kind than FRCs attached to railcars.  Pls. Br. at 33-34.  They further claim that countervailing duty orders can cover only one class or kind of merchandise.  Pls. Br. at 34.

Plaintiffs are incorrect as to the law and the facts in this matter.  In regard to the legal standard, Plaintiffs assert that a party is prohibited from seeking an order on more than one class or kind of merchandise.  In reality, countervailing duty orders may cover multiple classes or kinds of subject merchandise.  Plaintiffs claim the contrary: that an order may only cover a single class or kind of merchandise.  Pls. Br. at 34.  In support, they cite to the statute saying, "The administering authority determines that the government of a country . . . is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a

class or kind of merchandise imported . . . into the United States." *See* 19 U.S.C. § 1671(a)(1). The language of this statute does not limit consideration of multiple classes or kinds or subject merchandise in a single countervailing duty investigation. This Court has previously affirmed Commerce's finding that an investigation examined five different classes or kinds of subject merchandise. *Torrington Co. v. United States*, 14 CIT 507, 516-17, 745 F. Supp. 718, 725-26 (1990). That investigation involved antifriction bearings (except tapered roller bearings) from Romania. The Court explicitly found that Commerce has the authority to modify the definition of a class or kind found in the petition if Commerce determines that the "petition's description actually contains more than one class or kind of merchandise." *Id.* at 520. The Federal Circuit affirmed this determination, finding that "Commerce is charged with administering the involved sections of the countervailing duty laws. {The Court} will not disturb its interpretation unless it is unreasonable, and we conclude that it is not." *Torrington Co. v. United States*, 938 F.2d 1276, 1278 (Fed. Cir. 1991).

Plaintiffs also cite the Issues and Decision Memorandum accompanying Commerce's final affirmative determination in *Certain Softwood Lumber Products from Canada*, claiming that it stands for the proposition that countervailing duty orders can cover only one class or kind of merchandise. Pls. Br. at 34. That memorandum agrees that Commerce has the authority to determine whether a product covered by the scope is of a different class or kind of merchandise from the other products covered in that scope. Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 Fed. Reg. 51,806 (Dep't Commerce Nov. 8, 2017) at cmt. 15. Regardless, Commerce did not find that

there was more than one class or kind of subject merchandise and, as discussed below, that determination was supported by substantial evidence.

### C. Commerce's Decision that FRCs Maintained Their Identity as a Distinct Article of Commerce Was Supported by Substantial Evidence and in Accordance with the Law

Commerce's decision to include in the scope FRCs that are attached to non-subject merchandise is supported by substantial evidence and in accordance with the law, and Plaintiffs are asking the Court to reweigh evidence that Commerce has already considered.  For the Court to do so would be outside its purview.  *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (internal citation omitted).

As an initial matter, Commerce's decision is consistent with its previous practice and decisions of its reviewing courts.  The Court of Appeals for the Federal Circuit (CAFC) has upheld this practice.  In *Ad Hoc Shrimp*, the CAFC concluded that a scope exclusion Commerce made was contrary to law because it was unsupported by any valid reason and, importantly, "Commerce owes deference to the intent of the proposed scope of an antidumping investigation as expressed in an antidumping petition."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 637 F. Supp. 2d 1166, 1174-75, 1181 (Fed. Cir. 2009).  If a "petition is deemed sufficient, {Commerce} is statutorily obliged to {ensure} that the proceedings are maintained in a form which corresponds to the petitioner's clearly evinced intent and purpose."  *See NTN Bearing Corp. of America v. United States*, 14 CIT 623, 626, 747 F. Supp. 726, 730 (1990).

Here, the Petitioner's intent was to cover FRCs that enter unmounted or mounted to railcars.  This was reflected in the language of the scope.  The common issues and injury volume of its petition stated:

> The country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the

subject coupler parts were cast or forged. Subject merchandise includes coupler parts as defined above that have been further processed or further assembled, including those coupler parts attached to a railcar in third countries.

Appx7890. Petitioner maintained this position throughout the investigation, repeatedly stating that, "to exclude mounted FRCs would thwart the intent of the petition," Appx10658, and that the scope language was designed to prevent the evasion of an order, Appx10660.

