**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| WABTEC CORPORATION,<br><br>   Plaintiff,<br><br> and,<br><br>STRATO, INC.,<br><br>   Plaintiff-Intervenor<br><br> v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br> and,<br><br>COALITION OF FREIGHT COUPLER PRODUCERS,<br><br>   Defendant-Intervenor. | Before: Hon. Stephen Alexander Vaden, Judge<br><br>Court No. 23-00161 |

**SUPPLEMENTAL RESPONSE BRIEF**

        Daniel B. Pickard, Esq.
        Claire M. Webster, Esq.

        Buchanan Ingersoll & Rooney PC
        1700 K Street, NW, Suite 300
        Washington, DC 20006
        (202) 452-7000

        *Counsel to Coalition of Freight Coupler Producers*

**Dated: March 3, 2025**

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................ 1

I.    What division of authority and legal duties govern the Department of Commerce and International Trade Commission's actions related to scope determinations (including the requirement that "such merchandise" subject to an AD/CVD order be injurious)? ........................ 1

II.    What are the limits, if any, that restrict Commerce's discretion to include products in a final scope determination? ................................................................................................................. 6

III.    Which tests – if any – should or must be applied by Commerce or the Courts to effectuate those limits? ................................................................................................................................ 8

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 915, 637 F. Supp. 2d. 1166 ....2, 6, 8, 15

*American Lamb Co. v. United States*, 785 F.2d 994 (Fed. Cir. 1986) ........................................... 9

*Aristech Chem. Corp. v. United States*, 20 C.I.T. 353 (1996) ........................................................ 9

*Diamond Sawblades Mfrs. Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010) ................ 7

*Diversified Prods. Corp. v. United States*, 6 C.I.T. 155, 572 F. Supp. 883 (1983) ........................ 3

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .............................................................. 13

*Hitachi Metals Ltd. v. United States*, 949 F.3d 710 (Fed. Cir. 2020) ............................................. 2

*Hosiden Corp. v. Advanced Display Mfrs.*, 85 F.3d 1561 (Fed. Cir. 1996) ................................... 9

*M.S. Int'l, Inc. v. United States*, 32 F.4th 1145 (Fed. Cir. 2022) ........................................... 6-8, 15

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295 (Fed. Cir. 2013) ............................... 14

*Mitsubishi Elec. Corp. v. United States*, 12 C.I.T. 1025, 700 F. Supp. 538 (1988) .............. 6, 8, 15

*Nippon Steel Corp. v. United States*, 19 C.I.T. 450 (1995)………………………………………..4

*NTN Bearing Corp. of. Am. v. United States*, 747 F. Supp. 726 (C.I.T. 1990) .............................. 2

*Texas Crushed Stone Co. v. United States*, 35 F.3d 1535 (Fed. Cir. 1994) ................................... 9

*Torrington Co. v. United States*, 14 C.I.T. 648, 747 F. Supp. 744 (1990) ............................... 4, 10

*Torrington v. United States*, 14 C.I.T. 507, 745 F. Supp. 718 (1990) ........................................... 3

*Torrington v. United States*, 938 F.2d 1276 (Fed. Cir. 1991) ....................................................... 3

*Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350 (Fed. Cir. 2010) .................. 14, 15

**Statutes**

19 U.S.C.
  1671(a)(1) ................................................................................................................................. 1
  1671(a)(2) ................................................................................................................................. 1
  1671a(a)(1) ............................................................................................................................... 1
  1671b(a)……………………………………………………………………………………….9
  1671b(a)(2)(A)………………………………………………………………………………...8

1673(a)(1)………………………………………………………………………………1
1673(a)(2) ........................................................................................................................ 1
1673a(a)(1) ....................................................................................................................... 1
1673b(a) ........................................................................................................................... 9
1673b(a)(2)(A) ................................................................................................................. 9
1677(4), (10) .................................................................................................................... 4
1677(7)(B) ....................................................................................................................... 6

