A-570-145, C-570-146
Remand
Slip Op. 25-160
**Public Document**
E&C/OIX:  BB

***Wabtec Corporation v. United States***
**Court No. 23-00160/161, Slip Op. 25-160 (CIT December 23, 2025)**
**Freight Rail Couplers from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court), in *Wabtec Corporation v. United States*.[1]  This action arises out of the final

determination to include "mounted" merchandise within the scope of the antidumping duty (AD)

and countervailing duty (CVD) investigations on certain freight rail couplers and parts thereof

(FRCs) from the People's Republic of China (China).[2]

In the *Remand Order*, the Court sustained, in part, and remanded, in part Commerce's

final determinations in these investigations, and directed Commerce to reassess whether attached

FRCs should be excluded from the scope of the *Orders*.[3]  The Court remanded for Commerce to

consider, in greater detail, Wabtec Corporation's (Wabtec) argument regarding the scope of the

---

[1] *See Wabtec Corporation v. United States*, Consol. Court No. 23-00160 and 23-00161, Slip Op. 25-160 (CIT December 23, 2025) (*Remand Order*).
[2] *See Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part,* 88 FR 32184 (May 19, 2023), and accompanying Final Scope Decision Memorandum (Final Scope Decision Memorandum); and *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances*, 88 FR 34485 (May 30, 2023).  The subsequent orders included the "mounted" language.  *See Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China:  Countervailing Duty Order*, 88 FR 45135 (July 14, 2023); and *Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China:  Antidumping Duty Order*, 88 FR 45138 (July 14, 2023) (collectively, *Orders*).
[3] *See Remand Order.*

*Orders*.[4]  As set forth below, after further considering Wabtec's argument, Commerce continues to find that attached FRCs were properly included in the scope of the *Orders*.

## II.    SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is certain freight railcar couplers (also known as "fits" or "assemblies") and parts thereof.  Freight railcar couplers are composed of two main parts, namely knuckles and coupler bodies but may also include other items (*e.g.*, coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors).  The parts of couplers that are covered by the *Orders* include:  (1) E coupler bodies, (2) E/F coupler bodies, (3) F coupler bodies, (4) E knuckles, and (5) F knuckles, as set forth by the Association of American Railroads (AAR).  The freight rail coupler parts (*i.e.*, knuckles and coupler bodies) are included within the scope of the *Orders* when imported separately.  Coupler locks, lock lift assemblies, knuckle pins, knuckle throwers, and rotors are covered merchandise when imported in an assembly but are not covered by the scope when imported separately.

Subject freight railcar couplers and parts are included within the scope whether finished or unfinished, whether imported individually or with other subject or nonsubject parts, whether assembled or unassembled, whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar.  Finishing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, machining, and assembly of various parts.  When a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope.

---

[4] *Id.* at 38.

The finished products covered by the scope of the *Orders* meet or exceed the AAR specifications of M-211, "Foundry and Product Approval Requirements for the Manufacture of Couplers, Coupler Yokes, Knuckles, Follower Blocks, and Coupler Parts" and/or AAR M-215 "Coupling Systems," or other equivalent domestic or international standards (including any revisions to the standard(s)).

The country of origin for subject couplers and parts thereof, whether fully assembled, unfinished or finished, or attached to a railcar, is the country where the subject coupler parts were cast or forged. Subject merchandise includes coupler parts as defined above that have been further processed or further assembled, including those coupler parts attached to a railcar in third countries. Further processing includes, but is not limited to, arc washing, welding, grinding, shot blasting, heat treatment, painting, coating, priming, machining, and assembly of various parts. The inclusion, attachment, joining, or assembly of nonsubject parts with subject parts or couplers either in the country of manufacture of the in-scope product or in a third country does not remove the subject parts or couplers from the scope.

The couplers that are the subject to the *Orders* are currently classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) statistical reporting number 8607.30.1000. Unfinished subject merchandise may also enter under HTSUS statistical reporting number 7326.90.8688. Subject merchandise attached to finished railcars may also enter under HTSUS statistical reporting numbers 8606.10.0000, 8606.30.0000, 8606.91.0000, 8606.92.0000, 8606.99.0130, 8606.99.0160, or under subheading 9803.00.50. Subject merchandise may also be imported under HTSUS statistical reporting number 7325.99.5000. These HTSUS subheadings are provided for convenience and customs purposes only; the written description of the scope of the *Orders* is dispositive.

### III.    BACKGROUND

On October 18, 2022, Commerce initiated a less-than-fair-value investigation on FRCs from China and Mexico and a CVD investigation of FRCs from China.[5]  On November 17, 2022, Wabtec commented on the proposed scope of these investigations, requesting that Commerce exclude from the scope FRCs that have been "further processed or further assembled, including those coupler parts attached to a railcar in third countries" (attached FRCs).[6]  Wabtec argued that the inclusion of attached FRCs in the scope is "improper because FRCs attached to new railcars in third countries are not capable of causing cognizable injury to the domestic industry."[7]  On December 21, 2022, Commerce issued a supplemental questionnaire to the Coalition of Freight Coupler Producers (the petitioner) regarding the proposed scope, to which the petitioner responded on December 29, 2022.[8]  In response to the petitioner's submission, Wabtec filed comments and rebuttal factual information.[9]

On March 28, 2023, Commerce issued the Preliminary Scope Decision Memorandum, addressing parties' comments on the scope of the investigations, including finding that "{FRCs} attached to or mounted on to railcars are the same class or kind" as {FRCs} covered by the investigations.[10]  In the Preliminary Scope Decision Memorandum, regarding Wabtec's injury argument, Commerce found that the "question of injury to the domestic freight rail coupler

---

[5] *See Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and Mexico:  Initiation of Less-Than-Fair-Value Investigations*, 87 FR 64444 (October 25, 2022); *see also Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China:  Initiation of Countervailing Duty Investigation*, 87 FR 64440 (October 25, 2022).

