**Consol. Ct. No. 23–00161**                                         **PUBLIC DOCUMENT**

### UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| WABTEC CORPORATION and STRATO INC.,<br><br>Plaintiff/Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>COALITION OF FREIGHT COUPLER PRODUCTS,<br><br>Defendant-Intervenor. | Consol. Court No. 23-00161 |

### RESPONSE TO QUESTIONS ON COMMERCE'S REMAND DETERMINATION

**1. Defendant-Intervenor the Coalition of Freight Coupler Products (the "Coalition) argues that "the scope … does not—and indeed cannot—contain a cognizable theory of injury … because the scope is a description of the subject merchandise." Cmts. in Supp. of the Final Result of Redetermination Pursuant to Court Remand at 2, June 12, 2026, ECF No. 83 ("Def.-Inter.'s Cmts.") (internal quotation marks omitted); *see also id.* at 6-7. Must the scope contain a cognizable theory of injury?**

Yes, in the sense that the facts must support a legally sufficient basis for relief. As this Court explained, Commerce "possesses inherent authority to redefine and clarify the parameters of {an} investigation" "{w}here the petitioner's scope is overly broad or defective." *Wabtec Corp. v. United States* ("*FRC*"), 815 F.Supp.3d 1390, 1412 (CIT 2025) (cleaned up). That includes a scope encompassing merchandise that cannot cause legally cognizable injury.

Commerce shall "determine" whether a petition "alleges the elements necessary for the imposition of a duty." §1671a(c)(1)(A), §1673a(c)(1)(A). [1] Commerce acts like a judge

---

[1] Section citations are of 19 U.S.C.

1

determining whether a complaint states a cognizable claim. *See* Civil Rule 12(b)(6); Wabtec Comments on Remand Determination 16 {Dkt. 80} ("W.Cmts."). This Court explained: "If the petition does not sufficiently allege the {necessary} elements," Commerce must address the problem. *FRC* 1398 (citing §1671a(c)(3), §1673a(c)(3)). "Commerce's job" is "to implement the statutory mandate." *Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1380 (Fed. Cir. 2022).

In §1673, those elements "include (1) a determination by Commerce 'that a class or kind of foreign merchandise is being, or is likely to be, *sold in the United States* at less than its fair value,' and (2) a determination by the Commission that 'an industry in the United States' is materially injured or threatened with material injury *by reason of the imports*.'" *FRC* 1407 (emphasis added). Section §1671's elements are similar. *Id.* So Commerce must ensure the scope is limited to merchandise that *could plausibly* cause injury *by reason of imports*. And "'by reason of'" requires at least "but-for causation." *Changzhou Trina Solar Energy Co. v. ITC*, 879 F.3d 1377, 1382 (Fed. Cir. 2018). If the injury would exist even if the product were not imported, the petition is defective. W.Cmts.2, 6-7.

As this Court explained, Commerce must police scope to prevent petitioners from "sneak{ing} products that cannot cause injury by reason of import into duty orders" by "propos{ing} scope language that also includes products that cause significant injury." *FRC* 1412; *see* W.Cmts.12-13. Commerce has recognized this too. Its regulations require petitioners to include "{f}actual information regarding material injury" and "causation." 19 C.F.R. §351.202(b)(10). And in the *Preamble*, Commerce acknowledged that a petitioner's proposed scope can be "over inclusive," requiring Commerce to "focus the scope on those products causing injury to the domestic industry." 62 Fed. Reg. 27,296, 27,323.

