**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

|  |  |
|---|---|
| WABTEC CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| STRATO, INC., ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | Court No. 23-00161 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| COALITION OF FREIGHT COUPLER ) | |
| PRODUCERS, ) | |
| ) | |
| Defendant-Intervenor. ) | |

**DEFENDANT'S RESPONSE TO COURT'S QUESTIONS FOR ORAL ARGUMENT**

1.    **Wabtec argues that "[t]he phrase by reason of . . . 'requires, at the least, but-for causation.'"  Wabtec Corp.'s Rule 56.2(H) Cmts. on the Dep't of Com.'s Remand Determination at 5, May 13, 2026, ECF No. 78 ("Pl.'s Cmts.") (quoting *Changzhou Trina Solar Energy Co. v. Int'l Trade Com.*, 879 F.3d 1377, 1382 (Fed. Cir. 2018) and citing *Burrage v. United States*, 571 U.S. 204, 213 (2014)).  What support do suggest for a different interpretation of "by reason of"?**

We are not contesting Wabtec's characterization of "by reason of" as requiring but-for causation.  But whether described as "by reason of" or "but-for causation," the standard simply does not apply to Commerce's assessment of the scope.  As explained in our responsive remand comments, the requirement to impose duties when a domestic industry is materially injured or

threatened by material injury "by reason of imports of that merchandise or by reason of sales . . . of that merchandise for importation" under 19 U.S.C. §§ 1671(a)(2) and 1673(2) only applies to the International Trade Commission's (ITC) injury determination—not Commerce's determination of the scope. *See* Govt. Comments at 5-7, ECF No. 86. Indeed, as this Court observed, Commerce was not required "to engage in any of the analysis that the Commission undertakes to determine whether attached {freight rail couplers (FRCs)} cause injury." *Wabtec Corporation v. United States*, 815 F. Supp. 3d 1390, 1412 (Ct. Int'l Trade 2025), Slip Op. 25-160 (ECF No. 67) (Remand Order). Rather, Commerce has broad authority under 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2) to establish the scope of an investigation, to include—as appropriate—the consideration of whether there is cognizable injury to the domestic injury. Remand Order at 7, 27-28. But even under Wabtec's inaccurate characterization, Commerce's determination that there was a cognizable theory of injury was adequately explained and supported by substantial evidence.

**2.    Do any of the investigations Commerce cites as support involve a similar two-purchaser theory?** *See* **Remand Results at 12–13 (citing *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof from the People's Republic of China: Antidumping and Countervailing Duty Orders*, 86 Fed. Reg. 23675 (Dep't Com. May 4, 2021); *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 27379 (Dep't Com. May 20, 2021); *Certain Chassis and Subassemblies Thereof from the People's Republic of China: Antidumping Duty Order*, 86 Fed. Reg 36093 (Dep't Com. July 8, 2021); *Certain Brake Drums from the People's Republic of China and the Republic of Türkiye: Countervailing Orders*, 90 Fed. Reg. 38753 (Dep't Com. Aug 12, 2025); *Aluminum Extrusions from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 80506 (Dep't Com. Oct. 3, 2024); *Certain Steel Trailer Wheels 12 to 16.5 Inches from the People's Republic of China: Antidumping and Countervailing Duty Orders*, 84 Fed. Reg. 45952 (Dep't Com. Sep. 3, 2019)).**

While the cited determinations do not explicitly mention a two-purchaser theory, they all include third-country assembly or further processing; as such, they implicitly contemplate a two-

2

purchaser theory.  Assembly and further processing in a third country would normally involve situations where there is a first purchaser in the third country who buys the product and assembles or completes it in that third country; that assembled or completed product is then bought by a second purchaser in the United States.  This is the same scenario presented by the underlying investigation, where unattached FRCs were bought by a first purchaser in the third country (here, Mexico), attached to a completed railcar in that third country, and then bought by a second purchaser in the United States.  Here, as in the cited determinations, completion or assembly in the third country did not render the product out of scope; Commerce thus reasonably relied on them in explaining its two-purchaser theory.  Wabtec cannot establish that, simply because the determinations do not explicitly discuss a two-purchaser theory, there would not typically be two purchasers in a situation involving assembling or further processing in a third country.

