Slip Op. 26-122

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **WABTEC CORPORATION,**<br>**Plaintiff,**<br>**and**<br>**STRATO, INC.,**<br>**Plaintiff-Intervenor,**<br>**v.**<br>**UNITED STATES,**<br>**Defendant,**<br>**and**<br>**COALITION OF FREIGHT COUPLER PRODUCERS,**<br>**Defendant-Intervenor.** | **Before: Gary S. Katzmann, Judge**<br>**Court No. 23-00160 &**<br>**Court No. 23-00161** |

**OPINION AND ORDER**

[ The U.S. Department of Commerce's antidumping and countervailing redeterminations are remanded.]

Dated: October 8, 2026

C. Kevin Marshall, Jones Day, of Washington, D.C., argued for Plaintiff Wabtec Corporation. Also on the brief was Shelbie M. Rose.

Andrew T. Schutz and Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C. and New York, N.Y., for Plaintiff-Intervenor Strato, Inc.

Sosun Bae, Senior Trial Counsel, Commercial Litigation Branch, U.S. Department of Justice of Washington, D.C. argued for Defendant United States. Also on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Deputy Director, and Claudia Burke, Deputy Director. Of counsel on the brief was Heather Holman, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Daniel B. Pickard, Buchanan Ingersoll & Rooney PC, of Washington, D.C., argued for Defendant-Intervenor Coalition of Freight Coupler Producers. Also on the brief were Claire M. Webster and Carson Easterling.

Katzmann, Judge: The court considers anew a series of interlinked challenges brought by Plaintiff Wabtec Corporation ("Wabtec") and Plaintiff-Intervenor Strato, Inc. ("Strato") (collectively, "Plaintiffs")[1] related to the U.S. Department of Commerce ("Commerce") and the International Trade Commission's ("the Commission") determinations in the antidumping and countervailing duty investigations of freight rail couplers ("FRCs"), the components that connect freight train cars, from China and Mexico. See Compl., Wabtec Corp. v. United States, No. 23-cv-00157 (U.S. Ct. Int'l Trade filed Aug. 14, 2023) ("Wabtec I"), Sep. 13, 2023, ECF No. 9; Compl., Wabtec Corp. v. United States, No. 23-cv-00160 (U.S. Ct. Int'l Trade filed Aug. 14, 2023) ("Wabtec II"), Sep. 13, 2023, ECF No. 9; Compl., Wabtec Corp. v. United States, No. 23-00161 (U.S. Ct. Int'l Trade filed Aug. 14, 2023) ("Wabtec III"), Sep. 13, 2023, ECF No. 10. Like the railcars of a train, these cases have progressed in tandem.[2]

This case involves two challenges[3] to Commerce's final determinations as to FRCs from

[1] Wabtec and Strato are both U.S. importers of FRCs. See Pls.' Mot. for J. on Agency R. at 1, Wabtec II, Jan 22, 2024, ECF No. 32 ("Pls.' Original Br."); Consent Mot. to Intervene as of Right (Corrected) at 2, Wabtec II, Oct. 13, 2023, ECF No. 25.

[2] Plaintiffs separately challenged the Commission's material injury determination. Wabtec Corp. v. United States, 49 CIT __, __, 805 F. Supp. 3d 1326, 1331 (2025). The court previously remanded the Commission's determination for the Commission to reconsider or further explain its determination regarding the composition of the domestic industry. Id. at 1332, 1350. The court deferred consideration of the Commission's ultimate affirmative injury determination at that time. Id. at 1349. After the Commission filed remand results maintaining and further explaining its original views, the court sustained the Commission's material injury determination. Wabtec Corp. v. United States, 50 CIT __, __, 2026 WL 2690306, at *16 (Sep. 14, 2026).

[3] The court joined Plaintiffs' challenges to Commerce's antidumping and countervailing determinations in Wabtec II and Wabtec III for hearing and decision. See generally Order Joining Cases, Wabtec II, Nov. 22, 2023, ECF No 31; Order Joining Cases, Wabtec III, Nov. 22, 2023, ECF No. 31.

China[4] in both the antidumping duty investigation, Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair Value and Final Affirmative Determination of Critical Circumstances, 88 Fed. Reg. 34485, 34485 (Dep't Com. May 30, 2023), Wabtec II P.R. 231[5] ("Final Antidumping Determination"), and the countervailing duty investigation, Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, In Part, 88 Fed. Reg. 32184, 32184 (Dep't Com. May 19, 2023), Wabtec III P.R. 309 ("Final Countervailing Determination") (collectively, "Final Determinations").

At issue here is the scope of those investigations, which Commerce described as including "[FRCs] . . . whether assembled or unassembled, whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar." Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China and Mexico: Initiation of Less Than-Fair-Value Investigations, 87 Fed. Reg. 64444, 64450 (Dep't Com. Oct. 25, 2022), Wabtec II P.R. 97 ("Antidumping Initiation"); Certain Freight Rail Couplers and Parts Thereof From the People's Republic of China: Initiation of Countervailing Duty Investigation, 87 Fed. Reg. 64440, 64441 (Dep't Com. Oct. 25, 2022) ("Countervailing Initiation"). The court previously remanded the Final Determinations for Commerce to "reconsider[] or further expla[in] . . . its decision not to exclude attached FRCs from the scope language." Wabtec Corp. v. United States,

4 While the relevant investigations covered imports from both China and Mexico, Wabtec and Strato here challenge only Commerce's antidumping and countervailing duty determinations with respect to China. See Compl. at 1, Wabtec II; Compl. at 1, Wabtec III.