Commerce's determinations that FRCs are not substantially transformed when they are mounted onto railcars and that there is only one class or kind of merchandise at issue here were supported by substantial evidence and in accordance with the law. The substantial transformation standard is as follows: "A substantial transformation occurs where, 'as a result of manufacturing or processing steps . . . the {product} loses its identity and is transformed into a new product having a new name, character{,} and use.'" *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018) (quoting *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)). Commerce looks to several factors, including the class or kind of merchandise, to determine whether a product has been substantially transformed. *Bell Supply*, 888 F.3d at 1228-29. An agency's decision must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). There is no dispute that a "simple assembly" cannot qualify as substantial transformation. *Cyber Power Sys. (USA) Inc. v. United States*, 560 F. Supp. 3d 1347, 1353 (CIT 2022).

### 1. Commerce Noted That There is Precedent for Scopes That Cover Subject Merchandise Imported with or Commingled with Non-Subject Merchandise

Commerce's well-established practice is to defer to the intent of the petitioner with respect to scope language, and there are several scopes in antidumping or countervailing duty orders that include subject merchandise that enters, whether or not joined with non-subject merchandise. Exemplar scopes are quoted below:

- Utility Scale Wind Towers: "Wind towers and sections thereof are included within the scope whether or not they are joined with non-subject merchandise, such as nacelles or rotor blades, and whether or not they have internal or external components attached to the subject merchandise." *See Utility Scale Wind Towers from Spain: Antidumping Duty Order*, 86 Fed. Reg. 45,707 (Aug. 16, 2021).

- Walk-Behind Lawn Mowers: "The inclusion in a third country of any components other than the lawn mower subassembly does not remove the lawn mower from the scope." *See Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China and the Socialist Republic of Vietnam: Antidumping Duty Order*, 86 Fed. Reg. 36,703 (July 13, 2021).

- Mattresses: "Mattresses covered by the scope of these orders may be imported…as part of furniture or furniture mechanisms (e.g., convertible sofa bed mattresses, sofa bed mattresses imported with sofa bed mechanism, corner group mattresses, day-bed mattresses, roll-away mattresses high risers, trundle bed mattresses, crib mattresses)…Only the mattress is covered by the scope if imported as part of furniture, with furniture mechanisms, or as part of a set in combination with a mattress foundation." *See Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (May 14, 2021).

- Chassis: "Processing of finished and unfinished chassis and components such as . . . assembly, or any other processing either in the country of manufacture of the in-scope product or in a third country does not remove the product from the scope." *See Certain Chassis and Subassemblies Thereof from the People's Republic of China: Countervailing Duty Order and Amended Final Affirmative Countervailing Duty Order*, 86 Fed. Reg. 24,844 (May 10, 2021).

- Large Vertical Shaft Engines: "The inclusion of any other components not identified as comprising the unfinished engine subassembly in a third country does not remove the engine from the scope." *See Certain Vertical Shaft Engines Between 225cc and 999cc, and Parts Thereof from the People's Republic of China: Countervailing Duty Order and Amended Final Affirmative Countervailing Duty Order*, 86 Fed. Reg. 12,619 (Mar. 4, 2021).

- Quartz Surface Products: "{Q}uartz surface products are covered by the orders whether or not they are imported attached to, or in conjunction with, non-subject merchandise such as sinks, sink bowls, vanities, cabinets, and furniture. If quartz surface products are imported attached to, or in conjunction with, such non-subject merchandise, only the quartz surface product is covered by the scope." *See Certain Quartz Surface Products from India and the Republic of Turkey: Countervailing Duty Orders*, 85 Fed. Reg. 37,431 (June 22, 2020).

- Wooden Cabinets and Vanities and Components Thereof: "Wooden cabinets and vanities are covered by this order whether or not they are imported attached to, or

in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope . . . . Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to . . . assembly, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the in-scope product." *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22, 216 (Apr. 21, 2020).