**Regulations**

19 C.F.R.
  § 351.202(b)(5) ............................................................................................................. 1
  § 351.225(k)(1) ........................................................................................................... 11
  § 351.225(k)(2) ........................................................................................................... 11

**Administrative Determinations**

*Antidumping Duty Order: Ball Bearings and Parts Thereof From Romania*, 54 Fed. Reg. 20,906 (May 15, 1989) ............................................................................................................... 3, 5

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, USITC Pub. 2185 (May 1989) (Final) ........................................................ 2-5

*Certain Freight Rail Couplers and Parts Thereof from China*, USITC Pub. 5438 (July 2023) (Final) ................................................................................................................................ 5, 10

*Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138 (July 14, 2023) ................................................ 5, 11

*Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135 (July 14, 2023) ......................................... 5, 11

*Final Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany*, 54 Fed. Reg. 18,992 (May 3, 1989) ........................................................................................................................ 2

*Final Determinations of Sales at Less Than Fair Value; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania*, 54 Fed. Reg. 19,109 (May 3, 1989) ................................................................................................................................................ 2, 3

*Partial Rescission of Initiation of Antidumping Investigation and Dismissal of Petitions; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania, Singapore, and Thailand*, 53 Fed. Reg. 39,327 (Oct. 6, 1988) ................................................... 3

Defendant-Intervenor, the Coalition of Freight Coupler Producers, respectfully submits this supplemental response brief pursuant to the Court's Minute Order issued on December 20, 2024, and in response to Plaintiff Wabtec's supplemental brief, submitted on January 24, 2025. *See* ECF No. 56 ("Pls. Supp. Br.").

**ARGUMENT**

I.  **What division of authority and legal duties govern the Department of Commerce and International Trade Commission's actions related to scope determinations (including the requirement that "such merchandise" subject to an AD/CVD order be injurious)?**

Commerce and the Commission play different roles in administering antidumping and countervailing duty investigations and reaching any ultimate orders. *See* Defendant's Supplemental Brief at 1, ECF No. 57. Broadly, Commerce determines whether dumping and/or subsidization of subject merchandise is occurring and, if so, at what magnitude. 19 U.S.C. §§ 1671(a)(1); 1673(a)(1). The Commission determines whether the domestic industry has been injured as a result of that dumping and/or subsidization. *Id.* §§ 1671(a)(2); 1673(a)(2). The Department of Commerce determines whether to initiate an investigation based on the information alleged in a petition. *See id.* §§ 1671a(a)(1); 1673a(a)(1).

Each agency also plays a different role in defining the bounds of the merchandise considered by an investigation. In an investigation initiated at the request of a petitioner, the information alleged in the petition is the starting point for both agencies' inquiries. Commerce's regulations delineate the requirements of a petition. These requirements include that petitions for antidumping and/or countervailing duties must contain, "A detailed description of the subject merchandise that defines the requested scope of the investigation, including the technical characteristics and uses of the merchandise and its current U.S. tariff classification number . . . ." 19 C.F.R. § 351.202(b)(5).

Accordingly, the scope included in a petition is the genesis of Commerce's scope determination. Once a petition is deemed sufficient and an investigation is initiated, Commerce determines the scope of the investigation, with deference to the scope provided in the petition and petitioner's intent. *See, e.g.*, *NTN Bearing Corp. of. Am. v. United States*, 747 F. Supp. 726, 730 (C.I.T. 1990); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 915, 924, 637 F. Supp. 3d 1166, 1174-75 (2009).