[6] *See* Wabtec's Letter, "Comments on Proposed Scope," dated November 17, 2022.

[7] *Id*. at 2.

[8] *See* Commerce's Letter, "Scope Supplemental Questions," dated December 21, 2022; *see also* Petitioner's Letter, "Supplemental Scope Questionnaire Response," dated December 29, 2022.

[9] *See* Wabtec Letter, "Wabtec's Comments and Rebuttal Factual Information," dated January 12, 2023.

[10] *See* Memorandum, "Preliminary Scope Decision Memorandum," dated March 28, 2023 (Preliminary Scope Decision Memorandum).

industry is within the purview of the concurrent investigation conducted by the {International Trade Commission (ITC)}."[11]

On April 10, 2023, Wabtec filed a scope case brief, again arguing that Commerce should exclude FRCs attached to a railcar in third countries from the scope of the investigations because "the proposed scope exceeds the statutory limits on antidumping and countervailing duty proceedings because FRCs are not capable of causing a cognizable injury to the domestic FRC industry when they are imported directly from China into a third country and mounted on and incorporated into new railcars there."[12]  On April 17, 2023, Wabtec filed a scope rebuttal case brief, arguing that the petitioner had failed to provide a persuasive reason to include FRCs attached to railcars in third countries in the scope of the investigations.[13]  On May 15, 2023, Commerce issued the Final Scope Decision Memorandum, in which it  "continued to find that attachment to freight railcars does not turn {FRCs} into a new article of commerce," and included in the scope "{FRCs} attached to, or mounted on, freight railcars."[14]

In the Final Scope Decision Memorandum, Commerce rejected Wabtec's argument that the injury to the petitioner was occurring in the third country and, therefore, there was no domestic injury.  We found:

> {T}he question of injury to the domestic freight rail coupler industry and the types of data collected for an injury determination is within the purview of the ITC, which is conducting the concurrent injury investigation, a separate and distinct proceeding.  The information that the ITC does or does not collect in its U.S. Importers and Purchaser Questionnaires is not a matter that Commerce must consider when making a scope determination.  Likewise, Commerce does not determine whether subject imports are a source of injury to the U.S. industry. Rather, as explained above, Commerce's role is to define or clarify the scope of an investigation, and its practice is to defer to the petitioner with respect to scope language.  The ITC will make its final injury determination with regard to imports

---

[11] *Id.* at 11.
[12] *See* Wabtec's Letter, "Wabtec's Scope Letter Brief," dated April 10, 2023, at 2.
[13] *See* Wabtec's Letter, "Wabtec's Rebuttal Scope Letter," dated April 17, 2023.
[14] *See* Final Scope Decision Memorandum at 8.

of subject freight rail couplers following the completion of Commerce's investigations, if affirmative.  That said, we note that contentions by interested parties that any injury to the petitioner is limited to lost export sales are based on the contention that freight rail couplers lose their distinct identity when mounted or joined to freight railcars, an argument that, as noted above, we find unpersuasive.

Therefore, on July 14, 2023, Commerce published the *Orders*, which included attached FRCs in the scope of the *Orders*.  Wabtec challenged Commerce's final scope determination.

In its *Remand Order*, the Court concluded that, while Commerce's determinations that attached FRCs are the same class or kind of merchandise as unattached FRCs and that FRCs are not substantially transformed when attached to railcars are in accordance with law and supported by substantial evidence, Commerce failed to address Wabtec's argument that the petitioner's theory of injury required exclusion of attached FRCs from the scope of the *Orders*.[15]  Further, because "Commerce has the authority to modify scope language where the petition's language is overly broad or otherwise defective, and because an analysis of whether a theory of injury is cognizable is distinct from the {ITC}'s determination as to whether injury exists," the Court remanded the final determination to Commerce for it "to reassess whether attached FRCs should be excluded from the scope language" of the *Orders*.[16]

On March 11, 2026, we released our Draft Remand to interested parties.[17]  On March 23, 2026, we received comments from Wabtec, Strato Inc. (Strato), and the petitioner.[18]  We respond to these comments below.  After considering the comments raised by interested parties, we made no changes to the Draft Remand.

---

[15] *See Remand Order* at 30 and 37.

[16] *Id*. at 37- 38.

[17] *See* Draft Results of Redetermination Pursuant to Court Remand, *Wabtec Corp. v. United States*, Slip Op. 25-160 (CIT December 23, 2025), dated March 11, 2026 (Draft Remand); *see also* Memorandum, "Placement of EAPA Notice of Initiation of Investigation," dated March 11, 2026.

[18] *See* Strato's Letter, "Draft Remand Comments," dated March 23, 2026 (Strato's Comments); *see also* Petitioner's Letter, "Comments on the Draft Remand Redetermination," dated March 23, 2026 (Petitioner's Comments); *see also* Wabtec's Letter, "Draft Remand Comments," dated March 23, 2026 (Wabtec's Comments).