**2. The Defendant (the "Government") notes that "Commerce's statutory authority to set the scope of an investigation and order is derived not from section 1671(a)(2) and 1673(2), but rather from sections 1671e(a)(2) and 1673e(a)(2)." Def.'s Cmts. in Supp. of Remand Redetermination at 5, June 12, 2026, ECF No. 84 ("Gov't Cmts.") (emphasis omitted). Why does the "by reason of imports" language from sections 1671 and 1673 apply to our analysis here?**

The Government is urging a false distinction. Various provisions in Congress's AD/CVD system work together. As explained above and by the Court (*FRC* 1407), §§1671a and 1673a require plaintiffs to allege the necessary elements; §§1671 and 1673 specify those elements. If a petition crosses this threshold, and "Commerce and the Commission both make affirmative final determinations," then Commerce must publish an order that "'include{s} a description of' the "'merchandise that is within the scope of an investigation.'" *FRC* 1399 (quoting §1671e(a)(2), §1673e(a)(2), §1677(25)). The petition, as delineated in the aforementioned provisions, "is the starting point for the scope language" in the final order. *Id.*

**a. Are you asking that Commerce engage with any of the causation analysis that the Commission is tasked with undertaking? *See id.* at 5-6.**

No. This Court recognized: "Analyzing the Coalition's 'theory of injury' as Wabtec suggests does not require Commerce to engage in *any* of the analysis that the Commission undertakes…." *FRC* 1412 (emphasis added). Commerce ensures a petition proceeds only on facts that plausibly allege a *legally cognizable* theory of injury, again like a judge under Rule 12—as all parties here have agreed. *See* Dkt. 37, at 18, 21 (Pet'r); Dkt. 36, at 14 n.6 (Gov.); W.Cmts.16; *supra* Q.1. Then the Commission determines whether the domestic industry has, *in fact*, suffered that cognizable injury. §§1671(a)(2); 1673(2). These are distinct inquiries. *See FRC* 1412 (distinguishing Wabtec's argument "that the Coalition's allegations 'do not state a viable theory of injury'" from the "determination that lies with the Commission"). Thus, "that the Commission is responsible for making a final injury determination does not absolve Commerce of its

responsibility to define the scope of the investigations and the final order—a responsibility that lies solely with Commerce." *Id.*

3.  **Commerce explained that the "domestic industry theoretically is losing a domestic sale of a coupler whenever a Chinese coupler—attached or unattached to something else—is sold in the United States." Letter from H. Holman to G. Justice, re: Final Results of Redetermination Pursuant to Court Remand Order at 11, Apr. 13, 2026, ECF No. 74 ("Remand Results"). Does this demonstrate injury by reason of importation?**

No. Petitioner's theory of injury, which Commerce accepted, includes the allegation that the domestic industry is competing "head-to-head" with Chinese FRC manufacturers for FRC "sales for rail cars produced *in Mexico*." *FRC* 1412 (quoting Pickard Letter) (emphasis added); W.Cmts.10 (similar). As Commerce recognizes, "{t}he first purchaser," who "opts for a Chinese FRC" in lieu of an American one, is "*in Mexico*." Remand Results 18 (emphasis added). That *lost export sale* is when the domestic industry loses an FRC sale, and thus when and where it suffers injury. What happens to the finished railcar cannot change that—whether it (1) stays in Mexico, (2) is imported into the U.S., or (3) is sold into another country. W.Cmts.2, 6-7. The industry cannot suffer the same injury twice, double-counting the lost sale. Thus, it is not even "theoretically" possible for the injury here to occur by reason of importation into the U.S. of Mexican-made railcars that include couplers.

Injury from a lost export sale into Mexico is different in kind from a lost domestic sale in the U.S. "[A] longstanding principle of American law" is "'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *TianRui Gp. Co. v. ITC*, 661 F.3d 1322, 1328 (Fed. Cir. 2011). "That presumption" protects "'against unintended clashes between our laws and those of other nations which could result in international discord.'" *Id.* at 1329. And it cuts against application of the trade laws to "purely extraterritorial conduct." *Id.*

Consistent with this presumption, AD/CVD duties "work to remedy *domestic injuries* caused by goods *imported* at unfair prices or receiving countervailable subsidies from foreign governments." *Rimco Inc. v. United States*, 98 F.4th 1046, 1049 (Fed. Cir. 2024) (emphasis added). They protect competition in the domestic market. The system is "directed to 'merchandise' that is considered to be unfairly traded, as a result of dumping or countervailable subsidy, ***upon being sold, or offered for sale, for importation into the United States*.**" *Worldwide Door Components, Inc. v. United States*, 787 F.Supp.3d 1363, 1373 (CIT 2025) (emphases added). Pervasive statutory language reaffirms the system is so "directed." *See supra* Q.1; *see also, e.g.,* §1673a(c)(2); §§1671b(a), 1673b(a), 1671d(b), 1673d(b).