**3.      Which purchase—the first purchase in Mexico or the second purchase in the United States—causes the harm to the domestic industry?  Would the domestic industry experience the same harm even if the second purchase never occurred?**

Here, it is the second purchase in the United States that causes cognizable harm to the domestic industry.  The potential harm to the domestic industry that Commerce considers when establishing the scope of an investigation or order is that which results from a purchase of subject merchandise in the United States.  The antidumping and countervailing duty laws were established to protect the domestic industry from unfairly priced goods entering the United States market.  *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA), H.R. Doc. No. 103-316 at 807 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 420.  Accordingly, the first purchase of the subject merchandise in Mexico would not cause harm to the domestic industry if that merchandise never enters the United States.  However, if—as

here—the FRCs are further assembled in Mexico (via attachment to railcars) before entering the United States and the third-country processing does not cause a substantial transformation to the FRCs, the FRCs enter the United States as subject merchandise and can cause harm to the domestic industry. Commerce thus appropriately included "coupler parts attached to a railcar in third countries" in the scope. *See Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China*, 88 Fed. Reg. 34,485, 34, 487 (Dep't of Commerce May 30, 2023).

**4.      You argue that Commerce's remand redetermination is consistent with the Commission's choice not to make a separate injury finding for attached FRCs. *See* Remand Results at 11. Could the Commission have issued separate determinations? *See* Pl.'s Cmts. at 11 ("The Commission . . . lacks authority to subdivide merchandise based on misgivings about the validity of certain theories of injury embodied in the scope."). What is the level of the Commission's discretion here?**

**a.      Wabtec argues that "whether attached FRCs cause legally cognizable injury is completely independent of the [Commission's] determinations." *Id*. at 11. Of what relevance is the Commission's single determination here?**

Yes—the ITC could have issued separate determinations. Commerce thus appropriately found persuasive the fact that the ITC did not make separate injury findings. Remand Redetermination at 11, 20-22. The ITC has the authority to determine the domestic like product, which is defined by statute as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). In making this determination, the ITC may make separate injury findings for multiple domestic like products. *See, e.g., Hydroflorocarbon Blends and Components from China*, 81 Fed. Reg. 53, 157 (Int'l Trade Comm'n Aug. 11, 2017) (*HFCs from China*); *Large Diameter Welded Pipe from Canada, Greece, Korea, and Türkiye*, 84 Fed. Reg. 16, 533 (Int'l Trade Comm'n Apr. 19, 2019) (*LDWP from Canada, Greece, Korea, and Türkiye*).

Moreover, the ITC has considerable discretion to define the domestic like product. *See Torrington Co. v. United States*, 938 F.2d 1278 (Fed. Cir. 1991); *Timken Co. v. United States*, 913 F. Supp. 580 (Ct. Int'l Trade 1996) ("bases upon which a like product determination is made fall within the Commission's broad discretion and expertise in conducting investigations.") (internal quotations omitted).  As explained in *HFCs from China*, "{a}lthough the Commission must accept Commerce's determination as to the scope of the imported merchandise that is subsidized or sold at less than fair value, the Commission determines what domestic product is like the imported articles Commerce has identified." *HFCs from China*, USITC Inv. No. 731-TA-1279 (Aug. 1, 2016).  In that proceeding, despite Commerce defining the scope to include all hydroflorocarbon blends and their components, the ITC found that hydrofluorocarbon blends and hydrofluorocarbon blend components constituted two separate domestic like products. *Id.*  Here, the ITC had the same discretion to find that unattached FRCs and attached FRCs were separate domestic like products, even though Commerce included both within the scope language.