5 All citations to the public and confidential records are to the joint appendices in both Wabtec II and Wabtec III and are accordingly labeled either "Wabtec II P.R." or "Wabtec III P.R." Where the same documents appear in both joint appendices, P.R. numbers refer to the Wabtec II joint appendix.

49 CIT __, __, 815 F. Supp. 3d 1390, 1417 (2025) ("Remand Order"). On remand, Commerce "continue[d] to find that attached FRCs were properly included in the scope of the Orders." Final Results of Redetermination Pursuant to Court Remand at 2 (Dep't Com. Apr. 13, 2026), Apr. 13, 2026, ECF No. 74 ("Remand Results").[6]

Plaintiffs now challenge Commerce's Remand Results, renewing their argument that " 'attached' FRCs cannot be included [in the scope of the investigations], because they do not cause injury cognizable in the United States." Wabtec Corporation's Rule 56.2(H) Comments on the Department of Commerce's Remand Determination at 1, May 13, 2026, ECF No. 78 ("Pl.'s Br."). For the reasons set forth below, the court finds that Commerce on remand again failed to adequately explain its determination not to exclude attached FRCs from the scope of the investigations and specifically failed to reasonably address Wabtec's argument that attached FRCs cannot cause injury that is cognizable under the antidumping and countervailing duty remedial scheme. Accordingly, the court remands Commerce's Remand Results for reconsideration or further explanation of its decision not to exclude attached FRCs from the scope language.

## BACKGROUND

The court presumes familiarity with the facts and legal framework underpinning this case as set out in its Remand Order, see Remand Order, 815 F. Supp. 3d at 1399–1403, and now recounts only that which is relevant to the court's review of the Remand Results.

### *I. Legal Background*

To facilitate fair trade, "[t]he Tariff Act of 1930, as amended, permits Commerce to impose two types of duties on imports that injure domestic industries:" countervailing duties on goods that

---

[6] Because the briefing and materials in both Wabtec II and Wabtec III are substantially identical, all citations are to the docket in Wabtec II unless otherwise specified.

receive countervailable subsidies[7] from a foreign government, and antidumping duties on goods sold in the United States at less-than-fair value.[8] Guangdong Wireking Housewares & Hardware Co. v. United States, 745 F.3d 1194, 1196 (Fed. Cir. 2014). Commerce and the Commission have distinct roles in antidumping and countervailing duty investigations.

First, Commerce initiates a countervailing or antidumping duty investigation either on its own authority or when an interested party files a petition for antidumping or countervailing duty relief. See 19 U.S.C. §§ 1673a(a)–(b), 1671a(a)–(b). After a petition is filed, Commerce "determine[s] whether the petition alleges the elements necessary for the imposition of a duty under [19 U.S.C. §§] 1673 [or 1671]." 19 U.S.C. §§ 1673a(c)(1)(A)(i), 1671a(c)(1)(A)(i). Where the petition alleges the elements necessary for the imposition of antidumping or countervailing duties, and meets other statutory requirements, Commerce "shall initiate an investigation." Id. §§ 1673a(c)(2), 1671a(c)(2); see also id. §§ 1673a(b)(1), 1671a(b)(1).

Commerce sets the investigation's scope, or the subject merchandise to be covered by the investigation. See Mitsubishi Elec. Corp. v. United States, 898 F.2d 1577, 1582 (Fed. Cir. 1990) (Commerce has "the responsibility to determine the proper scope of the investigation . . . ."); Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n, 844 F.3d 1334, 1339 (Fed. Cir. 2016) ("[T]he statute vests Commerce with the role of determining the scope of the merchandise subject to investigation."); 19 U.S.C. § 1677(25) ("Subject merchandise" is "the class or kind of merchandise

---

[7] "For a subsidy to be countervailable, it must meet certain requirements," including that the subsidy "is 'specific' to an enterprise or industry rather than generally available" and that "a foreign government provides a specific financial contribution to a party and that party benefits from the contribution." Mosaic Co. v. United States, 160 F.4th 1340, 1342–43 (Fed. Cir. 2025) (citing 19 U.S.C. § 1677(5)(A)).

[8] "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.' " U.S. Steel Corp. v. United States, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (quoting 19 U.S.C. § 1677(35)(A)).

that is within the scope of an investigation, review, . . . [or] order . . . ."). The petition is the starting point for the scope language, and "Commerce owes deference to the petitioner's intended scope." M S Int'l, Inc. v. United States, 32 F.4th 1145, 1151 (Fed. Cir. 2022). Ultimately, however, Commerce "has inherent authority to define the scope of an . . . investigation," NTN Bearing Corp. of Am. v. United States, 14 CIT 623, 627, 747 F. Supp. 726, 731 (1990), and "may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective." M S Int'l, 32 F.4th at 1151 (internal quotation marks and citation omitted); see also Duferco Steel, Inc. v. United States, 296 F. 3d 1087, 1089 (Fed. Cir. 2002) (explaining that while "[t]he petition initially determines the scope of the investigation . . . Commerce has inherent power to establish the parameters of the investigation, so that it would not be tied to [the] initial scope definition" within the petition (internal quotation marks and citation omitted)).

After Commerce initiates and sets the scope of an investigation, the Commission separately makes a determination as to "whether an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports, or sales (or the likelihood of sales) for importation . . . ." 19 U.S.C. §§ 1673b(a)(1), 1671b(a)(1); see also id. §§ 1673b(a)(2), 1671b(a)(2) (explaining timing for the Commission's determination). The Commission uses Commerce's scope determination in its investigations. Torrington Co. v. United States, 42 CIT __, __, 747 F. Supp. 744, 748 (1990), aff'd, 938 F.2d 1278 (Fed. Cir. 1991) ("[T]he [Commission] does not have the authority to modify [Commerce's] finding of class or kind . . . ."); Ad Hoc Shrimp Trade Action Comm. v. United States, 515 F.3d 1372, 1381 (Fed. Cir. 2008) ("[T]he [Commission] must accept the determination of [Commerce] as to the scope of the imported merchandise . . . ." (internal

quotation marks and citation omitted)).