The scope of an antidumping or countervailing duty order governs whether duties are owed on merchandise upon import. *See, e.g.*, *Shenyang Yuanda Aluminum Indus. Eng'g Co., Ltd. v. United States*, 776 F.3d 1351, 1356 (Fed. Cir. 2015). Scope language is the "cornerstone" of any scope determination. *See Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (quoting *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed Cir. 2002)). Here, Commerce's decision was fully consistent with its prior practice.

The scope of the underlying investigation explicitly included mounted FRCs: "Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar." *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138, 45,139 (July 14, 2023). Accordingly, Commerce's determination to include mounted FRCs in the scope of the investigations was not only consistent with its previous practice but also consistent with the Petitioner's intent and request for relief.

### 2. FRCs Are Not Permanently Affixed, Nor Do They Undergo Further Processing

Commerce relied on substantial record evidence to find that FRCs are not permanently affixed to railcars, nor do they undergo further processing. In its final scope memorandum,

Commerce found that "evidence submitted on the record by the petitioner indicates that freight rail couplers are not directly attached to railcars but are attached to yokes that are attached to railcars by bolted plates."  Appx12238.  Commerce cited to a submission by Petitioner, which included a sworn statement from a director of engineering in the FRCs industry, who stated that:

> {A} coupler is typically pinned to the yoke (either horizontally or vertically) and the yoke is held in the car via bolted plates.  The yoke only rests on the plates and is not bolted to the plates.  Simply by removing the pin, the coupler becomes unattached to the yoke and also the car.  Consequently, the coupler is not directly attached to the rail car.

Appx10684.  Accordingly, FRCs have the exact same physical characteristics both before they are mounted to a railcar and after they are mounted to a railcar, as they are not physically transformed when they are mounted.

Commerce also explicitly referenced in its decision that the Petitioner's description was consistent with diagrams provided by another interested party, Amsted, that "show that there are several parts that fit between the end sill of a freight railcar and the freight rail coupler, and therefore, the coupler is not directly attached to the railcar."  Appx12238.  Commerce cited an exhibit provided in an Amsted submission, which shows how a coupler fits into a yoke with a pin, or key, and how the yoke then fits into the end sill of the railcar.  Appx10575.  This further corroborates that FRCs are not permanently affixed to railcars and, indeed, are not directly affixed to railcars at all.  As Commerce found, FRCs are connected to railcars with a key or a pin and, accordingly, an FRC is "attached to an item that is itself not permanently attached to a railcar, and which is only held in place by a pin or a key."  Appx12238.

Commerce further noted that Strato had described the assembly of an FRC to a railcar, "indicating that {an FRC} is not a permanently affixed component."  Appx12238.  Specifically, Strato stated: "Once in place, the end of the coupler body makes contact with the follower block.

A draft key (21 pounds) is inserted through prefabricated slots in the yoke and coupler body to secure the coupler body to the assembly in the draft sill." Appx9296.

Substantial record evidence also shows that "knuckles and coupler bodies are designed to be removable and replaceable without undergoing physical changes when attached to or removed from railcars." Appx12239. Indeed, Amsted explained that "System components need to be inspected and replaced periodically due to wear or damage, so that parts need to be accessible and removable." Appx10574.

Commerce also found that the record below shows that FRCs have a shorter average useful life than freight railcars. Appx12239. The average useful life of a knuckle, for example, is five years. Appx10684. Knuckles were designed by the rail industry as the fuse of the train. Appx10684. If the knuckle undergoes a severe load, it is designed to fail before everything else. Appx10684. Once that "fuse" breaks, the air line opens up and the brakes come on to ensure a safe stop. Appx10684. Knuckles are replaced so frequently that freight railcars carry spare knuckles so that replacements can occur in transit. Appx10684. Knuckle replacements take only nine minutes, and full coupler replacements take approximately an hour. In contrast, the average useful life of a freight railcar ranges from 30 to 50 years. Appx10684.