The investigations underlying the *Torrington* line of cases, which were discussed extensively at oral argument, are illustrative of the roles that Commerce and the Commission each play in conducting antidumping and countervailing duty investigations. It is unequivocally Commerce's province to define the scope of an investigation, based on the scope provided by the petitioner. *See, e.g.*, *Hitachi Metals Ltd. v. United States*, 949 F.3d 710, 714 (Fed. Cir. 2020). Torrington's petition covered imports of antifriction bearings, other than tapered roller bearings, from nine countries. *See generally Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, USITC Pub. 2185 (May 1989) (Final) ("Pub. 2185"). Commerce determined to subdivide the scope of the investigations into five classes or kinds of merchandise – ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings, and plain bearings – based on the *Diversified Products* criteria, which are now incorporated into Commerce's regulations at 19 C.F.R. § 351.225(k)(2): (1) physical characteristics; (2) ultimate use; (3) expectations of the ultimate purchaser; (4) channels of trade; and (5) manner of advertising and display. *See Final Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany*, 54 Fed. Reg. 18,992, 18,998-99 (May 3, 1989) (discussing

subdivision of scope as to all subject countries) ("AFBs from Germany"); *see also Diversified Prods. Corp. v. United States*, 6 C.I.T. 155, 162-63, 572 F. Supp. 883, 889-90 (1983).

Subsequent to this subdivision, Commerce partially rescinded the investigations with regard to cylindrical roller bearings, needle roller bearings, and plain bearings from Romania, Singapore, and Thailand, as well as with regard to spherical roller bearings from Singapore and Thailand, because Torrington, the petitioner, had not provided sufficient evidence of sales at less than fair value of these classes or kinds of merchandise from these countries. *Partial Rescission of Initiation of Antidumping Investigation and Dismissal of Petitions; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania, Singapore, and Thailand*, 53 Fed. Reg. 39,327 (Oct. 6, 1988). Commerce separately investigated the remaining two classes or kinds, ball bearings and spherical roller bearings, calculated separate dumping margins for those products, and issued an order for ball bearings. *Final Determinations of Sales at Less Than Fair Value; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Romania*, 54 Fed. Reg. 19,109, 19,111 (May 3, 1989); *see generally Antidumping Duty Order: Ball Bearings and Parts Thereof From Romania*, 54 Fed. Reg. 20,906 (May 15, 1989).

This Court blessed Commerce's exercise of this authority, stating that Commerce has the responsibility of determining the scope of an investigation and any order, and that it can divide a scope into multiple classes or kinds of products. *Torrington v. United States*, 14 C.I.T. 507, 509, 512-13, 745 F. Supp. 718 (1990). The Court of Appeals for the Federal Circuit further affirmed this Court's opinion. *Torrington v. United States*, 938 F.2d 1276 (Fed. Cir. 1991).

Importantly, in the *Torrington* case Commerce did not issue an order covering spherical roller bearings from Romania, because the Commission did not find that spherical roller bearings were a cause of injury to the domestic industry. *See* Pub. 2185 at 5. It is the Commission's province

3

to determine the domestic like product whose production is being materially injured, threatened with material injury, or materially retarded as a result of subject imports. *See* 19 U.S.C. § 1677(4), (10). In the Commission's preliminary and final determinations in the antifriction bearings investigations, it found <u>six</u> domestic like products: ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings, spherical plain bearings, and slewing rings. Pub. 2185 at 33. In an appeal of that determination, this Court also affirmed that the Commission need not find the same number of domestic like products as Commerce finds classes or kinds. *Torrington Co. v. United States*, 14 C.I.T. 648, 651-56, 747 F. Supp. 744, 748-53 (1990), *aff'd* 938 F.2d 1278 (Fed. Cir. 1991). The Commission reviews six factors for determining the domestic like product: physical characteristics and end use, interchangeability, channels of distribution, customer and producer perceptions, production facilities and employees, and, where appropriate, price. *See, e.g.*, *Nippon Steel Corp. v. United States*, 19 C.I.T. 450, 455 n.4 (1995). Determining the universe of the domestic like product allows the Commission to compare volume and prices of imports – as defined by the scope set by Commerce – to domestic production to determine whether the domestic industry is injured as a result of subject imports.