## IV.    ANALYSIS

In light of the Court's *Remand Order*, we have further considered Wabtec's arguments regarding the inclusion of attached FRCs in the scope of the *Orders*.  Wabtec argues that Commerce erred in "including within the scope FRCs attached to railcars abroad and imported into the US as a component part of a railcar,"[19] because, according to Wabtec, the import of mounted subject merchandise (*i.e.*, attached FRCs) cannot cause injury to the domestic industry because it only results in the loss of export sales (*e.g.*, sales of subject merchandise to new railcar builders in Mexico), not the loss of U.S. domestic sales of subject merchandise.

Commerce finds that we did not disclaim our authority to modify the scope language, as Wabtec alleges.  Commerce has the ultimate authority and responsibility for establishing the scope of the investigation, as well as the authority to modify the scope language, and Commerce executed this authority in determining whether the scope language including attached FRCs needed to be modified.[20]  The Court has repeatedly opined that Commerce has the inherent authority to define the scope of an investigation.  Commerce may depart from the scope as proposed in a petition if it determines the petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective.  Commerce may set the scope "with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."[21]  However, because none of these circumstances applied to this case, Commerce did not alter the scope contained in the petition.

As Commerce stated in the Final Scope Decision Memorandum, "to the extent that {third country} railcar manufacturers are purchasing {FRCs} and exporting finished railcars with

---

[19] *Id.* at 25.
[20] *See, e.g., Kyocera Solar, Inc. v. United States,* 253 F. Supp. 3d 1294, 1315-16 (CIT 2017).
[21] *See M S Int'l, Inc. v. United States,* 32 F.4th 1145 (Fed. Cir. 2022), citing *Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 555 (CIT 1988).

attached or mounted {FRCs}, the dumping law authorizes Commerce to examine such sales if they enter the United States for consumption because they are the parties exporting (*i.e.*, are the price discriminators) the {FRCs} to the Unites States."[22]  Furthermore, the Court has stated, "{Commerce} has the authority to define and/or clarify what constitutes the subject merchandise to be investigated as set forth in the petition ... taking into consideration such factors as ... the known tactics of foreign industries attempting to avoid a countervailing duty order."[23]  The Court has also held, "Commerce has inherent power to establish the parameters of the investigation so that it would not be tied to an initial scope definition that may not make sense in light of the information available to {Commerce} or subsequently obtained in the investigation."[24]  Thus, Commerce did not disclaim its authority to modify the scope language but, as is within its discretion, determined to maintain attached FRCs in the scope of these investigations.

By including attached FRCs in the scope of these investigations as part of Commerce's ultimate authority to determine the scope, we followed our practice in investigations to provide ample deference to the petitioner to clarify and identify the products for which it seeks relief.[25] Indeed, Commerce has a "large" amount of discretion to determine "the appropriate scope" of an investigation to ensure that any potential order will remedy any countervailable subsidies or dumping determined to exist during an investigation.[26]  However, Commerce strives to craft a

---

[22] *See* Final Scope Decision Memorandum at 11; *see also* section 772(a) of the Tariff Act of 1930, as amended (the Act), which defines "export price" as the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.

[23] *See, e.g.*, *Mitsubishi Electric Corporation v. United States*, 700 F. Supp. 538, 556 (CIT 1988), *aff'd* by *Mitsubishi Electric Corporation v. United States*, 898 F.2d 1577, 1583 (Fed. Cir. 1990)

[24] *See Remand Order* at 27 (citing *Duferco Steel, Inc. v. United States,* 296 F.3d 1089 (Fed. Cir. 2002)).

[25] *See, e.g.*, *Large Residential Washers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 81 FR 90776 (December 15, 2016), and accompanying Issues and Decision Memorandum (IDM) at Comment 5.

[26] *See, e.g.*, *Mitsubishi Electric Corporation v. United States*, 700 F. Supp. 538, 556 (CIT 1988), *aff'd* by *Mitsubishi Electric Corporation v. United States*, 898 F.2d 1577, 1583 (Fed. Cir. 1990); *see also* Senate Report on Trade Agreements Act of 1979, S. Rep. No. 96-249 (1979), at 45 (stating that "domestic petitioners and the administrators

scope that both includes the specific products for which the petitioner, the injured party, requests relief, and excludes those products that would otherwise fall within the general physical description of products in the scope, but for which the petitioner does not seek relief.[27]  Absent a concern that a proposed scope cannot be effectively administered, that there is potential for evasion or circumvention without amendment to the scope, or that the scope language is inconsistent with the intent of the petitioner, Commerce generally will accept the scope as defined in the petition.[28]  The petitioner may request relief for a class or kind of product not in production at the time the petition is filed, to help avoid future circumvention and transshipment concerns.[29]  In fact, the petitioner explicitly requested that attached FRCs be included in the scope of the *Orders* to prevent evasion, given that the "majority of subject FRCs that enter the United States enter mounted to railcars from Mexico."[30]  Indeed, in our Final Scope Decision Memorandum, we stated, "Commerce may diverge from its practice of giving deference to the petitioner's request in cases where there exists an 'overarching reason to modify' the scope of an investigation such as when there are concerns about the ability of the agency and {U.S. Customs and Border Protection} (CBP) to administer the scope as written.  Here, there is no reason for Commerce to not apply its practice, because the scope is clearly written to include freight rail couplers attached to railcars that enter the United States for consumption, and we find no overarching reason to modify the scope of the investigations."[31]

---

of the law have reasonable discretion to identify the most appropriate group of products for purposes of both the subsidy and injury investigations").