Critically, Congress has *separately* addressed "third-country dumping," in §1677k. Consistent with the risks of "clashes" between nations' laws and of "international discord," *TianRui*, 661 F.3d at 1328-29, Congress did so through a *different part* of the government—the Trade Representative, charged with *negotiations*—and in a *different way*—through *diplomacy*. *See* W.Cmts.9-10. Section 1677k was added in 1988, a decade after the modern AD/CVD regime. It "establish{ed} a *separate* remedial scheme to address any injury suffered by U.S. producers from *lost sales in foreign markets*." *OCP S.A. v. United States*, 2025 WL 1837257, at *13 (CIT Apr. 22, 2025) (emphases added). And it thereby confirmed, consistent with background law, that the pre-existing AD/CVD regime does *not* remedy that sort of injury.

4. **Please respond to Commerce's description of "the second purchase": "The first purchaser of [freight rail couplers ("FRCs")] is in Mexico, and when that purchaser opts for a Chinese FRC and attaches it to a railcar, the attached FRC remains subject merchandise if it is then sold to the United States. The second purchaser of FRCs is in the United States, and when that purchaser opts for a railcar with an attached FRC of Chinese origin, the harm to the United States FRCs industry occurs by reason of such imports." *Id.* at 18.**

Commerce may have *described* two purchases, but it has never *articulated how* the second could injure the domestic FRC industry. It cannot, since any injury was by reason of the initial

purchase—*by* the Mexican railcar company, *from an FRC producer* (Chinese or Mexican rather than American). W.Cmts.2, 6-7; *supra* Q.1, Q.3.

The nature of a "second purchase"—*by* a U.S. railcar purchaser, *from a Mexican railcar producer*—confirms that any injury to the domestic FRC industry occurred with the first purchase; any second purchase cannot be a but-for cause of injury. *Supra* Q.1, Q.3. Commerce recognizes "{t}he first purchaser of FRCs is *in Mexico*." Remand Results 18 (emphasis). That means the domestic FRC producer has lost an export sale of FRCs *to Mexico*—"lost sales in foreign markets." *OCP*, 2025 WL 1837257, at *13. Commerce also recognizes: "{t}he second purchaser" is "opt{ing} *for a railcar*," which happens to have "an attached FRC of Chinese origin." Remand Results 18 (emphasis added). That is, it is purchasing *from* the railcar producer, *not from* an FRC producer, which means no FRC producer is, at that stage, losing (or gaining) a sale. *See also* W.Cmts.6-7, 9 (analogies of other lost export sales).

5.  **Commerce cites a number of investigations where Commerce included scope language it argues are "similar" to the language here. *See id.* at 12-13. Do you agree that the scopes in these cases "are based on the theory that subject merchandise does not lose its character, and capacity to cause injury to the U.S. domestic industry, when imported while attached to, or assembled with, certain non-subject merchandise"? Remand Results at 12. Does that theory apply here?**

Commerce's administrative orders are irrelevant to Wabtec's statutory argument, and, in any event, whether subject merchandise "lose{s} its character" does not control whether any "injury to the U.S. domestic industry" happens upon import or, instead, from an earlier lost export sale. *See* W.Cmts.6-7; *supra* Q.4.