Commerce reasonably found the fact that the ITC did not make such a finding relevant to its consideration of whether attached FRCs cause cognizable injury. *See Certain Freight Rail Couplers and Parts Thereof from China,* Inv. Nos, 701-TA-682 and 731-TA-1592 (Final), USITC Pub. 5438 (July 2023).  The ITC determination speaks directly to the issue at hand—whether it is cognizable that imports of attached FRCs could cause an injury to the domestic industry. *See* Remand Order, 815 F. Supp 3d at 1413.  Once the ITC defines the domestic like product, it then determines whether imports of the subject merchandise are harming U.S. producers of that like product. *See* 19 U.S.C. §§ 1671d(b), 1673d(b), 1677(4)(A).  Here, the ITC Determination shows that: (1) attached FRCs are not a distinct domestic like product from unattached FRCs, and (2) both attached and unattached FRCs cause injury to the domestic industry.

**5.      Has Commerce sufficiently contemplated whether its determination could mean that "petitioners could sneak products that cannot cause injury by reason of import into duty orders simply by including them in proposed scope language that also includes products that cause significant injury"?** *Id.* **at 12 (quoting** *Wabtec Corp. v. United States***, 49 CIT __, __, 815 F. Supp. 3d 1390, 1412 (2025)).**

Commerce does not simply rubber stamp a petitioner's proposed scope. Although Commerce begins its analysis with petitioner's proposed scope and affords deference to the proposed scope, the analysis does not end there. As the Court recognized:

> "Commerce has the authority to initially determine the scope of the investigation, as well as the authority to modify the scope language until the final order is issued, based on the agency's findings." *Kyocera Solar, Inc. v. United States*, 253 F. Supp. 3d 1294, 1315 (2017); *see also Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1582 (Fed. Cir. 1990) (Commerce has "the responsibility to determine the proper scope of the investigation and of the ... order."). "Commerce has inherent power to establish the parameters of the investigation so that it would not be tied to an initial scope definition that may not make sense in light of the information available to {Commerce} or subsequently obtained in the investigation." *Duferco Steel*, 296 F.3d at 1089 (internal quotation marks and citation omitted). Commerce may "redefine and clarify the parameters of its investigation" if it "determine[s] the petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective." *NTN Bearing {Corp. of Am. v. United States}*, 747 F. Supp. {726,} 731 {(Ct. Int'l Trade 1990)}.

Remand Order, 815 F. Supp. 3d at 1411-12. Here, Commerce explained its duty to establish the scope of the proceeding and addressed Wabtec's arguments in light of the Court's remand order for Commerce to provide a more fulsome analysis of whether the injury to the domestic industry is cognizable. This case, if affirmed, will not stand for the proposition that petitioners could sneak products that cannot cause injury into an order simply by including them in proposed scope language that also includes products causing significant injury. This is because, in every case, Commerce analyzes the petitioner's proposed language and the relevant evidence to determine the scope, ensuring that scope language is not "overly broad, insufficiently specific or

6

defective."  Remand Redetermination at 7.  Commerce would also consider any arguments that "sneaked-in" products could render the scope language to be "overly broad, insufficiently specific or defective," as it did here.  Moreover, as discussed above, the ITC makes material injury determinations and would be able to make separate determinations for in-scope products that do not cause injury, thereby guarding against the implausible outcome suggested by Wabtec.

**6.      Did Commerce impermissibly "load[] the dice in Petitioner's favor" when it deferred to Petitioner's scope definition?  *Id*. at 2.**

Commerce did not impermissibly "load{} the dice in Petitioner's favor" when it considered the petitioner's proposed scope in establishing the scope of the orders.  The purpose of an antidumping or countervailing duty order is to provide relief to the domestic industry and an investigation is initiated through a petition filed by a member of that industry.  *See* 19 U.S.C. §§ 1671a, 1673a.  Therefore, the petition, and the proposed scope contained therein, constitutes an important source for Commerce in ascertaining which products the domestic industry believes warrant an antidumping or countervailing duty investigation.  And, as stated above, Commerce owes deference to the petitioner's proposed scope.  *See M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1151 (Fed. Cir. 2021) ("Commerce owes deference to the petitioner's intended scope.") (citing *Ad Hoc Shrimp Trade Action Comm. V. United States*, 637 F. Supp. 2d 1166, 1174 (Ct. Int'l Trade 2009)).  Consideration of a petitioner's proposed scope does not load the dice in its favor, but is reasonable and accords with precedent.