In an antidumping duty investigation, Commerce then "make[s] a final determination of whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value." Id. § 1673d(a)(1). In a countervailing subsidy investigation, Commerce "make[s] a final determination of whether or not a countervailable subsidy is being provided with respect to the subject merchandise." Id. § 1671d(a)(1).

If the final determinations from both Commerce and the Commission are affirmative, then Commerce "shall issue an antidumping [or countervailing] duty order." Id. §§ 1673d(c)(2), 1671d(c)(2). If either determination is negative, "the investigation shall be terminated." Id. §§ 1673d(c)(2), 1671d(c)(2). Commerce thus imposes duties only where both Commerce and the Commission have made affirmative determinations in their respective investigations. When Commerce publishes an antidumping or countervailing duty order, that order must "include[] a description of the subject merchandise, in such detail as the administering authority deems necessary." Id. §§ 1673e(a)(2), 1671e(a)(2); see also Duferco Steel, 296 F.3d at 1096 ("Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order."); Hutchison Quality Furniture, Inc. v. United States, 827 F.3d 1355, 1362 n.5 (Fed. Cir. 2016) ("Commerce . . . determines whether a particular product falls within the scope of an antidumping duty order.").

## *II. Factual Background*

### *A. Freight Rail Couplers ("FRCs")*

FRCs can be mounted onto the freight cars of trains and "connect two freight cars together by automatically interlocking the knuckles of both FRCs when the freight cars are pushed together, eliminating the need for previously required and potentially dangerous manual input." Certain

Freight Rail Couplers and Parts Thereof from China at 9, Inv. Nos. 701-TA-682, 731-TA-1592 (Final), USITC Pub. 5438 (July 2023) ("Commission Views"). In addition to connecting freight cars, FRCs "reduce shocks when freight cars are in transit or braking." Id. Freight cars typically use two FRCs "to allow for coupling additional freight cars together" on both ends of the car. Id.

### *B. Investigation of FRCs from China and Mexico*

On September 28, 2022, Defendant-Intervenor the Coalition of Freight Coupler Producers ("the Coalition") filed petitions for the imposition of antidumping and countervailing duties on U.S. imports of freight rail coupler systems and components from China and Mexico. See generally Letter from D. Pickard to G. Raimondo, Sec'y of Com., re: Certain Freight Rail Couplers and Parts Thereof from the People's Republic of China and the United Mexican States: Petitions for the Imposition of Antidumping and Countervailing Duties, Case No. A-570-145, Bar Code: 4289650 (Sep. 28, 2022), Wabtec II P.R. 1-44, C.R. 1-44 ("Petitions"). The Coalition's petitions indicated that "[s]ubject [FRCs] and parts are included within the scope . . . whether mounted or unmounted, or if joined with nonsubject merchandise, such as other nonsubject parts or a completed railcar."[9] Id. at 6. FRCs "joined with" completed railcars are also referred to as "attached FRCs." See Pls.' Original Br. at 22–23.

On May 15, 2023, Commerce issued a final scope determination maintaining the scope as including "[FRCs] attached to, or mounted on, freight railcars." Mem. from E. Begnal to J. Maeder, re: Freight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum at 8 (Dep't Com. May 15, 2023), Wabtec II P.R. 227 ("Final Scope Mem."). Commerce published its final affirmative determinations in May 2023. Final Antidumping Determination, 88 Fed. Reg. at 34485; Final Countervailing Determination, 88 Fed.

---

[9] "When a subject coupler or subject parts are mounted on or to other nonsubject merchandise, such as a railcar, only the coupler or subject parts are covered by the scope." Petitions at 7.

Reg. at 32184.

### *C. Remand*

Throughout the investigations and judicial proceedings underlying this case, Wabtec has continually argued that attached FRCs should not be included in the scope of the investigations because "FRCs are not capable of causing a cognizable injury to the domestic FRC industry when they are imported directly from China into a third country and mounted on and incorporated into new rail[cars] there." Letter from D. Morrell to G. Raimondo, re: Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Wabtec's Scope Letter Brief at 2, Case No. A-570-145, Bar Code: 4363875-01 (Apr. 10, 2023); see also Letter from D. Morrell to G. Raimondo, re: Certain Freight Rail Couplers and Parts Thereof from China and Mexico: Comments on Proposed Scope at 4, Case No. A-570-145, Bar Code: 4311522-01 (Nov. 17, 2022).

During the underlying investigation, Commerce disclaimed all authority to analyze Wabtec's arguments regarding the Coalition's theory of injury, stating that "the question of injury to the domestic [FRC] industry . . . is within the purview of the [Commission]." Mem. from E. Begnal to J. Maeder, re: Freight Rail Couplers from Mexico and the People's Republic of China: Final Scope Decision Memorandum at 12 (Dep't Com. May 15, 2023), Wabtec II P.R. 227.