The record below shows that it is common for FRCs to be excluded from drawings, schematics, and blueprints of freight railcars because they are not an inherent part of the railcar. *See* Appx12239. Original equipment manufacturers (OEMs) design freight cars separately and without regard for coupler design, such that freight cars can often be used with a variety of coupler types. Appx10684. The evidence of record in the underlying investigation includes a 3D model representation of an actual covered hopper railcar. Appx10685-10686. The 3D model originated from Trinity Industries, an Association of American Railroads (AAR) approved railcar

manufacturer.  Appx10684-10686.  The 3D model is an accurate representation of a covered hopper railcar and demonstrates a lack of a coupler.  Appx10684-10686.  This example is supportive of the fact that couplers are not constituent components of a railcar but are a distinct device for joining cars.  Commerce's scope decision memorandum also cited to Trinity Rail's Autorack Parts Catalog, which lists all of the parts of a freight railcar, which does not include FRCs as parts of a railcar.  *See* Appx10695-10698. The AAR Field Guide to Tank Cars was part of the record and shows a diagram of a tank car that identifies parts of the car and did not include FRCs.  Appx10820.

Based on the totality of this evidence, it was reasonable for Commerce to conclude that FRCs are not an attached or integrated component of a freight railcar and, instead, are a separate product.  Commerce is obligated to discuss competing evidence and decide whether to credit or reject it.  *Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007).  Commerce did so in this investigation.  Its scope decision memorandum did "acknowledge{e} competing evidence on the record regarding whether drawings of railcars depict couplers within the designs.  However, in conducting {its} analysis of freight rail couplers, {it} examine{d} the totality of the evidence rather than any one factor or information on the record in isolation."  *See* Appx12239.

Plaintiffs asked Commerce to consider other scopes in other countervailing duty investigations that do not exist.  Commerce acknowledged this in its final scope memorandum in the underlying investigation, stating that these arguments were "based on hypothetical scenarios . . . without any developed factual record."  Appx12240.  It is a fundamental principle of American jurisprudence that courts are to consider only the cases and controversies before them.  *See* U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).  Indeed, "No principle

is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976). The same applies to agencies, which must consider only the matters before them. *See Royal Thai Gov't v. United States*, 978 F. Supp. 2d 1330, 1333-34 (CIT 2014) (dismissing plaintiff's appeal of Commerce's negative countervailing duty determination because plaintiff did not have standing and a ruling on the merits would constitute an impermissible advisory opinion). Accordingly, Commerce's determination not to address hypothetical scenarios is consistent with this principle. It did, however, consider its past practice, sworn affidavits, rail car diagrams, submissions by all parties, OEM catalogs of parts, and an AAR Field Guide in support of its position.

### 3.    Plaintiffs' Reliance on Inapposite Case Law and Greek Mythology Is Not Persuasive

Lest the Court be persuaded by Plaintiffs' references to Greek mythology, Defendant-Intervenor is not advocating that all parts of a railcar be considered as parts, rather than parts of a whole, upon import. Defendant-Intervenor did not argue below, nor did Commerce find, that "all parts (however many) assembled into a 'pre-determined' product may never result in a substantial transformation. That is not, and cannot be, the law." *Cyber Power Sys.*, 560 F. Supp. 3d at 1355. This is not the Ship of Theseus. This brief addresses arguments regarding the scope of the countervailing duty investigation that is the subject of this appeal. Neither Commerce, nor the Court, need to consider whether, for example, the bolts of a railcar are substantially transformed when the railcar is built. This question is not "an important aspect of the problem" before the Court. *See Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 872 (Fed. Cir. 2008).

Plaintiffs cite to *MacLean Power* as an example of the assertion that, when an import consists of multiple parts, duties that cover a part of that merchandise do not apply. Pls. Br. at 36.