Wabtec's supplemental brief asserts that none of the Commission's determinations "allowed the Commission to exclude attached couplers from the scope of the final orders here," and that, "{N}one of these statutory determinations turn on whether a subset of in-scope merchandise is addressed to a non-cognizable theory of injury." Pls. Supp. Br. at 3. Wabtec is incorrect. The Commission has the authority to define the domestic like product and, based on its factors for determining injury, determine whether the domestic producers of that domestic like product have been injured as a result of subject imports. If the Commission were to find that an investigation covered multiple domestic like products, and the production of one of those domestic

4

like products was not injured as a result of subject imports, then no order would issue as to that product. *See, e.g.*, Pub. 2185; *Antidumping Duty Order: Ball Bearings and Parts Thereof From Romania*, 54 Fed. Reg. 20,906 (May 15, 1989).  Here it is of note that Wabtec never argued before the Commission that there should be separate domestic like products – mounted vs. unmounted – and has again failed to exhaust administrative remedies.

Notwithstanding Wabtec's failure to exhaust issue, the Commission found that all FRCs constituted a single domestic like product, coextensive with Commerce's scope. *See Certain Freight Rail Couplers and Parts Thereof from China*, USITC Pub. 5438 (July 2023) (Final) at 13 ("Pub. 5438"). It bears repeating that no party in the Commission's final phase investigation argued that the Commission should define more than one domestic like product, in effect that imports of mounted FRCs should be evaluated separately for injury: "Respondents do not address the issue of the domestic like product definition in the final phase of these investigations." *Id.* at 10. As a result, the Commission's affirmative injury determination applied to all FRCs, and Commerce issued one antidumping duty order on FRCs from China and one countervailing duty order on FRCs from China. *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138 (July 14, 2023); *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135 (July 14, 2023).

Accordingly, the scope of an investigation defines only the physical characteristics of the imports subject to the investigation.  It is the Commission's role to examine whether the imports meeting the scope definition have injured the domestic industry. 19 U.S.C. § 1677(7)(B). That is, the scope in an investigation is to define the physical characteristics of the subject merchandise as it enters the United States, and this is separate from the requirement that subject merchandise be a

5

cause of injury to the domestic industry. Wabtec's attempts to conflate these analyses are as unavailing as they are legally unsupported.

**II.     What are the limits, if any, that restrict Commerce's discretion to include products in a final scope determination?**

As discussed further below, the statutory framework permits Petitioners to propose the scope of an investigation and the limits recognized by the Courts are primarily focused on preventing Commerce from *excluding* – not including – products from that definition. Commerce "'retains broad discretion'" for defining the scope of an investigation, while "staying within the bounds of 'the intent of the petition.'" *M.S. Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed. Cir. 2022) (quoting *Minebea Co. v. United States*, 16 C.I.T. 20, 22, 782 F. Supp. 117, 120 (1992)). Commerce can modify a petitioner's proposed scope definition in limited circumstances, such as when the scope definition is insufficiently specific or otherwise lead to enforcement issues. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 915, 924, 637 F. Supp. 2d. 1166, 1175 (internal citations omitted). Commerce may set the scope "with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law." *Mitsubishi Elec. Corp. v. United States*, 12 C.I.T. 1025, 1046, 700 F. Supp. 538, 555 (1988).

Similar to choosing the causes of action in civil litigation, Petitioners in a trade case decide the scope definition. Then Petitioner must prove before Commerce that those products are being dumped or subsidized, and similarly – based on their chosen scope definition – the domestic industry must prove to the Commission that such imports are causing material injury to the domestic industry. Wabtec attempts to paint the scope definition as being synonymous with the entirety of the investigative process. Petitioners may choose a broad scope definition but if they define the scope in an overly broad manner then the statutory framework requires them to satisfy both proving that such a scope amounts to dumping and injury to the corresponding domestic

industry or industries. Simply put, the limits are two-fold: (1) the statutory framework provides checks and balances in regard to an overly broad scope due to the parallel processes and evidentiary burdens; and (2) the Court of Appeals has made clear that petitioners can exercise this right and Commerce can only modify the scope if there are essentially enforcement issues, but not if it would frustrate the relief sought by the petitioner. Again, referring back to the analogy to civil litigation, a plaintiff chooses their cause of action by pleading or alleging facts in its complaint, but then such plaintiff must prove its case theory is correct. While Wabtec claims that there was no "cognizable theory of injury" connected with the scope definition, the fact remains that the Commission – the agency tasked with injury determinations – ultimately did find that imports subject to the scope were injurious to the domestic industry (and importantly, Wabtec never argued for a separate injury determination as to mounted FRCs).