[27] *See NTN Bearing Corp.,* 747 F. Supp. at 731 (citing *Torrington Co. v. United States,* 745 F. Supp. 718 (1990), aff'd, 938 F.2d 1276, 1278 (Fed. Cir. 1991)).

[28] *Id.*

[29] *Id.*; *see also* section 701(a)(2) of the Act ("a class or kind of merchandise imported or sold (*or likely to be sold*) for importation in the United States") (emphasis added); section 731(1) of the Act ("a class or kind of foreign merchandise is being *or is likely to be*, sold in the United States at less than its fair value") (emphasis added).

[30] *See* Petitioner's Letter, "Scope Case Brief," dated April 10, 2023.

[31] *See* Final Scope Decision Memorandum at 14.

Commerce's determination on whether merchandise is subject to an AD/CVD order involves two separate inquiries: whether the product is of the type described in the scope of the order and whether the country of origin of the product is that of the subject country.[32] As stated in the Final Scope Decision Memorandum, "Commerce found that {FRCs} are not permanently affixed to freight railcars and that {FRCs} do not undergo further processing or physical changes when attached to or removed from railcars."[33] Indeed, the Court found that "Commerce correctly analyzed whether attached FRCs are the same class or kind of merchandise as unattached FRCs… ."[34] Because we find that attached FRCs are of the same class or kind of merchandise as unattached FRCs, we find that FRCs do not lose their distinct identity once attached to railcars. Consequently, we find that whether the attachment of FRCs takes place in the same or third country (*e.g.*, Mexico) before entering the United States is immaterial to our determination.[35]

We note that in the *Final Determination*, we did not disclaim our authority to modify the scope language. Rather, we disclaimed authority to evaluate injury, given that injury determinations fall squarely under the purview of the ITC.[36] However, as the Court recognized, an analysis of the petitioner's "theory of injury" is distinct from the evaluation performed by the ITC to determine the existence of injury.[37] Therefore, when we now consider whether the

---

[32] *See Sunpower Corp. v. United State*s, 179 F.Supp.3d 1286, 1298 (CIT 2016); *see also Final Determination of Sales at Less Than Fair Value: 3.5" Microdisks and Coated Media Thereof from Japan*, 54 FR 6433, 6435 (February 10, 1989).

[33] *See* Final Scope Decision Memorandum at 9.

[34] *See Remand Order* at 37.

[35] As we specifically stated in the Final Scope Decision Memorandum, we did not instruct CBP to apply duties to FRCs that do not enter the United States for consumption (*i.e.*, rail cars in transit through the United States). This example demonstrates Commerce's appropriate narrow interpretation of the scope language, while still providing necessary relief to the domestic industry. *See* Final Scope Decision Memorandum at 15.

[36] *Id.* at 12.

[37] *See Remand Order* at 29 ("Analyzing {petitioner}'s 'theory of injury' as Wabtec suggests does not require Commerce to engage in any of the analysis that the {ITC} undertakes to determine whether attached FRCs cause injury").

petitioner's theory of injury is cognizable, we conclude that it is. Specifically, we find that the ITC's injury determination is relevant to Wabtec's arguments regarding injury. Notably, the ITC did not make a separate injury finding of class or kind for the "attached" FRCs.[38] The ITC included all FRCs, whether attached or unattached, in its determination that the domestic industry was injured. Therefore, consistent with the ITC's determination, we find that injury occurs when the FRC enters the United States, regardless of whether it is attached to a railcar.

As stated in the scope language, "{w}hen a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope." Duties will only be collected on the coupler or subject parts. In other words, for AD/CVD purposes, the non-subject merchandise surrounding, or attached to, the subject merchandise is irrelevant. The good entering the United States is fundamentally and simply a coupler (or subject parts) for AD/CVD purposes. Whether it is attached in Mexico is immaterial; when it enters the United States, it enters as subject merchandise. Therefore, the U.S. domestic industry theoretically is losing a domestic sale of a coupler whenever a Chinese coupler—attached or unattached to something else—is sold in the United States. Wabtec's theoretical argument falls apart, because it assumes that the good entering the United States for AD/CVD purposes is a railcar, instead of an FRC.

Moreover, it is not unusual for AD/CVD orders to include language within the scope that covers merchandise that is further assembled or attached to non-subject merchandise. Such scopes do not create an "overly broad result," that could cause certain products causing injury to mask the lack of injury from other products, a concern cited by the Court in its *Remand Order*.[39]

---

[38] *See Certain Freight Rail Couplers and Parts Thereof from China*, Inv. Nos, 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023), at 13.
[39] *See Remand Order* at 29.