Because Wabtec's argument is statutory, the Court cannot defer to Commerce's practice. *See SEC v. Sloan*, 436 U.S. 103, 118 (1978). Even assuming these prior rulings were "similar" to this order (*but see* W.Cmts.8), they do not reflect "the best reading" of the Tariff Act. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). As discussed above, the AD/CVD regime remedies

injuries in the U.S. market "by reason of" imports; the domestic industry cannot seek duties for lost export sales of a product, whether or not it is, post-sale, incorporated into another good that eventually is imported. *Supra* Q.1, Q.3. Otherwise, petitioners "could sneak {in} products," and "in-scope merchandise causing injury could mask the presence of in-scope merchandise that causes no injury whatsoever." *FRC* 1412; *supra* Q.1.

Tellingly, the examples Commerce cites were issued since 2020. If its account of the theory underlying them is correct, Petitioners have been doing just what this Court warned about. The apparent lack of historical pedigree is reason to be suspicious—and the patent lack of statutory grounding is reason to reject it.

Indeed, in recent years, this Court has twice flagged—on its own initiative—that "inclusion of upstream products" "used in producing the imported merchandise" may be "contrary to law." *Mosaic Co. v. United States*, 659 F.Supp.3d 1285, 1295 (CIT 2023). In *Mosaic*, "the scope language swe{pt} in" "certain upstream products" commingled outside the U.S. with the imported merchandise. The Court questioned whether these upstream products were "*imported*" merchandise but did not resolve the question, because respondent "ha{d} not raised any such arguments." *Id.* Then, in *Worldwide Door*, the Court remarked that it was "unaware" of statutory authorization to "apply an {AD/CVD} duty order" to "products that *are not sold or offered for sale in the United States* but instead are upstream components in the merchandise that *actually is imported and sold*." 787 F.Supp.3d at 1374 (emphasis added). The Court recommended "{f}uture cases" "provide clarity" on "the significant problems of interpretation presented," especially given *Loper Bright*'s "limiting principle." *Id.*

Even taken on their own terms, the examples provide a shaky foundation for Commerce's argument. *See* W.Cmts. 8-9. None of the respondents appears to have raised the injury argument

that Wabtec has raised here, and Commerce did not address it or otherwise articulate a theory. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (the "weight" agency precedent carries "depend[s] on the thoroughness evidence in its consideration"). Moreover, in each example, it appears the relevant sale occurred in the U.S., so harm could be "by reason of imports."

In three, Commerce clarified that subject merchandise remains in scope even if "components" are added "in a third country." *Lawn Mowers*, 86 Fed. Reg. 27,379 (2021); *see also Brake Drums*, 90 Fed. Reg. 38,753 (2025); *Vertical Shaft Engines*, 86 Fed. Reg. 23675 (2021). The purchaser of the subject merchandise—the lawnmower, brake drum, or vertical shaft engine— apparently was in the U.S.. No lost export sale was mentioned. The next two confirmed all different types of the subject merchandise actually sold in the U.S. were in scope.[2] *See Chassis and Subassemblies*, 86 Fed. Reg. 36093 (2021); *Steel Trailer Wheels*, 84 Fed. Reg. 45952 (2019). Here, however, whether harm to the domestic industry occurs "by reason of" subject imports does not turn on whether what is imported is thought of as assembled or unassembled, finished or unfinished. The problem is that the component has already been sold extraterritorially, and *that sale* is what caused any injury. *See* W.Cmts.6-7 (driveshafts and windshield wipers); *id.* at 9 (lawnmower batteries). As to "attached FRCs," the domestic industry is not competing for FRC sales on U.S. soil; it is competing for "sales in foreign markets." *OCP*, 2025 WL 1837257, at *13.