As explained above, Commerce fulfilled its statutory duty to establish the scope of an investigation and, in considering the petitioner's proposed scope, did not find that scope to be overly broad, insufficiently specific or defective.  Remand Redetermination at 7.  Commerce also considered the many arguments raised by parties regarding the extent of the scope throughout the underlying administrative proceeding, publishing two lengthy memoranda analyzing those

arguments.  *See* Preliminary Scope Decision Memorandum, dated March 28, 2023 (AD P.R. 199, CVD P.R. 275); Final Scope Decision Memorandum, dated May 15, 2023 (AD P.R. 227, CVD P.R. 306).  Additionally, Commerce—on remand—considered Wabtec's arguments regarding whether the injury to the domestic industry from attached FRCs was cognizable.  *See generally* Remand Redetermination.  As the Court confirmed, Commerce's "discretion concerning scope clarification at the investigatory stages is extensive."  Remand Order, 815 F. Supp. 3d at 1416, (citing *Minebea Co. v. United States*, 782 F. Supp. 117, 121 (1992), *aff'd*, 984 F.2d 1178).  Nothing in Commerce's determinations suggests that it impermissibly "loaded the dice" in petitioner's favor.  Rather, Commerce fulfilled its statutory duty and considered all parties' arguments, reasonably concluding that the scope properly included attached FRCs.

**7.    Did Commerce impermissibly base its determination on a view that "Wabtec's injury argument simply repackaged the substantial-transformation argument that Commerce had already rejected"?  *Id.* at 3–4.**

No.  While Commerce discussed the Court sustaining Commerce's determination that the FRCs were not substantially transformed by their attachment, Wabtec's characterization of Commerce's remand redetermination as simply repackaging the substantial transformation arguments is inaccurate, and Commerce—while it considered the fact that the FRCs were not substantially transformed—did not reconduct a substantial transformation analysis or rely solely on the lack of substantial transformation.

When conducting its substantial transformation analysis, Commerce considered the nature of the product and its various processing steps.  *See* Final Scope Memo at 10.  By contrast, when analyzing whether the injury to the domestic industry from imports of attached FRCs is cognizable, Commerce considered the impact of imports on the domestic industry.  *See generally* Remand Redetermination; *Compare Bell Supply, LLC v. United States*, 888 F.3d 1222,

1228 (Ct. Int'l Trade 2018) (explaining that a "substantial transformation occurs where, as a result of manufacturing or processing steps…, the {product} loses its identify is transformed into a new product having a new name, character and use." (internal quotations omitted)) *with* Remand Order, 815 F. Supp. at 1417 ("Commerce failed to address arguments by Wabtec that the Coalition's theory of injury required exclusion of attached FRC's from the scope language. Because Commerce has the authority to modify scope language . . . and {} an analysis of whether a theory of injury is cognizable is distinct from the Commission's determination as to whether injury exists").

True, Commerce cited the lack of substantial transformation in its analysis. *See* Remand Redetermination at 15-16. But it did not simply incorporate or repackage the substantial transformation argument to find the theory of injury cognizable. Rather, Commerce found its substantial transformation determination to be relevant to addressing Wabtec's arguments regarding whether the petitioner's theory of injury was cognizable. For instance, in responding to Wabtec's argument that duties are only permitted where, but for imports or sales of the subject merchandise, the domestic industry would not have been injured, Commerce cited its substantial transformation finding to explain why the subject merchandise at issue lawfully included attached FRCs. Remand Redetermination at 15; *see also* Remand Order, 815 F. Supp. 3d (sustaining Commerce's substantial transformation finding). Commerce also observed that FRCs are not substantially transformed by their attachment to railcars in rebutting Wabtec's misplaced attempt to analogize Chinese nails sold to furniture manufacturers in Mexico. Remand Redetermination at 16. None of this demonstrates that Commerce simply repackaged its substantial transformation analysis.