On September 13, 2023, Wabtec brought two actions to challenge Commerce's Final Determinations. See Compl., Wabtec II, Sep. 13, 2023, ECF No. 9; Compl., Wabtec III, Sep. 13, 2023, ECF No. 10. The Coalition moved to intervene as a Defendant-Intervenor, and Strato moved to intervene as a Plaintiff-Intervenor. See Consent Mot. to Intervene at 2, Wabtec II, Sep. 18, 2023, ECF No. 17; Consent Mot. to Intervene at 2, Wabtec III, Sep. 18, 2023, ECF No. 18; Consent Mot. to Intervene as of Right (Corrected) at 2, Wabtec II, Oct. 13, 2023, ECF No. 25; Consent Mot. to Intervene as of Right (Corrected) at 2, Wabtec III, Oct. 13, 2023, ECF No. 25. The court granted the motions to intervene. Order, Wabtec II, Sep. 18, 2023, ECF No. 18; Order, Wabtec II, Oct. 16,

2023, ECF No. 27; Order, Wabtec III, Sep. 18, 2023, ECF No. 19; Order, Wabtec III, Oct. 16, 2023, ECF No. 28.

The court ultimately remanded Commerce's Final Determinations and instructed Commerce to "reconsider whether to modify the scope language to exclude attached FRCs." Remand Order, 815 F. Supp. 3d at 1418. Based on Commerce's authority to "determine the scope of the investigation, as well as the authority to modify the scope language until the final order is issued," Kyocera Solar, Inc. v. United States, 41 CIT __, __, 253 F. Supp. 3d 1294, 1315 (2017), the court determined in its Remand Order that Commerce "cannot disclaim all authority to modify the scope language simply because an argument proposing such a modification relates to injury." Remand Order, 815 F. Supp. 3d at 1412. The court expressed the following concern with the Government's position that Commerce cannot consider injury when tailoring the scope of the investigations:

> Such a conclusion would mean that petitioners could sneak products that cannot cause injury by reason of import into duty orders simply by including them in proposed scope language that also includes products that cause significant injury. So long as some in-scope merchandise causes a large enough injury to result in the Commission's affirmative injury determination regarding the merchandise as a whole, the in-scope merchandise causing the injury could mask the presence of in-scope merchandise that causes no injury whatsoever. It falls to Commerce to tailor the scope to avoid such an "overly broad" result.

Id. (quoting NTN Bearing, 14 CIT at 627, 747 F. Supp. at 731). Accordingly, the court remanded Commerce's Final Determinations for Commerce to reconsider or further explain its decision not to exclude attached FRCs from the scope language. Id. at 1417.

**PROCEDURAL HISTORY**

Commerce released draft remand results on March 12, 2026, and received administrative comments from Wabtec, Strato, and the Coalition on March 23, 2026. See Draft Results of Redetermination Pursuant to Court Remand, Case No. A-570-145, Bar Code: 4893829 (Dep't

Com. Mar. 12, 2026); Letter from K. Marshall to H. Lutnick, Sec'y of Com., re: Draft Remand Comments, Case No. A-570-145, Bar Code: 4899476-01 (Mar. 23, 2026); Letter from A. Schutz to H. Lutnick, Sec'y of Com., re: Draft Remand Comments, Case No. A-570-145, Bar Code: 4898976-01 (Mar. 23, 2026); Letter from D. Pickard to H. Lutnick, Sec'y of Com., re: Comments. on the Draft Remand Redetermination, Case No. A-570-145, Bar Code: 4899155-01 (Mar. 23, 2026); see also Remand Results at 6. Commerce filed its final Remand Results with the court on April 13, 2026, finding that "both attached and unattached FRCs may cause cognizable injury to the petitioner," and that "both types of FRCs were properly included in the scope of the Orders." Remand Results at 14.

Wabtec filed comments in opposition to the Remand Results on May 13, 2026. See Pl.'s Br. Strato filed a letter in lieu of comments, indicating that it "supports, and incorporates by reference, all arguments in [Wabtec's briefing]." Letter in Lieu of Remand Cmts. from Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to the Ct., May 13, 2026, ECF No. 77. The Coalition filed comments in support of the Remand Results on June 12, 2026. See Cmts. in Supp. of the Final Results of Redetermination Pursuant to Ct. Remand, June 12, 2026, ECF No. 83 ("Def.-Inter.'s Br."). Defendant, the United States ("the Government"), filed its responsive comments in support of Commerce's Remand Results on June 12, 2026. See Def.'s Cmts. in Supp. of Remand Redetermination, June 12, 2026, ECF No. 84 ("Gov't Br.").

The court issued and the Parties responded to questions in advance of oral argument. See Ct.'s Letter re: Qs. for Oral Arg., July 7, 2026, ECF No. 87 ("OAQs") ; Resps. to Qs. for Oral Arg., July 21, 2026, ECF No. 90 ("Def.-Inter.'s OAQ Resp."); Resp. to Qs. on Com.'s Remand Determination, July 21, 2026, ECF No. 91 ("Pls.' OAQ Resp."); Def.'s Resp. to Ct.'s Qs. for Oral Arg., July 21, 2026, ECF No. 92 ("Gov't OAQ Resp."). With all papers filed, the court held oral

argument on July 27, 2026. See Scheduling Order, July 1, 2026, ECF No. 86. As directed by the court, the Parties filed supplemental briefs following oral argument. See Def.-Inter.'s Post-Arg. Submission, Aug. 4, 2026, ECF No. 95; Pl.'s Post-Arg, Submission, Aug. 4, 2025, ECF No. 96; Def. Post-Arg. Submission, Aug. 4, 2026, ECF No. 97.

**JURISDICTION AND STANDARD OF REVIEW**

Jurisdiction lies under 28 U.S.C. § 1581(c). The court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Broadcom Corp. v. U.S. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022) (quoting Honeywell Int'l, Inc. v. U.S. Int'l Trade Comm'n, 341 F.3d 1332, 1338 (Fed. Cir. 2003)).