Further explanation of that case does not support Plaintiffs' assertion.  In *MacLean Power*, the plaintiff had filed a scope ruling request at the Department of Commerce seeking confirmation that its imports of pole line hardware products, which contain helical spring lock washers (HSLWs), were outside the scope of the antidumping duty order on HSLWs.  *MacLean Power, LLC v. United States*, 359 F. Supp. 3d 1367, 1369 (CIT 2019).  Commerce found that MacLean's pole line hardware products were within the scope of the order, and this Court remanded that finding.  The Court's determination was based in part on the language of the scope of the order.  The scope of HSLWs order "makes no mention of the importation of HSLWs as assembled as a component of a larger product." *Id.* at 1371.  Specifically, the scope of the HSLWs order does not state that the scope covered HSLWs attached to pole line hardware products. *See, e.g.*, *Certain Helical Spring Lock Washers from the People's Republic of China and Taiwan: Continuation of Antidumping Duty Orders*, 82 Fed. Reg. 24,301, 24,302 (May 26, 2017).  The scope at issue is factually distinguishable from the scope in HSLWs, as the scope at issue explicitly covers FRCs that enter attached to railcars.  Plaintiffs' reliance on *MacLean Power* is inapposite.  Indeed, this difference could not be starker.  In the current matter, the scope explicitly states that FRCs are covered by the scope, whether mounted to railcars or unmounted. *See* Appx12408.

In support of their argument, Plaintiffs claim that the underlying petition stated that Defendant-Intervenor "acknowledged" that the article of commerce entering the United States was a finished railcar by "noting that attached FRCs are not subject to section 301 duties."  Pls. Br. at 36-37.  Section 301 duties are irrelevant to Commerce's scope determination.  Section 301 is a fundamentally different provision of law than countervailing duties.  Section 301 exclusions are granted based on provisions of the Harmonized Tariff Schedule of the United States (HTSUS). *See Notice of Product Exclusions and Amendments: China's Acts, Policies, and Practice Related*

*to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 52,567 (Oct. 2, 2019). While the scope of a countervailing duty order typically references HTSUS codes under which the covered product may enter, the written language of the scope at issue is dispositive. *See Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138, 45,139 (July 14, 2023). It bears repeating that the scope specifically included FRCs regardless of whether they were mounted or unmounted.

Plaintiffs' brief also cites to several appeals of Customs classification determinations regarding whether tariffs are owed on certain merchandise. As these cases are not appeals of antidumping or countervailing duty determinations, they are not applicable to the case at bar. In such cases, "determining whether the items at issue come within a particular tariff provision . . . is a question of fact." *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483 (Fed. Cir. 1997). However, evaluation of tariff classification cases does not bear on the evaluation of Department of Commerce scope cases, especially when the scope explicitly includes the merchandise at issue.

### 4. Conclusion

For the foregoing reasons, the Court should find that Commerce's scope determination was supported by substantial evidence and in accordance with the law. Commerce relied in substantial record evidence in making its determination, which is consistent with the statute, caselaw, and past practice.

## VI.    **CONCLUSION**

For the reasons discussed above, Defendant-Intervenor respectfully requests that this Court hold that Commerce's *Final Determination* is supported by substantial evidence and in accordance with the law.

Respectfully submitted,

*/s/ Daniel B. Pickard*
Daniel B. Pickard, Esq.
Amanda L. Wetzel, Esq.
Claire M. Webster, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW, Suite 300
Washington, DC 20006
202-452-7936
daniel.pickard@bipc.com

Dated: April 19, 2024

*Counsel to the Coalition of Freight Coupler Producers*

36

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains no more than 11,386 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Daniel B. Pickard

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| **WABTEC CORPORATION,**<br><br>                **Plaintiff,**<br><br>    **and,**<br><br>**STRATO, INC.,**<br><br>                **Plaintiff-Intervenor**<br><br>    **v.**<br><br>**UNITED STATES,**<br><br>                **Defendant,**<br><br>    **and,**<br><br>**COALITION OF FREIGHT COUPLER PRODUCERS,**<br>                **Defendant-Intervenor.** |

**Before:  Hon. Stephen Alexander Vaden, Judge**

**Court No. 23-00161**

## <u>ORDER</u>

Upon consideration of the motions for judgment upon the agency record filed by plaintiff and plaintiff-intervenors, all responses thereto, the administrative record, and other pertinent papers, it is hereby

ORDERED that the motions are DENIED; and it is further

ORDERED that the Department of Commerce's final determination in this matter is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____, 2024          _____
New York, NY                                              Stephen Alexander Vaden, Judge