Wabtec asserts that "If Commerce determines that some, 'element{} necessary for the imposition of a duty' does *not* exist, . . . Commerce plainly cannot issue the order." *Id.* (quoting 19 U.S.C. § 1671a(a)). This implies that Commerce has the authority to exercise review over the validity of the Commission's injury determination before issuing an order. This too is incorrect. The Federal Circuit has held that, if Commerce made an affirmative determination of dumping and the Commission has made an affirmative determination of injury, then an order <u>must</u> issue. *Diamond Sawblades Mfrs. Coalition v. United States*, 626 F.3d 1374, 1383 (Fed. Cir. 2010) (affirming Court of International Trade's issuance of a writ of mandamus directing Commerce to issue antidumping duty order following International Trade Commission's finding of injury upon remand from the Court of International Trade).

In conclusion, Commerce, in determining the scope definition, must "stay{} within the bounds of 'the intent of the petition.'" *M.S. Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed.

Cir. 2022) (quoting *Minebea Co. v. United States*, 16 C.IT. 20,22, 782 F. Supp. 117, 1220 (1992)). Commerce can modify a petitioner's proposed scope definition only in limited circumstances. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 915, 924, 637 F. Supp. 2d. 1166, 1175 (internal citations omitted). Commerce may set the scope "with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law." *Mitsubishi Elec. Corp. v. United States*, 12 C.I.T. 1025, 1046, 700 F. Supp. 538, 555 (1988). However, this is only the beginning of the investigative process. While petitioners have the right to plead the scope definition as they see fit, they still must demonstrate that products covered by the scope are unfairly priced and injurious – and as discussed further below, this statutory framework provides the ultimate limits on an overly broad scope.

### III. Which tests – if any – should or must be applied by Commerce or the Courts to effectuate those limits?

The statutory framework and Commerce's own regulations provide checks and balances to ensure that investigations are not overly broad. The starting point of Commerce's analysis, and any tests that should be applied to determine whether merchandise is in the scope, is always with the language of the scope itself and is a fact- and case-specific inquiry. As discussed above, at initiation Commerce determines a scope that is "within the bounds of 'the intent of the petition.'" *M.S. Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed. Cir. 2022) (quoting *Minebea Co. v. United States*, 16 C.IT. 20,22, 782 F. Supp. 117, 1220 (1992)). Commerce can modify if the scope language is lacking in specificity or if the definition would lead to circumvention concerns. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 C.I.T. 915, 924, 637 F. Supp. 2d. 1166, 1175; *Mitsubishi Elec. Corp. v. United States*, 12 C.I.T. 1025, 1046, 700 F. Supp. 538, 555 (1988).

Wabtec's concerns regarding a lack of a "cognizable theory of injury" are also addressed by the statutory framework. Within 45 days of filing a petition, the Commission must make a

8

determination regarding the sufficiency of injury evidence. *See* 19 U.S.C. §§ 1671b(a)(2)(A); 1673b(a)(2)(A). The legal standard for preliminary antidumping and countervailing duty determinations requires the Commission to determine, based upon the information available at the time of the preliminary determinations, whether there is a reasonable indication that a domestic industry is materially injured or threatened with material injury, or that the establishment of an industry is materially retarded, by reason of the allegedly unfairly traded imports. 19 U.S.C. §§ 1671b(a), 1673b(a); *see also American Lamb Co. v. United States*, 785 F.2d 994, 1001-04 (Fed. Cir. 1986); *Aristech Chem. Corp. v. United States*, 20 C.I.T. 353, 354-55 (1996). In applying this standard, the Commission weighs the evidence before it and determines whether "(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." *American Lamb Co.*, 785 F.2d at 1001; *see also Texas Crushed Stone Co. v. United States*, 35 F.3d 1535, 1543 (Fed. Cir. 1994). Accordingly, within 45 days of the filing of the case, the statutory framework provides for a determination as to whether the imports that meet the scope definition present, in the words of the Plaintiffs, a cognizable theory of injury that is reasonably supported by the evidence.