All of these scopes are based on the theory that subject merchandise does not lose its character, and capacity to cause injury to the U.S. domestic industry, when imported while attached to, or assembled with, certain non-subject merchandise. Examples of investigations which included scope language similar to the "components thereof, and parts, unmounted, mounted, assembled in third country or not, *etc*." language included in the FRC scope description include:

- *Vertical Shaft Engines from China*: "The inclusion of any other components not identified as comprising the unfinished engine subassembly in a third country does not remove the engine from the scope."[40]
- *Walk-Behind Lawn Mowers from China*: "The merchandise covered by this investigation consists of certain rotary walk-behind lawn mowers, which are grass-cutting machines that are powered by internal combustion engines. The scope of this investigation covers certain walk-behind lawn mowers, whether self-propelled or non-self-propelled, whether finished or unfinished, whether assembled or unassembled, and whether containing any additional features that provide for functions in addition to mowing… the inclusion in a third country of any components other than the lawn mower subassembly does not remove the lawn mower from the scope."[41]
- *Chassis from China*: "The merchandise covered by this order consists of chassis and subassemblies thereof, whether finished or unfinished, whether assembled or unassembled, whether coated or uncoated, regardless of the number of axles, for carriage of containers, or other payloads (including self-supporting payloads) for road, marine roll-on/roll-off and/or rail transport."[42]
- *Brake Drums from China and Türkiye*: "Subject brake drums are included within the scope whether imported individually or with non-subject merchandise (for example, a hub), whether assembled or unassembled, or if joined with non-subject merchandise. When a subject drum is imported together with non-subject merchandise, such as, but not limited to, a drum-hub assembly, only the subject drum is covered by the scope."[43]
- *Aluminum Extrusions from China*: "regardless of form, finishing, or fabrication, whether assembled with other parts or unassembled, whether coated, painted, anodized, or thermally improved. Subject aluminum extrusions may also be fabricated, *i.e.,* prepared

---

[40] *See Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof from the People's Republic of China: Antidumping and Countervailing Duty Orders*, 86 FR 23675 (May 4, 2021) (*Vertical Shaft Engines from China*).

[41] *See Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 FR 27379 (May 20, 2021) (*Walk-Behind Lawn Mowers from China*).

[42] *See Certain Chassis and Subassemblies Thereof from the People's Republic of China: Antidumping Duty Order,* 86 FR 36093 (July 8, 2021) (*Chassis from China*).

[43] *See Certain Brake Drums from the People's Republic of China and the Republic of Türkiye: Countervailing Orders*, 90 FR 38753 (August 12, 2025) (*Brake Drums from China and Türkiye*).

for assembly, or thermally improved.  Performing such operations in third countries does not otherwise remove the merchandise from the scope of the investigation."[44]

- *Steel Trailer Wheels from China*:  "The scope includes rims and discs for certain on-the-road steel wheels, whether imported as an assembly, unassembled, or separately. The scope includes certain on-the-road steel wheels regardless of steel composition, whether cladded or not cladded, whether finished or not finished, and whether coated or uncoated."[45]

Finally, we note that there is evidence that the entry of attached FRCs continues to cause injury to the domestic industry.  As noted above, the petitioner explicitly requested that attached FRCs be included in the scope of the *Orders* to prevent evasion.  Since the publication of the *Orders*, the petitioner has filed an allegation with CBP under the Enforce and Protect Act (EAPA) that an importer of attached FRCs is evading payment on AD/CVD duties.[46]  We find that the petitioner's EAPA allegation demonstrates that:  (1) dumped and subsidized attached FRCs continue to enter the United States; and (2) the petitioner is still being injured such that it is expending resources to ensure that all imports of attached FRCs are being appropriately classified at entry.  Thus, if Commerce were to remove attached FRCs from the scope of the *Orders*, the domestic industry would be unable to address the ongoing injury caused by the entry of such merchandise originating from China.

Therefore, because Commerce continues to find that FRCs are neither consumed nor substantially transformed once attached to railcars, an import of the attached FRC, whether that

---

[44] *See Aluminum Extrusions from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 89 FR 80506 (October 3, 2024) (*Aluminum Extrusions from China*).

[45] *See Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping Duty and Countervailing Duty Orders*, 84 FR 45952 (September 3, 2019) (*Steel Trailer Wheels from China*).

[46] *See* Memorandum, "Placement of EAPA Notice of Initiation of Investigation," dated concurrently with this draft results of redetermination, containing EAPA Case 8183:  Greenbrier Companies, Inc (Notice of Initiation of Investigation and Interim Measures, August 20, 2025), available at https://www.cbp.gov/document/publications/eapa-case-8183-greenbrier-companies-inc-notice-initiation-investigation-and ("CBP is investigating whether Greenbrier evaded antidumping (AD) duty order A-201-857 on certain freight rail couplers and parts thereof (FRCs) from Mexico and/or AD and countervailing (CVD) duty orders A-570-145 and C-570-146 on FRCs from the People's Republic of China (China). CBP found there was a reasonable suspicion that Greenbrier is evading AD/CVD duties on entries of FRCs originating from China and Mexico.").

attachment occurs in the same or a third country, remains covered by the scope, as intended by the petitioner seeking relief.  As noted above, because Commerce did not disclaim our authority to modify the scope language, as Wabtec alleged, and both attached and unattached FRCs may cause cognizable injury to the petitioner, both types of FRCs were properly included in the scope of the *Orders*.

## V.    INTERESTED PARTY COMMENTS

On March 11, 2026, we released the Draft Remand to interested parties.[47]  On March 23, 2026, we received comments from the petitioner supporting Commerce's Draft Remand, as well as comments from Wabtec and Strato.[48]  Wabtec's comments are addressed below.[49]

**Comment 1:  Whether it is Lawful for FRCs Attached to Railcars to Be Within the Scope**

The following is a verbatim executive summary of argument submitted by Wabtec.  For further details, *see* Wabtec's Comments at 6-10.