**6. Do you agree with Commerce that "the non-subject merchandise surrounding, or attached to, the subject merchandise is irrelevant," such that "[t]he good entering the United States is fundamentally and simply a coupler"? *Id.* at 11.**

For purposes here, on remand, it is irrelevant what legal label one gives to the imported product, and thus irrelevant whether an FRC, once attached to a railcar, should be thought of as

---

[2] Commerce's final example involves the same products at issue in *Worldwide Door*, 787 F.Supp.3d at 1373-74. *See Aluminum Extrusions*, 89 Fed. Reg. 80506.

incorporated into it. *Cf. FRC* 1400-01; W.Cmts.6-9. But the fact that a railcar (including its couplers) is what is being purchased and imported into the U.S. reinforces that any injury to the domestic *FRC* industry happened before that, when it lost the sale of an FRC to the railcar *builder* in Mexico. That lost export sale into Mexico is not cognizable under the AD/CVD regime (as opposed to, perhaps, §1677k). What Commerce refers to as the "attached" non-subject merchandise—in plain English, the railcar with all its non-coupler components—is (with its couplers) what the U.S. purchaser is buying, as Commerce itself acknowledges when it refers to the "second purchaser" as one who "opts for a railcar." Remand Results 18; *see supra* Q.4. That confirms that the lost sale is an export sale.

Rather than confront this statutory problem, Commerce conflates it with the issue whether FRCs lose their distinct character when attached to a railcar. *But see FRC* 1412-13 (treating these arguments separately). Wabtec's Remand Comments (W.Cmts.6-7) illustrate the distinction with an analogy that remains unanswered: Imagine that an automobile manufacturer in Mexico buys driveshafts and windshield wipers from China. Assume that the driveshaft *is* substantially transformed into a car, whereas the windshield wipers *are not*. When the car is imported into the U.S., *neither* product *then* injures the domestic driveshaft and windshield-wiper industries. Rather, those industries both, earlier, lost *export sales to Mexico*, when they lost the sale to the automaker there.

7.  **Commerce concluded that "the [Commission's] injury determination is relevant to Wabtec's arguments regarding injury," and that the Commission's single injury finding for all FRCs, "whether attached or unattached," is consistent with Commerce's determination here.** *Id.* **at 11. What is the significance of the Commission's single injury determination for all FRCs, "whether attached or unattached"?** *Id.*

The Commission's determination is irrelevant to Commerce's scope decision, since Commerce's error is one of law. Commerce's reasoning not only flouts this Court's remand order, *supra* Q.2a, but also is incoherent, putting the cart before the horse. It is equivalent to a judge's

9

erroneously denying a Rule 12(b)(6) motion, waiting for a jury verdict, and then pronouncing that the verdict supported his denial. *See supra* Q.1, Q.2a.

In addition, the Commission *must* make its injury determination "with respect to the subject merchandise" *as Commerce has defined it*. *Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n*, 844 F.3d 1334, 1339 (Fed. Cir. 2016). It "does not have the authority" to second-guess "Commerce's finding of class or kind" and the theories of injury embodied in the scope. *Torrington Co. v United States*, 747 F.Supp. 744, 748 (CIT 1990), *aff'd* 938 F.2d 1278 (Fed. Cir. 1991). So once Commerce concluded that FRCs sold into Mexico for attachment to new railcars made in Mexico belong within the "class or kind" of merchandise subject to investigation, the Commission had to fall into line and address that defined merchandise as a whole. *See, e.g.*, W.Cmts.12 n.2 (collecting similar examples).

That is just what this Court warned against: If Commerce refuses to exclude from the scope merchandise that could not produce a cognizable injury, petitioners have free rein to "sneak" in products and obtain relief for them under the "mask" of properly in-scope merchandise. *Supra* Q.1, Q.5 (quoting *FRC* 1412). Like here.

8. **The Coalition argues that you "attempt to paint a picture of a fictitious robust rail market in Mexico, satisfied by Chinese and Mexican FRC imports, and that sales into that market have no causal connection with the production operations of U.S. producers." Def.-Inter.'s Cmts. at 14. Of what significance is it that "the overwhelming majority of railcars that are produced in Mexico ultimately enter the United States rail market"?** *Id.*

The Coalition has admitted that, as to "attached" FRCs, the competition among FRC producers occurs extraterritorially, as "'U.S. and Chinese FRC producers compete head-to-head for sales for rail cars produced in Mexico.'" *FRC* 1412 (quoting Pickard Letter); *see* W.Cmts.10 (similar); Remand Results 18 (discussing "first purchasers of FRCs," "in Mexico"). When a U.S. producer loses *those* (export) sales, its injury is complete; there is no subsequent purchase *from* an FRC producer. The domestic industry's fate is the same whether the FRCs sold into Mexico and