**8.     How is the harm to the domestic injury caused by attached FRCs different from the harm contemplated by the third-country dumping provision at 19 U.S.C. § 1677k(b)(1)?**

Section 1677k(b)(1) provides a remedy for a domestic industry that is being harmed by dumped imports into a third country.  This statute states that:

> (1) A domestic industry that produces a product that is like or directly competitive with merchandise produced by a foreign country (whether or not an Agreement country) may, if it has reason to believe that—
>
>> (A) such merchandise is being dumped in an Agreement country; and
>>
>> (B) such domestic industry is being materially injured, or threatened with material injury, by reason of such dumping;
>
> submit a petition to the Trade Representative that alleges the elements referred to in subparagraphs (A) and (B) and requests the Trade Representative to take action under subsection (c) on behalf of the domestic industry.

19 U.S.C. § 1677k(b)(1).

The harm to the domestic industry contemplated by section 1677k(b)(1) results from products being dumped into the third country, and involves injury to U.S. *exporters* competing in the Mexican FRC market.  By contrast, the harm to the domestic industry considered by Commerce when determining the scope of an antidumping or countervailing duty order results from dumped and subsidized imports into the United States, and involves injury to domestic producers competing in the U.S. market.  While both frameworks contemplate harm to the U.S. industry, the cause of the harm and the affected audience are different.  In making its determination, Commerce did not consider whether merchandise was being dumped in a third country, but based its determination on injury stemming from merchandise entering the United States.

In addition, the potential harm contemplated by section 1677k(b)(1) pertains to different merchandise than the potential harm Commerce considers in rendering a scope determination.  Wabtec contends that 19 U.S.C. § 1677k is the appropriate statute for addressing harm to the

domestic industry because FRCs that are attached to railcars in a third country lead to the

domestic industry losing sales to customers in the third country rather than the United States, and

therefore the domestic injury is not injured by imports into the United States.  Wabtec Comments

at 9-10, ECF No. 80.  But Wabtec's argument rests on the premise that the unattached FRCs

constitute the merchandise causing injury.  As Commerce explained in its remand

redetermination, it is not only unattached FRCs, but also *attached* FRCs, which cause cognizable

injury to the domestic industry when imported into the United States.  *See* Remand

Redetermination at 16; Remand Order.

9.       **What authorities best support your overall argument?**

The authorities that best support our argument are those cited by the Court in its remand

order and outline Commerce's authority to establish the scope of antidumping and countervailing

duty orders, as well as its wide discretion to do so.  *See* Remand Order, 815 F. Supp. 3d at 1411-

16 (citing, *e.g.*, *NTN Bearing Corp.*, 747 F. Supp at 731 (Commerce may "redefine and clarify

the parameters of its investigation" if it "determine{s} the petition to be overly broad, or

insufficiently specific to allow proper investigation, or in any other way defective."); *Minebea*,

782 F. Supp. at 121 (Commerce's "discretion concerning scope clarification at the investigatory

stages is extensive.").  We also rely on the authorities cited in our responsive remand comments

and Commerce's remand redetermination.

10.      **Are there any recent or pending Supreme Court, Federal Circuit, or USCIT cases that may affect the court's analysis?**

We are not aware of any recent or pending cases that may affect the Court's analysis.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
HEATHER HOLMAN
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, D.C., 20230

s/Sosun Bae
SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C., 20044
Email: Sosun.Bae@usdoj.gov

July 21, 2026

*Attorneys for Defendant*

12

**CERTIFICATE OF COMPLIANCE**

Pursuant to this Court's July 7, 2026 order, defendant's counsel certifies that this brief complies with the Court's type-volume limitations rules.  According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 2804 words, excluding those exempted portions of this brief.

/s/ Sosun Bae
SOSUN BAE