"The court will find a determination unlawful where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." Rhone-Poulenc, Inc. v. United States, 20 CIT 573, 575, 927 F. Supp. 451, 454 (1996). Commerce "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)) (referring to the arbitrary and capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Viet.) Ltd. v. United States, 33 CIT 1407, 1417, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of the agency with respect to the substantial evidence standard). Commerce must also provide "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A).

## DISCUSSION

### *I. Commerce Did Not Adequately Explain Why the Scope of the Investigations Should Include Attached FRCs*

On remand, Commerce "determined to maintain attached FRCs in the scope of these investigations," stating that this determination "follow[ed] [its] practice in investigations to provide ample deference to the petitioner to clarify and identify the products for which it seeks relief."[10] Remand Results at 8.[11]

The court finds Commerce's explanation of its scope determination to be inadequate because (1) Commerce did not sufficiently address Wabtec's arguments that attached FRCs do not cause injury "by reason of import[,]" (2) Commerce relied on materials that do not sufficiently support its conclusion that attached FRCs are in scope, and (3) Commerce did not adequately address the court's concerns about potential masking.

#### *A. Commerce Did Not Adequately Address Wabtec's Arguments that the Scope of the Investigations Should Not Include Merchandise that Cannot Cause Injury "By Reason of Import"*

To justify its remand redetermination to include attached FRCs in scope, Commerce

---

[10] As the court noted in the Remand Order, Commerce's deference to the petitioner's recommended scope "does not absolve Commerce of its authority to define the scope of the investigation and any subsequent orders." Remand Order, 815 F. Supp. 3d at 1412–13. Just as there, "[d]eference to the petitioner's intended scope does not prevent Commerce from establishing a scope that reflects information obtained during the investigation—including relevant arguments from interested parties." Id. at 1413.

[11] The Government acknowledges that Commerce bears the "responsibility . . . to determine the scope of merchandise . . . ." Gov't Br. at 9. In contrast, the Coalition continues to suggest that Commerce cannot engage with the relevant inquiry regarding a cognizable theory of injury. See, e.g., Def.-Inter.'s Br. at 1–2 (arguing that "it is not the role of the scope language to put forth a 'cognizable theory of injury.' "). The court previously rejected this argument, finding that "Commerce's authority to tailor scope language to avoid . . . overly broad results does not encroach upon the Commission's responsibility to evaluate the existence of injury." Remand Order, 815 F. Supp. 3d at 1412; see also Mitsubishi Elec. Corp., 898 F.2d 1577, at 1582 (Fed. Cir. 1990) (Commerce has "the responsibility to determine the proper scope of the investigation . . . ."). The court declines to reconsider its position on this issue.

described the import of attached FRCs as involving two purchases: the sale of a Chinese FRC to a Mexican railcar producer, and the sale of a Mexican railcar with an attached Chinese FRC to a U.S. customer. See Remand Results at 18. Commerce found "that injury occurs when the FRC enters the United States," id. at 11, and the Government described that "it is the second purchase in the United States that causes cognizable harm to the domestic industry," Gov't OAQ Resp. at 3 (emphasis added). Commerce suggested that "[t]he second purchaser of FRCs is in the United States, and when that purchaser opts for a railcar with an attached FRC of Chinese origin, the harm to the United States FRCs industry occurs by reason of such imports." Remand Results at 18. Beyond this conclusory statement, Commerce did not adequately explain how the domestic industry could be injured by "reasons of import" of attached FRCs under 19 U.S.C. § 1673b(a)(1) or 19 U.S.C. § 1671b(a)(1).

Wabtec repeats its challenge to Commerce's inclusion of attached FRCs as in the scope of the investigations. See Pl.'s Br. at 3. According to Wabtec, Commerce has still not sufficiently addressed its argument that attached FRCs cannot cause injury "by reason of import[,]" and thus they should be "exclude[d] from the scope of the orders." Pl.'s Br. at 2–4. Wabtec argues that the injury relevant to attached FRCs is the lost export sales of FRCs resulting from Mexican railcar producers' choice to purchase Chinese FRCs rather than American FRCs during the first purchase. See Pl.'s Br. at 7. In Wabtec's view, the domestic industry cannot be injured "by reason of imports" of attached FRCs, as required by the antidumping and countervailing duty remedial schemes, because that first purchase occurs in Mexico and does not involve importation into the United States, and attached FRCs thus should not be included in the scope of the investigation. Id. at 7–9; 19 U.S.C. §§ 1673b(a)(1), 1671b(a)(1).

Wabtec argues that harm caused to the U.S. domestic industry by FRCs attached to freights

cars in Mexico is not a "cognizable injury under §§ 1671 and 1673." Pl.'s Br. at 9. Instead, Wabtec suggests the harm from attached FRCs to the U.S. domestic industry is caused by " 'third-country dumping,' " and injuries from third-country dumping are addressed under a "narrower and diplomatic remedial scheme" set forth in 19 U.S.C. § 1677k. Pl.'s Br. at 9–10. That provision allows "[a] domestic industry that produces a product that is like or directly competitive with merchandise produced by a foreign country" to file a petition if "merchandise produced by a foreign country . . . is being dumped in [a third] country" and "such domestic industry is being materially injured . . . by reason of such dumping." 19 U.S.C. § 1677k(b)(1).[12]

Throughout these proceedings, Wabtec and Strato have argued that "[w]here the domestic industry loses an export sale [of an FRC] to Mexico, its alleged injury is the same regardless of whether the Chinese FRC later (1) enters the United States attached to a railcar, (2) is sent to a third country, or (3) remains in Mexico." Pl.'s Br. at 6 (emphasis in original); see also Pls.' Original Br. at 24 ("[W]here the domestic industry loses [a sale to a new railcar builder in Mexico], the injury to the domestic industry is the same whether or not the merchandise that won the sale later enters the United States.").