The statute provides for safeguards regarding Wabtec's concerns. As discussed above, Plaintiffs have argued that FRCs when mounted onto railcars are not injurious to the domestic industry and it is implied that there is nothing the Commission can do about an overly broad scope definition. But this is false. Commerce's scope finding does not control the Commission's like product determination. *Hosiden Corp. v. Advanced Display Mfrs.*, 85 F.3d 1561, 1568 (Fed. Cir. 1996). Indeed, the Commission may find a single like product corresponding to several different classes or kinds defined by Commerce or it can divide the scope into several different domestic

9

like products. *Torrington*, 14 C.I.T. at 650-56 (affirming the Commission's determination defining six like products in investigations where Commerce found five classes or kinds). Accordingly, within 45 days of filing a petition, the Commission makes an injury determination as to one or more domestic like product definitions and it is not bound by Commerce's scope definition in this regard.

Here, and again of note, is Plaintiffs failed to make any argument that mounted FRC's were a distinct domestic like product and that there was no injury by reason of such imports. The Commission explicitly addressed this issue in its Views, stating:

> In the final phase of these investigations, there is no new information on the record that would warrant the Commission's reconsideration of its finding in the preliminary determinations that all FRCs belong in a single domestic like product, and no party has argued to the contrary. As discussed below, this record contains additional information that further supports defining a single domestic like product coextensive with the scope. Accordingly, we find that all FRCs within the scope belong in a single domestic like product.

Pub. 5438 at 11 (emphasis added). As discussed above, the scope is just the beginning of the process, the statutory framework subsequently requires preliminary and final determinations by Commerce that all of the products subject to the scope are in fact being dumped and/or subsidized. And then ultimately, the Commission must make a final determination of injury. While Plaintiffs argue that there was no "cognizable theory of injury," it is undisputed that the Commission did in fact make an ultimate finding of injury due to subject imports. Plaintiffs did not argue that mounted FRCs should be considered a separate domestic like product and thus should be subject to a distinct injury determination. *See generally* Pub. 5438.

Wabtec's reliance on the *Diversified Products* analysis is unpersuasive. Wabtec concedes, "Commerce has codified this test in its regulations governing scope rulings" and cites to 19 C.F.R.

10

§ 351.225(k)(2). *See* Pls. Supp. Br. at 8. Assuming arguendo that this is right analysis[1] – and that Plaintiff did not fail to exhaust its administrative remedies – even this approach demonstrates that Commerce's decision is supported by substantial evidence and is otherwise in accordance with law.

To begin with, Plaintiffs cite to 19 C.F.R. § 351.225(k)(2). *See id.* However, resort to these factors is only appropriate when Commerce "determines that the sources under paragraph (k)(1)" are not dispositive. 19 C.F.R. § 351.225(k)(2). Accordingly, any such analysis begins with 19 C.F.R. § 351.225(k)(1). This section indicates that "In determining whether a product is covered by the scope of the order at issue, the Secretary will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive." *Id.* § 351.225(k)(1).

In other words, and in direct response to the Court's question, the regulations provide for a multifactor analysis to effectuate any limits, but only if the language of the scope is not dispositive. The language of the scope is explicit and dispositive: "Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, <u>whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar</u>." *See Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Antidumping Duty Order*, 88 Fed. Reg. 45,138, 45,139 (July 14, 2023); *Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Countervailing Duty Order*, 88 Fed. Reg. 45,135, 45,137 (July 14, 2023).