> Chinese FRCs imported or sold into Mexico at prices that are either subsidized or below fair value do not cause injury to the domestic industry that is legally cognizable under the {Act}.  Rather, the Act allows duties when the domestic industry is injured "by reason of imports or sales" of merchandise into the United States.  {Sections 701(a)(2) and 731(2) of the Act}.  When a Chinese FRC is imported or sold into Mexico, the domestic industry at most loses an export sale—that is, the opportunity to sell FRCs to a railcar builder in Mexico.  Any subsequent importation of that FRC into the United States does not cause injury to the domestic industry; the injury was complete at the time of the sale.  Thus, any injury is not "by reason of" imports into the United States, and therefore, FRCs imported and sold to railcar builders in third countries cannot be subject to AD/CVD duties.  The Draft Results do not grapple with this argument.

**Commerce's Position:**  We disagree with Wabtec that Commerce failed to address whether imports of attached FRCs cannot cause injury because, under sections 701(a)(2) and 731(2) of

---

[47] *See* Draft Remand.
[48] *See* Petitioner's Comments; *see also* Wabtec's Comments; and Strato's Comments.
[49] Because Strato's Comments simply support Wabtec's arguments, we have not separately addressed them below. Similarly, because Petitioner's Comments support Commerce's Draft Remand, we have not addressed them separately.

the Act, the domestic industry must be materially injured or threatened with material injury "by reason of imports or sales." Wabtec argues that, under *Changzhou Trina*, the "by reason of" language in sections 701(a)(2) and 731(2) of the Act should be read to require a "but-for causation," meaning that duties are only permitted where but for "imports or sales of" subsidized or dumped merchandise, the domestic industry would have avoided injury.[50] However, this argument ignores the fact that Commerce determined that mounted FRCs are not substantially transformed by their attachment to freight rail cars. Specifically, as Commerce stated in the Final Scope Decision Memorandum:

> The totality of the evidence on the record indicates that when a freight rail coupler is attached to or mounted on a freight railcar, it neither loses its identity nor is transformed into a new product with a new name, character, and use. Record evidence shows that freight rail couplers are not a permanent component of a railcar and are easily removable, and thus, retain their own identity even after being attached to or mounted on a railcar.[51]

The Court in its *Remand Order* did not direct Commerce to reconsider its class or kind or substantial transformation analyses.[52] Furthermore, Wabtec has not provided any additional factual information or argument to support its assumption that attached FRCs are a different class or kind of merchandise.

Wabtec continues to argue that the loss of the sale to the domestic FRC injury occurs in Mexico, not in the United States, and thus is not a sale lost "by reason of imports or sales" in the United States under sections 701(a)(2) and 731(2) of the Act. As we noted in the Draft Remand, we find that FRCs do not lose their distinct identity once attached to railcars. Consequently we

---

[50] *See* Wabtec's Comments at 6 (citing *Changzhou Trina Solar Energy Co. v. ITC*, 879 F.3d 1377, 1382 (CAFC 2018) (*Changzhou Trina*); *see also Bostock v. Clayton County*, 590 U.S. 644, 656 (2020).)

[51] *See* Final Scope Decision Memorandum at 11.

[52] *See Remand Order* at 25 ("Commerce's separate determinations that attached FRCs are the same class or kind of merchandise as unattached FRCs and that FRCs are not substantially transformed when attached to a full railcar are supported by substantial evidence").

15

find that whether the attachment of FRCs takes place in the same or third country (*e.g.*, Mexico) before entering the United States is immaterial to our determination because at the time of the FRC's entry to the United States (whether it is attached or unattached), it is an "import or sale" of merchandise under the scope of the *Orders* that may cause injury to the U.S. industry, in accordance with sections 701(a)(2) and 731(2) of the Act.

In support of its argument, Wabtec makes an analogy of Chinese nails sold to furniture manufacturers in Mexico, where it claims that the domestic nails industry loses export sales to Mexico, but is not injured by the subsequent import of the resulting furniture into the United States. However, this analogy concerns a product that is substantially transformed through its inclusion into a downstream product. Unlike nails used to produce furniture, Commerce determined based on record evidence that an FRC is not permanently attached to a railcar but is designed to be removable and replicable without undergoing physical changes when attached to or removed from railcars.[53] Therefore, we find that Wabtec's analogy is not relevant in the case of FRCs.

Wabtec further argues that the type of injury the petitioner alleged here is "third-country dumping" which, under 19 U.S.C. 1677k, should be filed with the United States Trade Representative.[54] We disagree with Wabtec because, as noted above, this is not a matter of the domestic FRC industry losing sales in a third country. FRCs are not substantially transformed when they are attached to railcars and, thus, when attached FRCs enter the United States, they are entering as FRCs for import or for sale, which may cause material injury to an industry in the United States under sections 701(a)(2) and 731(2) of the Act. As we discussed in the Draft Remand, Commerce has orders on products with similar scopes based on the theory that subject

---

[53] *Id.*; *see also* Final Scope Decision Memorandum at 9-10.
[54] *See* Wabtec's Comments at 7-8.

merchandise does not lose its character, or capacity to cause injury to the U.S. domestic industry, when imported while attached to, or assembled with, certain non-subject merchandise.[55]

Wabtec argues that, even assuming that FRCs remain distinct after being attached to a railcar, "it nonetheless remains true that the loss of an export sale to a third country at dumped or subsidized prices is not cognizable under the {Act}."[56]  We disagree, because an attached FRC entering the United States causes injury to the U.S. domestic industry in the form of the sale of a foreign-produced  FRC over a domestic-produced FRC as contemplated under sections 701(a)(2) and 731(2) of the Act.  FRCs are not materially changed when attached to a railcar and, thus, attached FRCs enter the United States under the scope of the *Orders*.  The fact that the FRC was first transported from China to Mexico to be attached to a railcar does not change the nature of the merchandise nor the injury to the domestic FRC industry upon entry of the attached FRC to the United States.