**PUBLIC DOCUMENT**

mounted to a new railcar are—in another transaction (between the railcar manufacturer and its customer)—(1) imported into the U.S., (2) sold within Mexico, or (3) imported into another country. *See* W.Cmts.6; *supra* Q.3, Q.4. Such FRCs remain outside the cognizance of the AD/CVD statutes because their *importation* or sale into the U.S. is not a but-for cause of any injury the domestic injury suffered. *See supra* Q.1, Q.3. Thus, the supposed "picture" is irrelevant.

9. **The Coalition argues that *Kyocera* is distinguishable because "the issue in *Kyocera* was the Commission's negligibility analysis," *id.* at 4, and because *Kyocera* hinged on the *countries* that were at issue in the investigation." *Id.* at 5 (emphasis in original). Why does the logic of *Kyocera* apply here?**

By focusing on "the *issue* in *Kyocera*," the Coalition avoids the controlling reasoning of the court. The Federal Circuit agreed that the Commission had to conduct its negligibility analysis subject to "Commerce's definition of the scope," so could not distinguish imports from Mexico and imports from Taiwan. 844 F.3d 1334, 1336-37 (Fed. Cir. 2016) (quoting ITC); *see id.* at 1340 ("{T}he statute vests Commerce with the role of determining the scope of the merchandise subject to investigation," and then "requires that the Commission make its determinations with regard to subject merchandise."). That logic applies here—as this Court, citing *Kyocera*, already recognized. *Supra* Q.2a (quoting *FRC* 1411-12); *see supra* Q.7.

10. **The Coalition argues that Wabtec could have, but did not, argue before the Commission that mounted FRCs were a separate domestic like product and that there was a lack of injury due to such imports. *See id.* at 8. Similarly, the Coalition argues that Wabtec could have, but did not, argue before the Commission for a separate determination as to injury connected to mounted FRCs. *See id.* Would these have been more appropriate venues for your arguments regarding attached FRCs?**

No. As to domestic like-product, the Coalition already tried that argument, and this Court was unmoved. W.Cmts.14. Wabtec could not have pushed the Commission to define two domestic industries based on two domestic like-products, because the products are identical. Every "attached coupler" was born an unattached coupler. The only difference is where it is sold and attached. But where sales may be lost cannot possibly impact how the Commission defines the domestic like-

11

product and industry. Tellingly, Petitioner makes no effort to show how the Commission's six-factor test for ascertaining whether to define multiple domestic like products would even apply to the attached/unattached construct. In any event, *no* domestic industry is entitled under the AD/CVD regime to relief for lost export sales. And to the extent the "separate determination as to injury" argument is distinct, Wabtec has answered above. *Supra* Q.7, Q.9.

**11. What authorities best support your overall argument?**

> *FRC*; *Worldwide Door*; *Mosaic Co.*; *OCP S.A.*; *Kyocera Solar*; *Torrington*.

**12. Are there any recent or pending Supreme Court, Federal Circuit, or USCIT cases that may affect the court's analysis?**

> No.

Dated: July 21, 2026

Respectfully submitted,

*/s/ C. Kevin Marshall*
C. Kevin Marshall
Hannah Templin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
202.879.3851
ckmarshall@jonesday.com

*Counsel for Wabtec Corporation*

**Consol. Ct. No. 23–00161**                                    **PUBLIC DOCUMENT**

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) and (2) of the Standard Chambers Procedures of this Court and the Court's letter of July 7, 2026, ECF Nos. 87 and 89 that the answers to the Court's questions contain no more than 2,986 words, excluding the certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

Dated: July 21, 2026

*/s/ C. Kevin Marshall*
C. Kevin Marshall
*Counsel for Wabtec Corporation*