Commerce, in its Remand Results, did not provide an adequate "explanation of the basis for its determination that addresses [this] relevant argument[] made by interested parties." 19 U.S.C. § 1677f(i)(3)(A).; see generally Remand Results. In the Remand Results, Commerce stated that "[w]hether [an attached FRC] is attached in Mexico is immaterial . . . [because] the U.S. domestic industry theoretically is losing a domestic sale of [and FRC] whenever a Chinese [FRC] —attached or unattached to something else —is sold in the United States." Remand Results at 11.

---

[12] If the United States Trade Representative "determines that there is a reasonable basis for the allegations in the petition," then the Trade Representative "submits to the appropriate authority of the [third] country" and requests that "appropriate antidumping action" be taken in the third country on behalf of the United States. 19 U.S.C. § 1677k(c)(1).

This explanation merely states a conclusion. To adequately address Wabtec's argument, Commerce needs to explain how the U.S. domestic industry is injured because of an import, rather than being injured by losing an export sale of an FRC to be attached in Mexico.[13]

Prior to oral argument, the court asked the Government to specifically address Wabtec's argument that the second sale cannot be a cause of injury by reason of import to the domestic industry, asking: "[w]hich purchase—the first purchase in Mexico or the second purchase in the United States—causes the harm to the domestic industry?" OAQs at 4. The Government responded that "it is the second purchase in the United States that causes cognizable harm to the domestic industry." Gov't OAQ Resp. at 3. But neither the Government nor Commerce has persuasively explained how or why that harm would occur by reason of import. See, e.g., Remand Results at 11 ("Whether it is attached in Mexico is immaterial . . . the U.S. domestic industry theoretically is losing a domestic sale of a coupler . . . ."); Gov't Br. at 11 ("the only relevant purchaser for purposes of determining scope is the domestic purchaser of the attached FRC."). Instead, the Government stated that "[t]he antidumping and countervailing duty laws were established to protect the domestic industry from unfairly priced goods entering the United States market . . . . Accordingly, the first purchase of the subject merchandise in Mexico would not cause harm to the domestic industry if that merchandise never enters the United States." Gov't OAQ Resp. at 3. The fact that the statute was established to protect the domestic industry from unfairly priced goods entering the United States does not address whether attached FRCs cause harm to the domestic industry "by reason of import[]." 19 U.S.C. §§ 1673d(b)(1), 1671d(b)(1). The

[13] Regardless of whether FRCs are substantially transformed via attachment, the fact that attachment occurs outside of the United States is still relevant to the question of whether attached FRCs cause injury by reason of import. See Remand Order, 815 F. Supp. 3d at 1417; see also Bell Supply Co. v. United States, 888 F.3d 1222, 1229 (Fed. Cir. 2018) ("[S]ubstantial transformation analysis [is used] to determine country of origin . . . .").

Government's answer does not demonstrate that Commerce provided a reasonably discernable response to Wabtec's argument that attached FRCs cannot cause cognizable harm under the relevant statute and thus should not be in scope.

### *B. The Materials Commerce Relied Upon Do Not Adequately Support Its Determination that Attached FRCs Should Be in the Scope of the Investigations*

Much of Commerce's analysis relies on materials that do not demonstrate that attached FRCs cause cognizable injury. Specifically, Commerce relied on the Commission's affirmative injury determination, a subsequent Enforce and Protect Act (EAPA) allegation filed with U.S. Customs and Border Protection ("Customs"), and its previous administrative decisions to justify finding attached FRCs as in scope. These materials do not adequately support Commerce's determination.

First, Commerce refers to the Commission's affirmative injury determination. Commerce "[found] that the [Commission's] injury determination is relevant to Wabtec's arguments regarding injury." Remand Results at 11. Commerce suggests that its determination to maintain attached FRCs as in scope is consistent with the Commission's determination to "include[] all FRCs, whether attached or unattached, in its determination that the domestic industry was injured." Id. This logic is a tautology.

The fact that the Commission made a final affirmative injury determination for all FRCs, whether attached or unattached, is of no matter to Commerce's scope determination. "It is Commerce, not the [Commission], that determines the 'class or kind' of imported merchandise that will be subject to the investigation," Nucor Corp. v. United States, 42 CIT __, __, 296 F. Supp. 3d 1276, 1282 (2018), and "the [Commission] has the authority to make a final determination of material injury only for 'the merchandise with respect to which [Commerce] has made an affirmative determination,' " Ad Hoc Shrimp, 515 F.3d at 1381 (emphasis added) (quoting 19

U.S.C. § 1673d(b)). In its final injury determination, the Commission itself noted that it "must accept Commerce's determination as to the scope of the imported merchandise . . . ." Commission Views at 5 n.12 (first citing USEC, Inc. v. United States, 34 Fed. App'x 725, 730 (Fed. Cir. 2002); and then citing Algoma Steel Corp. v. United States, 12 CIT 518, 522–523, 688 F. Supp. 639, 644 (1988), aff'd, 865 F.3d 240 (Fed. Cir.), cert. denied, 492 U.S. 919 (1989)).[14]

The Commission's single affirmative injury determination for all FRCs does not suggest that attached FRCs can cause injury "by reason of import[]." 19 U.S.C. §§ 1673d(b)(1), 1671d(b)(1). The scope language that Commerce set at the outset of the investigation framed the Commission's material injury analysis. See Commission Views at 5–8 (noting that the scope determination "includes FRCs attached to railcars"); Duferco Steel, 296 F.3d at 1089 ("Commerce has inherent power to establish the parameters of the investigation . . . ." (internal quotation marks and citation omitted)). To use that affirmative material injury determination to support Commerce's determination of the scope is circular and unpersuasive.