---

[1] 19 C.F.R. § 351.225(k) explicitly applies to scope rulings, which are made following this issuance of an order, as opposed to scope determinations, which are made in the course of an investigation prior to the issuance of an order and one of which is at issue here.

Accordingly, under 19 C.F.R. § 351.225(k), the test is satisfied if the language is dispositive, and that is the case here. But, again of note, Plaintiffs did not make these arguments before Commerce. Rather, their arguments were framed as a question of substantial transformation ("The scope is improper because the attachment of freight rail couplers results in a substantial transformation into freight railcars."). Appx12234.

And Commerce directly addressed this argument as well. The decision on appeal specifically states that:

> We also continue to find (consistent with the prior investigations) that freight rail couplers are not substantially transformed into a distinct class or kind of merchandise when they are attached to a freight railcar. In the prior investigations, Commerce found that freight rail couplers are not permanently affixed to freight railcars and that freight rail couplers do not undergo further processing or physical changes when attached to or removed from railcars. This understanding of freight rail couplers is further supported by the record of the current investigations.

Appx12238. Plaintiffs argued below that substantial transformation was the appropriate test, and Commerce indicated that there was substantial evidence that demonstrated that no substantial transformation occurred, including:

- Freight rail couplers are not directly attached to railcars, but are attached to yokes that are attached to railcars by bolted plates (also noting that in a prior investigation, Strato described the assembly of a freight rail coupler to a railcar indicating that a freight rail coupler is not a permanently affixed component). Appx12238.

- Evidence on the record demonstrates that knuckles and coupler bodies are designed to be removable and replaceable without undergoing physical changes when attached to or removed from railcars. (For example, Amsted itself explained that "System components need to be inspected and replaced periodically due to wear or damage, so the parts need to be accessible and removable." In the prior investigations, Strato agreed with Amsted that freight rail couplers are removed and replaced when their useful life has ended and added that "the physical nature of these components is not changed when they are removed from a railcar.") Appx12239.

- Information indicated that freight rail couplers have a shorter useful life than freight railcars, further supporting that couplers are not a permanent part of the railcar. Appx12239.

12

- Record evidence demonstrates that within the freight railcar industry, it is common for freight rail couplers to be excluded from drawings and schematics of freight railcars. Appx12239.

Therefore, Commerce addressed Wabtec's arguments that the appropriate test was one of substantial transformation, as opposed to the arguments that they make for the first time before this Court. Commerce reasonably concluded that the totality of the evidence demonstrated that freight rail couplers are not permanently affixed to railcars and do not undergo further processing or physical changes when attached to or removed from railcars. As a result, freight rail couplers attached to or mounted on railcars are not substantially transformed into a separate class or kind of merchandise from freight rail couplers imported on their own, and, thus, meet the physical description of the merchandise in the scope of these investigations. Accordingly, Commerce's decision was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

This determination was based on substantial evidence that discussed the substantial transformation test proposed by Wabtec. Commerce's final scope determination explicitly referenced both the class or kind and substantial transformation tests:

> A substantial transformation occurs where, "as a result of manufacturing or processing steps . . . {,} the {product} loses its identity and is transformed into a new product having a new name, character, and use." Additionally, in considering whether a product constitutes a distinct class or kind of merchandise, Commerce looks for "clear dividing lines" between products. The totality of the evidence on the record indicates that when a freight rail coupler is attached to our mounted on a freight railcar, it neither loses its identity nor is transformed into a new product with a new name, character, and use.

Appx12240.