Wabtec argues that our citation to *Walk-Behind Lawn Mowers from China* misunderstands Wabtec's argument, as a lawnmower constructed in China with components added in Mexico and then imported into the United States causes injury to the domestic industry because "the purchaser of subject merchandise (the lawnmower) is in the United States" and the domestic industry is injured "when that purchaser opts for a Chinese/Mexican lawn mower over an American one… ."[57]  This is indeed Commerce's conclusion for FRCs from China, as both lawnmowers and FRCs from China injure the domestic industry when subject merchandise enters the United States.  When Wabtec compares the lawnmower scenario to the sale of the FRC, it does not appear to contemplate the second purchase in the United States, stating "the

---

[55] *See* Draft Remand at 11-12.
[56] *See* Wabtec's Comments at 8.
[57] *Id.* at 8-9.

purchaser of FRCs (that is, a railcar builder) is in Mexico, and when a railcar builder in Mexico opts for a Chinese FRC over a domestic one, the harm occurs in Mexico and thus is not 'by reason of imports or sales' of dumped or subsidized merchandise into the United States."[58] However, there are *two* purchasers of FRCs - one in Mexico and one in the United States. The first purchaser of FRCs is in Mexico, and when that purchaser opts for a Chinese FRC and attaches it to a railcar, the attached FRC remains subject merchandise if it is then sold to the United States. The second purchaser of FRCs is in the United States, and when that purchaser opts for a railcar with an attached FRC of Chinese origin, the harm to the United States FRCs industry occurs by reason of such imports. As Commerce has repeatedly stated, attached FRCs are not materially altered when they are attached to railcars. Therefore, attached FRCs are essentially the same as unattached FRCs when they enter the United States and are subject to AD and CVD duties under these *Orders*.

Finally, we disagree with Wabtec that the prior determinations Commerce cited in the Draft Remand are moot as the respondents in those cases did not raise the same injury arguments raised here. We cited those cases in our Draft Remand because they illustrated our finding that the inclusion of attached FRCs in the scope of the instant proceeding was neither novel nor new. Wabtec's argument is based on the assumption that an attached FRC, rather than an unattached FRC, entering the United States is somehow distinct under the Act. As we illustrated by the list of cases provided in the Draft Remand, Commerce has contemplated and included similar types of attached merchandise in the scope of its orders and imposed AD and CVD duties on the "attached" merchandise. The fact that respondents in those cases did not raise the same

---

[58] *Id.* at 9.

arguments as Wabtec has here is immaterial. Therefore, we continue to find that attached FRCs can cause injury to the U.S. domestic industry.

**Comment 2: Whether Commerce Excessively Defers to Petitioner's Scope Language**

The following is a verbatim executive summary of the argument submitted by Wabtec. For further details, *see* Wabtec's Comments at 10-11.

> The Draft Results continue to defer excessively to Petitioner's proposed scope language, even though the {CIT} indicated that deference is not appropriate here. Respondents maintain that the legal theory underlying the Petitioner's proposed scope is infirm, and there is no basis for deferring to one side's legal theory over another side's objections.

**Commerce's Position:** We disagree with Wabtec that Commerce violated the Court's instructions by deferring to the petitioner's scope in the investigation. Wabtec cites the *Remand Order*, in which the Court states, "{d}eference to the petitioner's intended scope does not prevent Commerce from establishing a scope that reflects information obtained during the investigation - including relevant arguments from interested parties," arguing that we did not provide an adequate response in our Draft Remand to the petitioner's theory of injury not being cognizable.[59] In its *Remand Order*, the Court states "{Commerce} is also correct that 'Commerce owes deference to the petitioner's intended scope of the investigation,'" but notes that "{d}eference to the petitioner's intended scope does not prevent Commerce from establishing a scope that reflects information obtained during the investigation and any subsequent orders."[60] In the Draft Results, while we recognized Commerce's practice to provide ample deference to the petitioner with regard to the language in the scope regarding the products for which the petitioner seeks relief, we also responded to Wabtec's arguments regarding the petitioner's theory of injury, ultimately concluding that it is cognizable, as the injury occurs

---

[59] *See Remand Order* at 30.
[60] *Id.*

when the FRC enters the United States, whether or not it is attached to a railcar.[61]  Therefore, Commerce appropriately considered arguments and facts on the record, and determined the scope after a reasoned analysis.

Finally, we note that Wabtec cites Federal Rule of Civil Procedure 12(b)(6) and associated case law, drawing an analogy between a court's dismissal of a petition that failed to state a claim, to Commerce's role at initiation.  As discussed *supra*, our deference to the petitioner's intended scope is Commerce's well-established as practice, rather than action "predicated on an incorrect legal theory" as Wabtec posits.