Next, Commerce points to a subsequent allegation filed with Customs under EAPA that an importer of attached FRCs is evading payment on duties. Remand Results at 13. Commerce suggests that "the petitioner's EAPA allegation demonstrates that: (1) dumped and subsidized attached FRCs continue to enter the United States; and (2) the petitioner is still being injured such that it is expending resources to ensure that all imports of attached FRCs are being appropriately classified at entry." Id. However, the EAPA investigation is still ongoing. Pl.'s Br. at 17–18. The allegation alone cannot conclusively indicate anything about whether attached FRCs can cause

[14] In its final injury determination, the Commission noted that its " 'domestic like product' analysis begins with the 'article subject to an investigation,' i.e., the subject merchandise as determined by Commerce." Commission Views at 5. In making its final injury determination, the Commission evaluates how the imported subject merchandise affects the prices of domestic like products and producers of domestic like products. Id. at 27; 19 U.S.C. § 1677(7)(B).

injury to the domestic industry "by reason of import[]." 19 U.S.C. §§ 1673d(b)(1), 1671d(b)(1). Additionally, Customs's EAPA investigation addresses whether a company is evading antidumping or countervailing duties. 19 U.S.C. § 1517(b)(1). Customs will not consider the question before Commerce here—whether attached FRCs can cause injury "by reason of import[]." 19 U.S.C §§ 1673d(b)(1), 1671d(b)(1).

Finally, Commerce cites other administrative determinations that include attached and assembled products as in scope to support its analysis. See Remand Results at 11–13. Those scope determinations are of little persuasive value here because in those administrative proceedings Commerce did not consider whether the petitioner's theory of injury regarding the attached or assembled products was cognizable. See Kaptan Demir Celik Endustrisi v. Ticaret A.S., 49 CIT __, __, 803 F. Supp. 3d 1291, 1313-14 (2025) (declining to find a practice to be permissible based on Commerce's past practice where an interested party in the prior proceeding "did not raise the issue" of whether Commerce's action was permissible); see also 19 U.S.C. § 1677f(i)(3)(A) (Commerce must provide "an explanation of the basis for its determination that addresses relevant arguments . . . ."); cf. Al Ghurair Iron & Steel LLC v. United States, 65 F.4th 1351, 1360 (Fed. Cir. 2023) ("Commerce's analysis here is consistent with its prior determination." (emphasis in original)).

For example, Commerce points to scope language in its final duty order on brake drums from China and Turkey, which states that "[s]ubject brake drums are included within the scope whether imported individually or with non-subject merchandise (for example, a hub), whether assembled or unassembled, or if joined with non-subject merchandise." Certain Brake Drums from the People's Republic of China and the Republic of Turkiye: Countervailing Duty Orders, 90 Fed. Reg. 38753, 38755 (Dep't Com. August 12, 2025). However, no party in that administrative

proceeding suggested that assembled brake drums should not be included in the scope of merchandise subject to investigation. See generally Mem. from K. Archuletta to S. Fullerton, re: Antidumping Duty and Countervailing Duty Investigations of Certain Brake Drums from the People's Republic of China and the Republic of Turkiye: Final Scope Decision Memorandum at 3, Case Nos. A-570-174, C-570-175, A-489-853, C-489-854, Bar Code: 4778262-01 (Dep't Com. June 13, 2025).

Commerce also points to similar scope language in its final duty order on aluminum extrusions from China, which includes extrusions "whether assembled with other parts or unassembled." Aluminum Extrusions From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 89 Fed. Reg. 80506, 80509 (Dep't Com. Oct. 3, 2024). Certain interested parties there argued that "aluminum extrusions that enter the United States as an input to subassemblies and other downstream products," do not qualify as "subject merchandise" under the plain meaning of the definition of "merchandise." Mem. from A. Villanueva and S. Smith to S. Fullerton, re: Less-Than-Fair Value and Countervailing Duty Investigations of Aluminum Extrusions from the People's Republic of China, Colombia, Ecuador, India, Indonesia, Italy, the Republic of Korea, Malaysia, Mexico, Taiwan, Thailand, the Republic of Turkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Final Scope Issues and Decision Memorandum at 28, Case No. A-570-158, Bar Code: 4638340-01 (Dep't Com. Sep. 26, 2024). However, the interested parties in that proceeding did not suggest that aluminum extrusions assembled with non-subject merchandise could not cause injury by reason of importation. See id. at 17–23, 28–31. Commerce therefore did not consider that argument. Overall, these past determinations are incongruous to this matter because the interested parties did not present arguments that the merchandise could not cause injury by reason of importation and

thus should not be included in the scope of the investigations

Regardless, the court has consistently held that Commerce's investigations are "sui generis, consisting of a set of variables and relative factors." Trust Chem. Co. v. United States, 35 CIT 1012, 1024, 791 F. Supp. 2d 1257, 1268 (2011); see also U.S. Steel Corp. v. United States, 33 CIT 984, 1003, 637 F. Supp. 3d 1199, 1218 (2009) ("[E]ach agency determination is sui generis, involving a unique combination and interaction of many variables . . . ."); Hitachi Metals, Ltd. v. United States, 949 F.3d 710, 718 (Fed. Cir. 2020). Thus, Commerce's past determinations, based on different variables and factors, do not persuade the court to find Commerce adequately explained that attached FRCs can cause injury to the domestic industry "by reason of import[,]" and thus should be included in the scope of the investigations. 19 U.S.C. §§ 1673d(b)(1), 1671d(b)(1).[15]

### *C. Commerce Did Not Adequately Address the Court's Concerns about Potential Masking from Overly Broad Scope Determinations*