Wabtec renews its criticisms of Commerce's explanations in its supplemental brief, but its approach is far from principled. First, Wabtec cites *Mid Continent Nail Corp. v. United States* for the proposition that Commerce must "first determine what the product coming across the border

13

is. Is the product "'a single, unitary item, or a mere aggregation of separate items.'" Pls. Supp. Br. at 9 (citing 725 F.3d 1295 (Fed Cir. 2013)). This test pertains to Commerce's mixed media analysis, which is used in certain, limited instances to determine whether a product is included in the scope of an order, but is inapposite here. Namely, Commerce employs the mixed media test when subject merchandise is imported as part of a set or kit that includes non-subject merchandise. *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1301 (Fed. Cir. 2013); *Walgreen Co. of Deerfield, IL v. United States*, 620 F.3d 1350, 1354-55 (Fed. Cir. 2010). And of course, Plaintiffs did not make any arguments regarding the mixed media test before Commerce.

In *Mid Continent*, the appellant challenged a scope ruling regarding household tool kits that included brass-coated steel nails, which Commerce found not to be subject to an antidumping duty order on steel nails from China. *See Mid Continent Nail*, 725 F.3d at 1298-1300. The Federal Circuit began its analysis by noting that analysis begins with the language of the scope:

> In issuing scope rulings, Commerce ... enjoys substantial freedom to interpret and clarify its antidumping orders. But while it may interpret those orders, it may not change them. We therefore afford significant deference to Commerce's interpretation of a scope order, so long as Commerce's interpretation is not contrary to the order's terms and does not change the scope of the order. In particular, orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it.

*Id.* at 1300 (internal quotes and citations omitted). Most importantly, *Mid Continent* did not involve a scope that explicitly addressed the merchandise in the form at issue. Here, of course, the scope clearly and explicitly covers mounted FRCs.

Similarly in *Walgreen*, the appellant challenged Commerce's scope inquiry regarding whether gift bag sets were included in an antidumping duty order on tissue paper products. *See Walgreen*, 620 F.3d at 1352-54. In both cases, the mixed media inquiry was appropriate because of the lack of clarity in the language of the scope of the applicable orders. In *Walgreen*, for

14

example, the scope of the relevant order did not address whether tissue paper was included in the scope if imported as part of a set. *See id.* at 1353. Here, however, it bears repeating one last time, the FRCs scope explicitly states that FRCs are included in the scope whether mounted or unmounted; regardless of application of the (k)(2), or "*Diversified Products*," analysis or the inapplicable mixed media test, mounted FRCs were appropriately included in the scope.

Commerce can and does enforce limits on the scopes of investigations. As discussed above, Commerce can modify a scope that is overly broad or insufficiently specific, or to prevent evasion or circumvention. *Ad Hoc Shrimp*, 33 C.I.T. at 924; *Mitsubishi*, 12 C.I.T. at 1046. However, deference to the intent of the petitioner has been the touchstone in virtually every case at this Court and at the Federal Circuit that has addressed scope rulings or determinations. *See, e.g.*, *M S Int'l*, 32 F.4th at 1151; *Ad Hoc Shrimp*, 33 C.I.T. at 924; *Mitsubishi*, 12 C.I.T. at 1046. Then it becomes Petitioners obligation to prove their case. Commerce's determination was consistent with the statutory framework and its own regulations, addressed the arguments actually made by the Plaintiffs below, and is supported by substantial evidence and in accordance with law.

## CONCLUSION

For the foregoing reasons and those set forth in our prior briefing, the Coalition of Freight Coupler Producers respectfully requests that this Court hold that Commerce's final determination is supported by substantial evidence and in accordance with the law.

Respectfully submitted,

*/s/ Daniel B. Pickard*
Daniel B. Pickard, Esq.
Claire M. Webster, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
*Counsel to the Coalition of Freight Coupler Producers*

Dated: March 3, 2025

15

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that Defendant-Intervenor's Supplemental Brief, filed on March 3, 2025 complies with the page limitation of 15 pages set forth in the Court's December 20, 2024 order. The page count for Defendant-Intervenor's Supplemental Brief is 15 double spaced pages, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature.

Dated: March 3, 2025             /s/ Daniel B. Pickard, Esq.
                                 Daniel B. Pickard
                                 Counsel for Defendant-Intervenor