**Comment 3:  Whether Commerce Improperly Relied on the ITC's Injury Determination**

The following is a verbatim executive summary of argument submitted by Wabtec.  For further details, *see* Wabtec's Comments at 11-15.

> The Draft Results continue to rely on the International Trade Commission's injury determination, finding it relevant that the ITC did not make separate injury determinations for standalone FRCs imported or sold into the United States ("unattached FRCs") and FRCs imported or sold into Mexico, attached to railcars there, and thereafter imported or sold into the United States ("attached FRCs"). But the Court of International Trade warned the Department against deferring to the ITC on this issue, explaining that the determination is one for the Department to make. Further, as Federal Circuit precedent confirms, the ITC has no authority to make separate injury determinations among subject merchandise once the Department has set the scope.

**Commerce's Position:**  We disagree with Wabtec that Commerce continues to improperly rely on the ITC's injury determination.  We reference the ITC's injury determination as one factor among many supporting Commerce's determination that the petitioner's theory of injury is cognizable.  Therefore, we find that we followed the Court's remand instructions to evaluate whether the petitioner's theory of injury was cognizable separate from the ITC's injury determination.

---

[61] *See* Draft Remand at 10.

Additionally, we note that Wabtec erred when it stated that the ITC "has no authority to subdivide merchandise based on misgivings about the validity of certain theories of injury embodied in the scope; rather it is bound to make its injury determinations 'with respect to the subject merchandise' as Commerce has defined it."[62]  The ITC may deviate from Commerce's scope language when it defines the "domestic like product" used to make its injury determinations, specifically when it determines that certain domestic like products otherwise covered by the language of the scope did not cause injury.[63]  For example, in *LDWP from Canada, Greece, Korea, and Türkiye*, the ITC determined that the scope of these investigations covered three separate domestic like products and made separate injury determinations for each.[64]  Similarly, in *HFC Blends from China*, the ITC determined that the scope of the investigation covered two separate domestic like products and only determined that an industry in the United States was materially injured by one of the two domestic like products.[65]  Wabtec cites *Kyocera Solar* in support of its argument that "'the {ITC} must defer to Commerce's definition of the scope of the merchandise subject to these investigations.'"[66]  However, *Kyocera Solar* concerns the ITC's negligibility analysis, an analysis distinct from its domestic like product and injury determination, and in the context of the negligibility analysis the court found the ITC was bound by Commerce's definition of the country of origin of the subject merchandise at issue.  This is distinct from the ITC's examination of domestic like product, industry, and injury issues.  Thus, the ITC does have the authority, as it exercised in *HFC Blends from China*

---

[62] *Id.* at 12 (emphasis removed).

[63] *See Hydrofluorocarbon Blends and Components From China; Determination*, 81 FR 53157 (August 11, 2016) (*HFC Blends from China*); *see also Large Diameter Welded Pipe from Canada, Greece, Korea, and Turkey,* 84 FR 16533 (April 19, 2019) (*LDWP from Canada, Greece, Korea, and Türkiye*).

[64] *See LDWP from Canada, Greece, Korea, and Türkiye*, 84 FR 16533.

[65] *See HFC Blends from China*, 81 FR 53157.

[66] *See Kyocera Solar, Inc. v. United States International Trade Commission*, 884 F.3d 1334, 1339 (CAFC 2016) (*Kyocera Solar*).

and *LDWP from Canada, Greece, Korea, and Türkiye*, to make different injury determinations for different types of domestic like products.[67]  Therefore, we continue to find it relevant that the ITC did not make separate domestic like product determinations for attached and unattached FRCs.  As a result, we find that our citation to the ITC's injury determination was relevant to our determination that the petitioner's theory of injury in these investigations was cognizable.

**Comment 4:  Whether the EAPA Allegation is Relevant**

The following is a verbatim executive summary of argument submitted by Wabtec.  For further details, *see* Wabtec's Comments at 15-16.

> The Draft Results purport to rely on an EAPA investigation pending before Customs and Border Protection.  That investigation is irrelevant to the Department's determination of the proper scope of AD/CVD Orders and has no bearing on Wabtec's statutory argument.  Wabtec argues that the EAPA allegation Commerce cites is irrelevant to the issue at hand.

**Commerce's Position:**  We disagree with Wabtec and find that Commerce's citation to the petitioner's EAPA allegation is relevant to this remand redetermination.  We refer to the petitioner's EAPA allegation as a single factor demonstrating support for our determination that the petitioner's theory of injury was cognizable, because it illustrates that the petitioner is still facing injury from the attached FRCs at issue in this litigation.  Similar to our citation to the ITC's injury determination, the EAPA allegation is merely one piece of evidence among many supporting our determination.

**VI.    FINAL RESULTS OF REDETERMINATION**

In consideration of the Court's *Remand Order*, Commerce has reassessed whether attached FRCs should be excluded from the scope of the *Orders*.  We have concluded our reassessment in these final results of redetermination and continue to find that FRCs that are

---

[67] *See HFC Blends from China*; *see also LDWP from Canada, Greece, Korea, and Türkiye*.

attached to railcars, whether that attachment occurs in the same or a third country, remain

covered by the scope, as intended by the petitioner seeking relief.  Therefore, we made no

changes to the scope of the *Orders* in these final results of redetermination.

4/13/2026

X Chris Abbott

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

23