Additionally, Commerce did not adequately address the court's concern with masking. Recall that in its Remand Order, the court reasoned that "[s]o long as some in-scope merchandise causes a large enough injury to result in the Commission's affirmative injury determination

---

[15] Additionally, the court has previously expressed doubt that the Tariff Act of 1930 permits the inclusion of upstream, assembled products like the FRCs assembled into railcars here. In Worldwide Door Components, Inc. v. United States, the court noted that "[Commerce's] current interpretation of [antidumping and countervailing duty orders] can result in the assessment of antidumping and countervailing duties on products that are not sold or offered for sale in the United States but instead are upstream components in the merchandise that actually is imported and sold." 49 CIT __, __, 787 F. Supp. 3d 1363, 1374 (2025). The court went on to state that it "is unaware of Tariff Act provisions that expressly authorize Commerce to structure or apply an antidumping or countervailing duty order in this way." Id. Similarly, in Mosaic Co. v. United States, the court, per the same session as in Worldwide Door, contemplated a scope that includes an ingredient "when commingled (i.e., mixed or blended) with [an imported product,]" stating that "[a]rguments can be made that the Department's inclusion of the upstream products within the scope of the Order was contrary to law." 47 CIT __, __, 659 F. Supp. 3d 1285, 1294–1295 (2023). In neither case did the plaintiffs argue that upstream merchandise does not cause injury by reason of importation. See id.; Worldwide Door, 787 F. Supp. 3d at 1374.

regarding the merchandise as a whole, the in-scope merchandise causing the injury could mask the presence of in-scope merchandise that causes no injury whatsoever." Remand Order, 815 F. Supp. 3d at 1412. Wabtec argues that "[t]his case exemplifies those concerns" because "[o]nce the Commission found unattached FRCs to cause material injury, it had no discretion to exclude attached FRCs from the scope. . . ." Pl.'s Br. at 12.

In its Remand Results, Commerce stated that the scope does "not create an 'overly broad result,' that could cause certain products causing injury to mask the lack of injury from other products" and "note[d] that there is evidence that the entry of attached FRCs continues to cause injury to the domestic industry." Remand Results at 11–12. However, evidence that the domestic industry is injured is not sufficient; what matters here is how the domestic industry is harmed. Commerce does not sufficiently explain whether the injury related to attached FRCs is caused by importation or a loss of export sales.

Prior to oral argument, the court asked the Government to specifically address the concern about masking, inquiring whether "Commerce sufficiently contemplated whether its determination could mean that 'petitioners could sneak products that cannot cause injury by reason of import into duty orders simply by including them in proposed scope language that also includes products that cause significant injury . . . .' " OAQs at 5 (quoting Remand Order, 815 F. Supp. 3d at 1412). The Government provided the following response:

> This case, if affirmed, will not stand for the proposition that petitioners could sneak products that cannot cause injury into an order simply by including them in proposed scope language that also includes products causing significant injury. This is because, in every case, Commerce analyzes the petitioner's proposed language and the relevant evidence to determine the scope, ensuring that the scope language is not 'overly broad, insufficiently specific or defective.'

Gov't OAQ Resp. at 6–7 (citation omitted). Nevertheless, Commerce has not provided an adequate analysis explaining why the petitioner's proposed scope language to include attached

FRCs is not "overly broad". M S Int'l, 32 F.4th at 1151; see generally Remand Results.

The court continues to see masking as a potential concern because Commerce's scope determination sets the parameters of the Commission's material injury determination. The Commission could not, and did not, alter the scope of the investigations when it evaluated whether imported FRCs injured the domestic industry by reason of importation. See Commission Views at 5, 27–28. Therefore, the inclusion of both attached and unattached FRCs in the scope underlying the Commission's material injury determination could mask that attached FRCs cannot cause injury by reason of importation, as Wabtec alleges.

**CONCLUSION**

In sum, Commerce does not adequately address Wabtec's argument that attached FRCs should not be in the scope of the investigations because FRCs attached in Mexico cannot cause injury "by reason of import[,]" and thus do not create a cognizable injury under the antidumping and countervailing remedial schemes. 19 U.S.C. §§ 1673d(b)(1), 1671d(b)(1). Moreover, the materials Commerce used to justify including attached FRCs in the scope of investigations do not sufficiently support its determinations. Finally, Commerce's Remand Results do not satisfactorily address the court's concern that petitioners could engage in masking by sneaking products that cannot cause injury by reason of import into antidumping and countervailing duty orders by including them in proposed scope language alongside products that do cause injury. Accordingly, the court holds that Commerce's Remand Results are not supported by substantial evidence and not in accordance with law. The court remands Commerce's Remand Results for reconsideration or further explanation as to whether attached FRCs should be excluded from the scope of the antidumping and countervailing duty investigations of FRCs from China and Mexico.[16] It is

[16] If Commerce alters its scope determination on remand, then the Commission may need to reconsider its final material injury determination using the revised scope. See Ad Hoc Shrimp,

hereby:

**ORDERED** that Commerce is instructed to reconsider or further explain whether to modify the scope language to exclude attached FRCs, and it is further

**ORDERED** that Commerce shall file its second remand redetermination with the court within ninety days of the date of this opinion. The timeline for filings and comments regarding the remand redetermination shall proceed according to USCIT Rule 56.2(h).

**SO ORDERED**.

*/s/ Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: October 8, 2026
New York, New York

515 F.3d at 1383 n.8 ("Commerce argues convincingly that the statutorily mandated procedures apply to an amended fair value determination that changes the scope of the investigation, and accordingly, that if Commerce amended its final determination to include [merchandise], the [Commission] would reconsider its final material injury determination as part of its routine obligation . . . .").